No. 25-1188

_____

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

JOSHUA DIEMERT,

Plaintiff – Appellant,

v.

THE CITY OF SEATTLE, a municipal corporation,

Defendant – Appellee.

_____

On Appeal from the United States District Court
for the Western District of Washington
Honorable Jamal N. Whitehead, District Judge

_____

## APPELLANT'S OPENING BRIEF

_____

LAURA M. D'AGOSTINO
Pacific Legal Foundation
3100 Clarendon Blvd.,
  Suite 1000
Arlington, Virginia 22201
(202) 888-6881
LDAgostino@pacificlegal.org

ANDREW R. QUINIO
ERIN E. WILCOX
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
(916) 419-7111
AQuinio@pacificlegal.org
EWilcox@pacificlegal.org

*Attorneys for Plaintiff – Appellant*

# Table of Contents

Table of Authorities ................................................................. iii

Introduction .............................................................................. 1

Statement of Jurisdiction ........................................................ 2

Statement Regarding Addendum ............................................ 3

Statement of Issues ................................................................. 3

Statement of the Case ............................................................. 4

   I.   The City's "race-first" Initiative requires employees to apply racial stereotyping in all aspects of work .................................................................. 5

     A.   Mr. Diemert's exposure to racially harassing training was frequent, not occasional............................ 9

     B.   The City required employees to internalize and apply the race-based creeds and framework of its Racial Initiative............... 10

     C.   Supervisors and coworkers repeatedly targeted Mr. Diemert based on race............................ 12

     D.   The City ignored Mr. Diemert's complaints and compromised the internal investigation...................... 14

Procedural History ................................................................ 15

Summary of the Argument ................................................... 16

Standard of Review ............................................................... 18

Argument ............................................................................... 19

   I.   The District Court failed to apply the correct standards ............. 19

  II.   The record is replete with triable issues of fact—the District Court erred in granting summary judgment........................................... 23

     A.   The City's Racial Initiative was not just training—it was a mandated, race-based workplace regime ................................. 23

     B.   Mr. Diemert was not merely "exposed" to ideas—he was targeted and harassed because of his race.............................. 26

     C.   The District Court misapplied the hostile work environment standard and ignored material facts ........................ 28

i

    1.   The conduct was racial in nature, unwelcome, and directed at Mr. Diemert ................................................................ 29

    2.   The conduct was pervasive and ongoing ................................. 30

    3.   Whether the environment was objectively hostile is a fact finder question ..................................................................... 31

   D.   The District Court misapplied the disparate treatment standard and overlooked material facts ..................................... 32

    1.   Mr. Diemert presented direct evidence of racial animus ........ 32

    2.   Even under *McDonnell Douglas*, Mr. Diemert established a prima facie case ..................................................................... 33

    3.   The City's proffered justifications are disputed and pretextual ......................................................................... 34

   E.   The District Court misapplied the retaliation standard and overlooked triable issues of fact ................................................. 36

    1.   The City violated Mr. Diemert's Family and Medical Leave Act rights after he filed EEOC charges ........................................ 36

    2.   The City favored complaints by others while dismissing Mr. Diemert's ..................................................................... 37

    3.   The City compromised its own investigation by assigning biased investigators ........................................................... 38

    4.   The District Court misconstrued the evidence and drew inferences against Mr. Diemert ............................................. 39

   F.   The District Court misapplied the constructive discharge standard and ignored ongoing discriminatory conditions ....... 39

III. The District Court failed to apply strict scrutiny to the City's use of explicit racial classifications ....................................................... 41

Conclusion................................................................................................ 44

Statement of Related Cases ................................................................... 46

Certificate of Service ............................................................................. 47

Certificate of Compliance for Briefs ...................................................... 48

Addendum

# Table of Authorities

**Page(s)**

## Cases

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) ............................................................... 43

*Ames v. Ohio Department of Youth Services,*
  145 S. Ct. 1540 (2025) ............................ 2, 16, 32, 33, 35, 42

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ..................................................... 18, 19, 20

*Brooks v. City of San Mateo,*
  229 F.3d 917 (9th Cir. 2000) ................................................ 39

*Chuang v. Univ. of Cal. Davis, Bd. of Trs.,*
  225 F.3d 1115 (9th Cir. 2000) ....................................... 19, 20

*City of Richmond v. J.A. Croson Co.,*
  488 U.S. 469 (1989) ................................................... 41, 43, 44

*Currier v. Northland Servs., Inc.,*
  182 Wash. App. 733 (2014) ................................................. 36

*EEOC v. MJC, Inc.,*
  400 F. Supp. 3d 1023 (D. Haw. 2019)................................. 38

*Fried v. Wynn L.V., LLC,*
  18 F.4th 643 (9th Cir. 2021) ................................................ 31

*Jackson v. United Parcel Serv., Inc.,*
  548 F.3d 1137 (8th Cir. 2008)............................................. 35

*Johnson v. City of Pleasanton,*
  982 F.2d 350 (9th Cir. 1992)............................................... 22

*Liggett v. Wash. State Univ.,*
  No. C13-5176 RJB, 2014 WL 793150 (W.D. Wash. Feb. 26,
  2014) ....................................................................................... 19

*Manatt v. Bank of Am., NA,*
  339 F.3d 792 (9th Cir. 2003)............................................... 28

*Maner v. Dignity Health,*
  9 F.4th 1114 (9th Cir. 2021) ............................................... 18

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ............................................................ 4, 17, 32, 33

*McGinest v. GTE Serv. Corp.*,
    360 F.3d 1103 (9th Cir. 2004) .............................................. 19

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002) ............................................................ 28, 31

*Navarro v. Block*,
    72 F.3d 712 (9th Cir. 1995) .................................................. 43

*Oyama v. Univ. of Haw.*,
    813 F.3d 850 (9th Cir. 2015) ................................................ 18

*Personnel Administrator of Massachusetts v. Feeney*,
    442 U.S. 256 (1979) ............................................................ 43

*Peterson v. Hewlett-Packard Co.*,
    358 F.3d 599 (9th Cir. 2004) ................................................ 33

*Poland v. Chertoff*,
    494 F.3d 1174 (9th Cir. 2007) .............................................. 36

*Reynaga v. Roseburg Forest Prods.*,
    847 F.3d 678 (9th Cir. 2017) ................................. 28, 30, 31, 32, 33, 35

*Sanchez v. City of Santa Ana*,
    915 F.2d 424 (9th Cir. 1990) ................................................ 39, 41

*Schnidrig v. Columbia Mach., Inc.*,
    80 F.3d 1406 (9th Cir. 1996) ................................................ 19

*Sea-Land Serv., Inc. v. Lozen Int'l, LLC*,
    285 F.3d 808 (9th Cir. 2002) ................................................ 22

*SEC v. Jasper*,
    678 F.3d 1116 (9th Cir. 2012) .............................................. 22

*Shaw v. Reno*,
    509 U.S. 630 (1993) ............................................................ 42

*Sneed v. Barna*,
    80 Wash. App. 843 (1996) .................................................. 41

*Students for Fair Admissions, Inc. v. President & Fellows of*
    *Harvard Coll.*, 600 U.S. 181 (2023) ...................................... 41, 42, 44

*Tex. Dep't of Cmty. Affs. v. Burdine*,
450 U.S. 248 (1981) ................................................................. 35

*United States v. Manibusan*,
529 F. App'x 818 (9th Cir. 2013) .......................................... 22

*Vasquez v. Atrium, Inc.*,
No. CIV. 00-1265 PHXLOA, 2002 WL 818066
(D. Ariz. Apr. 24, 2002) ......................................................... 39

*Vasquez v. Cnty. of L.A.*,
349 F.3d 634 (9th Cir. 2003) ............................................ 28, 36

*Washington v. Boeing Co.*,
105 Wash. App. 1 (2000) ......................................................... 39

*Yartzoff v. Thomas*,
809 F.2d 1371 (9th Cir. 1987) ................................................ 37

**Statutes**

28 U.S.C. § 1291 ........................................................................... 3

28 U.S.C. § 1331 ........................................................................... 2

28 U.S.C. § 1343 ........................................................................... 2

28 U.S.C. § 1367(a) ...................................................................... 2

42 U.S.C. § 2000e-2(a)(1) .......................................................... 32

42 U.S.C. § 2000e-5(f)(3) ............................................................. 2

**Rules of Court**

Fed. R. App. P. 4(a)(1) ................................................................. 3

Fed. R. Civ. P. 56(a) ................................................................... 18

**Other Authorities**

Seattle Channel, *Seattle's Race and Social Justice Initiative
Turns 20* (YouTube, Oct. 4, 2024),
https://www.youtube.com/watch?v=95sgOS4nPpY ............................. 6

## Introduction

The District Court denied Appellant Joshua Diemert the opportunity to present his claims at trial by granting summary judgment in the City of Seattle's favor. In doing so, the court applied the wrong legal standards, resolved disputed facts in favor of the moving party, and failed to subject the City's race-based policies to the strict scrutiny the Constitution demands.

Mr. Diemert served for eight years in the City's Human Services Department, working to assist Seattle's most vulnerable residents. But as the City's official Race and Social Justice Initiative ("Racial Initiative" or "RSJI") took hold, the City subjected Mr. Diemert to relentless racial harassment, compelled participation in race-segregated trainings, and eventually retaliation for raising concerns. When he reported that City policy encouraged employees to "lead with race" and divided them into "white oppressors" and "BIPOC oppressed," he was told—repeatedly—that "white people can't experience racial discrimination." That message came not just from coworkers and supervisors, but ultimately from the District Court itself. 1-ER-0003. ("[H]istory and common sense tell us: instances of discrimination against the majority are rare and unusual.").

1

But Title VII and the Constitution forbid racial discrimination in all forms and against all individuals. As the Supreme Court recently reaffirmed in *Ames v. Ohio Department of Youth Services*, Title VII "focus[es] on individuals rather than groups" and applies equally regardless of race. 145 S. Ct. 1540, 1546 (2025). No heightened showing is required just because a plaintiff is white.

This Court should reverse. The District Court disregarded controlling precedent, failed to apply the correct summary judgment standards, and excused an official City policy that openly classifies, segregates, and punishes employees based on race. Mr. Diemert is entitled to a trial on his claims of equal protection violation, hostile work environment, disparate treatment, retaliation, and constructive discharge.

## Statement of Jurisdiction

The District Court had subject matter jurisdiction over Mr. Diemert's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 2000e-5(f)(3). The District Court also had supplemental jurisdiction to adjudicate Mr. Diemert's Washington Law Against Discrimination claims pursuant to 28 U.S.C. § 1367(a). The events,

parties, witnesses, and injuries that form the basis of his Title VII claims are the same or related to the events, parties, witnesses, and injuries that form the basis of the Washington Law Against Discrimination claims.

Appellate jurisdiction is invoked under 28 U.S.C. § 1291 as this is an appeal from the final judgment disposing of all claims. Specifically, on February 10, 2025, the District Court granted summary judgment in favor of the City of Seattle, thereby disposing of Mr. Diemert's claims. *See* 1-ER-0047; 28 U.S.C. § 1291. Mr. Diemert timely filed his notice of appeal on February 24, 2025. 5-ER-1018; *see also* Dkt. No. 2.1; Fed. R. App. P. 4(a)(1).

## Statement Regarding Addendum

An addendum reproducing relevant constitutional and statutory provisions is bound with this brief.

## Statement of Issues

1. Did the District Court err in granting the City summary judgment by resolving disputed facts, drawing inferences in favor of the City, and weighing evidence—contrary to Federal Rule of Civil Procedure 56?

2. When the evidence is viewed in the light most favorable to Mr. Diemert, could a reasonable factfinder conclude that he was

subjected to race-based discrimination, harassment, and retaliation in violation of the Equal Protection Clause, Title VII, and the Washington Law Against Discrimination?

3. Did the District Court err by treating the City's Race and Social Justice Initiative as presumptively lawful without applying strict scrutiny to its race-based classifications?

4. Did the District Court misapply the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), framework in rejecting Mr. Diemert's disparate treatment claim?

## Statement of the Case

Joshua Diemert spent eight years serving vulnerable residents as a Program Intake Representative in Seattle's Human Services Department. 2-ER-0050, 0057–0058 (Diemert Decl. ¶¶ 3, 27, 30); 2-ER-0070, 0208 (D'Agostino Decl. ¶ 9, Ex. 8 at 60). As the City implemented its Racial Initiative, Mr. Diemert became the subject of escalating racial harassment and discrimination. *See generally* 2-ER-0050–0068 (Diemert Decl.). When he reported the conduct, his concerns were dismissed—often with the refrain that "white people can't experience racial discrimination." *See* 2-ER-0053–0055, 0057–0059, 0063 (Diemert Decl.

4

¶¶ 15, 21, 27, 32, 33, 48); 2-ER-0070, 0258 (D'Agostino Decl. ¶ 10, Ex. 9 at 3); 3-ER-00475–0478 (D'Agostino Decl. ¶ 36, Ex. 35); 4-ER-0736, 0749:18–24, 0750:1–16, 0758:6–13 (Slade Decl. ¶ 2, Ex. A at 39:18–24; 41:1–16; 49:6–13).

## I. The City's "race-first" Initiative requires employees to apply racial stereotyping in all aspects of work

The Racial Initiative is a city-wide policy that applies across departments and directs employees to "lead with race." 2-ER-0056–0057, 0070–0071, 0261, 0275–0276, 0310 (Diemert Decl. ¶ 26, D'Agostino Decl. ¶ 10, Ex. 9 at 6, 20, 21, 55); 3-ER-0390–0391 (D'Agostino Decl. ¶ 19, Ex. 18 at 15); 4-ER-0694–0712 (Groce Decl. ¶ 10, Ex. D at 68–86). Its implementation includes racially segregated trainings, race-focused "change teams," race-specific work plans and caucuses, and the use of race-based evaluation tools, like the Racial Equity Toolkit. 2-ER-0054–0062, 0067 (Diemert Decl. ¶¶ 16–18, 22–24, 27, 29–30, 32–36, 38, 40, 43, 47, 64); 2-ER-0070–0073, 0261, 0273, 0276, 0290–0303; 3-ER-0397, 0399, 0453–0456, 0465–0474, 0480–0495 (D'Agostino Decl. ¶ 10, Ex. 9 at 6, 18, 21, 36–48; ¶ 21, Ex. 20; ¶ 22, Ex. 21; ¶ 31, Ex. 32; ¶ 35, Ex. 34 at 2–11; ¶ 37, Ex. 36); 4-ER-0630–0632, 0638–0713, 0726–0730 (Groce Decl. ¶ 8, Ex. B; ¶ 9, Ex. C; ¶ 10, Ex. D; ¶ 15, Ex. J); 5-ER-0893 (Plaintiff's First

5

Amended Complaint, Ex. 9 at 6).[1] The City's first Racial Initiative manager described the process candidly:

> We asked all the white people to go in one room and all the people of color go in another room . . . . Well, the white people got in the room and just talked about their fear, and the black people got in the room and talked about how glad they weren't the white people.[2]

The Racial Initiative includes employee trainings targeted to specific racial groups, trainings that use racially charged language or normalize discriminatory language about "white" employees, racially

---

[1] *See also* City of Seattle, *RSJI Teams and Structure*, www.seattle.gov/documents/Departments/RSJI/RSJI-Org-Chart.pdf (last visited July 7, 2025).

[2] Seattle Channel, *Seattle's Race and Social Justice Initiative Turns 20*, (YouTube, Oct. 4, 2024), https://www.youtube.com/watch?v=95sgOS4nPpY. *See also* https://www.seattle.gov/rsji/rsji-summit/2024-rsji-summit#OpeningRemarks. One of the speakers at the 2024 Racial Initiative Summit was Mary Flowers—who once stated in a workplace conversation that "our job in America has been to take care of white people and make sure they are always comfortable and never threatened . . . we have internalized that White people are in charge of this country and our occupancy . . . whether . . . America or HSD depends upon the approval of white people . . . white people no matter what their station have been conditioned to think they are always in charge and they have a right to comfort and safety . . . ." 2-ER-0073 (D'Agostino Decl. ¶ 34), 3-ER-0457–0463 (Ex. 33). Former Human Services Department Employee Jennifer Yost also details Ms. Flowers' racially discriminatory conduct towards white employees. 2-ER-0073 (D'Agostino Decl. ¶ 35), 3-ER-0469 (Ex. 34 at 6).

segregated workplace meetings, single-race employee caucuses and affinity groups, and it applauds reducing the number of white employees across the City.[3] 2-ER-0054–0061 (Diemert Decl. ¶¶ 16–35, 40–43); 2-ER-0070, 0072–0073, 0084–0118, 0135, 0239, 0258, 0282, 0284, 0295–0300; 3-ER-0405–0411, 0458–0463, 0465–0474, 0480–0495 (D'Agostino Decl. ¶ 5, Ex. 4; ¶ 6, Ex. 5; ¶ 7, Ex. 6; ¶ 8, Ex. 7 at 17; ¶ 9, Ex. 8 at 91; ¶ 10, Ex. 9 at 3, 27, 29, 40–45; ¶ 23, Ex. 22; ¶ 34, Ex. 33; ¶ 37, Ex. 36); 4-ER-0630–0632, 0638–0713, 0726–0730 (Groce Decl. ¶ 8, Ex. B; ¶ 9, Ex. C; ¶ 10, Ex. D; ¶ 15, Ex. J); 4-ER-0736, 0739, 0785, 0816–0819 (Slade Decl. ¶ 4, Ex. C at 135; ¶ 19, Ex. R at 382–385); 5-ER-0859–1003 (Pl's. First Am. Compl., Exs. 7–15).

Participation in Racial Initiative activities was not optional. 2-ER-0059 (Diemert Decl. ¶ 36); 2-ER-0070, 0149–0255 (D'Agostino Decl. ¶ 9, Ex. 8). Employees were evaluated on whether they embraced and applied its race-based messaging, and the expectations varied depending on the

---

[3] The District Court held that "all caucuses are open to any City employee regardless of racial identity"—a position the City has taken throughout this lawsuit. 1-ER-0007. The record and the City's own 30(b)(6) witness contradict this assertion and the Court's holding on this disputed material fact. *See* 2-ER-0073 (D'Agostino Decl. ¶ 37), 3-ER-0479–0495 (Ex. 36); 4-ER-736 (Slade Decl. ¶ 2, Ex. A at 16–17).

employee's race. *See generally* 2-ER-0070, 0149–0255 (D'Agostino Decl.

¶ 9, Ex. 8); 4-ER-0630–0631, 0703, 0718 (Groce Decl. ¶ 10, Ex. D at 77;

¶ 14, Ex. I at 116). The RSJI required employees to attend racially

segregated trainings, adopt a "racial equity lens" in evaluating coworkers

and clients, and directed employees to participate in single-race affinity

groups for advancement and promotion opportunities.[4] 2-ER-0057–0059,

0068 (Diemert Decl. ¶¶ 27, 30–34, 65); 2-ER-0070, 0072, 0177, 0188–

0190, 0239, 0257–0315; 3-ER-0405–0411 (D'Agostino Decl. ¶ 9, Ex. 8 at

29, 40–42, 91; ¶ 10, Ex. 9; ¶ 23, Ex. 22); 4-ER-0630–0632, 0638–0667,

0670, 0674, 0676–0677, 0680–0691, 0694–0713, 0726–0730 (Groce Decl.

¶ 8, Ex. B; ¶ 9, Ex. C at 44, 48, 50–51, 54–65; ¶ 10, Ex. D; ¶ 15, Ex. J); 4-

ER-0736–0737, 0742–0743, 0763–0774, 0782, 0793 (Slade Decl. ¶ 2,

Ex. A at 16–17; ¶ 3; Ex. B at 86–95, 107–108; ¶ 4, Ex. C at 127:18–24;

¶ 8, Ex. G at 202).

---

[4] Employees could participate in the single-race affinity groups to fulfill their yearly RSJI training requirement. *See* 4-ER-0630 (Groce Decl. ¶ 7); 4-ER-0737, 0789–0790 (Slade Decl. ¶ 7, Ex. F at 181–182).

## A. Mr. Diemert's exposure to racially harassing training was frequent, not occasional

Contrary to the District Court's findings, Mr. Diemert was subjected to far more than two RSJI-related trainings per year. 1-ER-0005; 2-ER-0056, 0059–0061 (Diemert Decl. ¶¶ 25, 36, 39–41); 2-ER-0070, 0257–0315 (D'Agostino Decl. ¶ 10, Ex. 9); 4-ER-0736–0737, 0750–0754, 0757, 0759–0760, 0790 (Slade Decl. ¶ 2, Ex. A at 41–45, 48, 50, 52; ¶ 7, Ex. F at 182). In addition to those trainings, the Human Services Department required three more race-focused sessions for its employees. *See* 2-ER-0070, 0285 (D'Agostino Decl. ¶ 10, Ex. 9 at 30); 4-ER-0630, 0636 (Groce Decl. ¶ 6, Ex. A at 10). City managers and supervisors also had the discretion to mandate further training. 4-ER-0737, 0790 (Slade Decl. ¶ 7, Ex. F at 182). Racial Initiative programming permeated workplace meetings, conversations, evaluations, and expectations for performance. 2-ER-0055–0057, 0061–0062 (Diemert Decl. ¶¶ 21–24, 27, 44–46); 2-ER-0070–0074, 0084–0092, 0120–0148, 0257–0315, 0349–0358, 0393–0395, 0399–0411, 0480–0495, 0511–0618 (D'Agostino Decl. ¶ 5, Ex. 4; ¶ 6, Ex. 5; ¶ 8, Ex. 7; ¶ 10, Ex. 9; ¶ 15, Ex. 14; ¶ 20, Ex. 19; ¶ 22, Ex. 21; ¶ 23, Ex. 22; ¶ 37, Ex. 36; ¶ 41, Ex. 40; ¶ 42, Ex. 41). 4-ER-0738, 0804–0808 (Slade Decl. ¶ 14, Ex. M at 323–327).

9

Mr. Diemert asked multiple times to be excluded from Racial Initiative trainings but was never given clear permission.[5] *See* 2-ER-0060 (Diemert Decl. ¶ 37); 4-ER-0631, 0715–0724 (Groce Decl. ¶ 14, Ex. I). The City continued to require that he act "equitably" as defined under the Initiative. 4-ER-0630–0631, 0703, 0718 (Groce Decl. ¶¶ 10, 14, Exs. D at 77, I at 116).[6] His evaluations reflected that expectation through 2021, as he continued to experience racial hostility and retaliation. 2-ER-0060 (Diemert Decl. ¶ 37); 2-ER-0070, 0239, 0243–0244 (D'Agostino Decl. ¶ 9, Ex. 8 at 91, 95–96).

## B. The City required employees to internalize and apply the race-based creeds and framework of its Racial Initiative

The City's Racial Initiative trainings introduced the "race first" mentality the City expected all its employees to adopt. 2-ER-0055–0057,

---

[5] In 2019, Mr. Diemert's supervisor excused him for failing to meet his training requirement because he had periods of absence from work and was working part-time due to his Family Medical Leave Act (FMLA) leave. 2-ER-0060 (Diemert Decl. ¶ 37). Between 2020 and 2021, the requirement to participate in Racial Initiative trainings remained, but classes were cancelled either due to COVID or the ongoing Department of Justice investigation into the City's trainings. *Id.*; *see also* https://embed.documentcloud.org/documents/7203169-Seattle-Notice-Ltr-8-26-20-viaEmail/.

[6] Mr. Diemert's exchange with Mr. Groce occurred in 2021—after Mr. Diemert had filed his Equal Employment Opportunity Commission (EEOC) charges.

0060 (Diemert Decl. ¶¶ 21, 25–26, 37); 2-ER-0072–0073, 3-ER-0414, 0417, 0465–0474, 0478, 0480–0495 (D'Agostino Decl. ¶ 24, Ex. 23 at 11; ¶ 35, Ex. 34; ¶ 36, Ex. 35 at 4; ¶ 37, Ex. 36); 4-ER-0630–0632, 0638–0713, 0726–0730 (Groce Decl. ¶¶ 8–10, 15 Exs. B–D, J). Racial Initiative trainings instructed employees to adopt "a racial equity lens" that treated "white" employees as inherently oppressive and privileged. 4-ER-0630, 0662, 0669–0692 (Groce Decl. ¶ 8, Ex. B at 36; ¶ 9, Ex. C). One colleague remarked, "I honestly believe white people have their souls sucked out of them . . . ." 2-ER-0070, 0090. The Race Initiative warned against "colorblindness" and framed such perspectives as "centering whiteness" and "resisting multiculturalism." 4-ER-0630, 0695, 0703 (Groce Decl. ¶ 10, Ex. D at 69, 77). RSJI materials labeled basic professional traits— punctuality, individualism, sense of urgency, perfectionism—as "white supremacy culture." *Id.*; 2-ER-0070, 0094–0118 (D'Agostino Decl. ¶ 7, Ex. 6).

The message Mr. Diemert received, again and again, was that racism was intrinsic to his race. 2-ER-0056–0057 (Diemert Decl. ¶¶ 23–27); 2-ER-0070–0074, 0076–0082, 0085–0148, 0257–0315, 0321–0326; 3-ER-0359–0368, 0397, 0405–0411, 0458–0463, 0480–0495, 0620–0627

11

(D'Agostino Decl. ¶ 4, Ex. 3; ¶ 6, Ex. 5; ¶ 7, Ex. 6; ¶ 8, Ex. 7; ¶ 10, Ex. 9; ¶ 13, Ex. 12; ¶ 16, Ex. 15, ¶ 21, Ex. 20, ¶ 23, Ex. 22; ¶ 34, Ex. 33; ¶ 37, Ex. 36; ¶ 40, Ex. 39; ¶ 42, Ex. 41. One training he attended declared, "racism is in white people's DNA," and described white people as "like the devil." 2-ER-0061 (Diemert Decl. ¶ 42).

### C. Supervisors and coworkers repeatedly targeted Mr. Diemert based on race

Mr. Diemert experienced direct racial harassment and witnessed similar conduct toward others. The City revoked his lead role because of his "white privilege." 2-ER-0054–0055 (Diemert Decl. ¶¶ 16–19). A supervisor[7] physically threatened him because of his race. 2-ER-0062 (Diemert Decl. ¶ 47). The City dismissed complaints he made to Human

---

[7] Shamsu Said is a supervisor that racially harassed and physically accosted Mr. Diemert in the workplace. 2-ER-0062–0063 (Diemert Decl. ¶¶ 47–48). The District Court held: "In his briefing, Diemert writes that Said 'chest bumped' him, *see* Dkt. Nos. 22 at 7; 74-1 at 3, but nowhere in Diemert's declaration or deposition transcript does he allege that Said 'chest bumped' him." 1-ER-0010. The District Court further noted that, "in a contemporaneously drafted email . . . Diemert described the interaction in starkly different terms—he made no mention of race and did not allege Said acted in a physically threatening manner." 1-ER-0032–0033. No shift has occurred in Mr. Diemert's account. Rather, the District Court resolved this factual dispute despite the City omitting the portion of Mr. Diemert's deposition testimony where he details *why* he omitted references to the racial and physical harassment he experienced at the hands of Mr. Said.

Resources, City directors, managers, and his colleagues on the basis that "white people can't experience discrimination."[8] 2-ER-0054, 0057–0058, 0062–0063, 0065 (Diemert Decl. ¶¶ 17, 27, 32, 47–50, 55); 2-ER-0070, 0073, 0257–0315, 3-ER-0477–0478 (D'Agostino Decl. ¶ 10, Ex. 9; ¶ 36, Ex. 35). And the City treated him worse[9] because he filed an Equal Employment Opportunity Commission ("EEOC") charge. 2-ER-0063–0064 (Diemert Decl. ¶¶ 48–50); 2-ER-0071, 0328–0346 (D'Agostino Decl. ¶ 14, Ex. 13). He observed management deny benefits to a white applicant due to presumed "white privilege," discuss race-based layoffs, and circulate discriminatory communications. 2-ER-0056–0058, 0060 (Diemert Decl. ¶¶ 24–29, 31, 37); 2-ER-0070, 0094–0118 (D'Agostino Decl. ¶ 7, Ex. 6); 4-ER-0737, 0795–0802 (Slade Decl. ¶ 9, Ex. H); 5-ER-0873–0887, 1002–1003 (Plaintiff's First Amended Complaint, Exs. 8, 15).

---

[8] In the years leading up to his EEOC filing, Mr. Diemert relayed the discrimination he was experiencing to Andi Morales, Brian Sharkey, Chaney Kilpatrick-Goodwill, Gloria Hatcher-Mays, and others within his department. *See* 2-ER-0057, 0062–0065 (D'Agostino Decl. ¶¶ 27, 47, 55).
[9] The District Court held that Chanel Kilpatrick-Goodwill, one of Mr. Diemert's supervisors, did not single him out for punishment. This is plainly another disputed fact resolved against Mr. Diemert, as Mr. Diemert's colleagues believe he was. *See* 2-ER-0071 (D'Agostino Decl. ¶ 14); 2-ER-0327 (Ex. 13).

13

### D. The City ignored Mr. Diemert's complaints and compromised the internal investigation

Despite raising concerns throughout his employment, Mr. Diemert's complaints were ignored until he filed EEOC charges in 2020. *See* 2-ER-0053, 0055, 0057–0058, 0062, 0065 (Diemert Decl. ¶¶ 15, 19, 27, 30, 32, 47, 55); 2-ER-0070, 0072, 0075–0082; 3-ER-0420–0443 (D'Agostino Decl. ¶ 4, Ex. 3; ¶ 26, Ex. 25). When the City finally initiated an internal investigation of Mr. Diemert's complaints, it assigned two investigators—Brandan Kuykendall and Christy Kuna[10]—who were both active members of the RSJI "change team" responsible for implementing the very policies Mr. Diemert had challenged. 2-ER-0066 (Diemert Decl. ¶ 57); 2-ER-0071, 0073, 0321–0326; 3-ER-0508 (D'Agostino Decl. ¶¶ 13, 39, Exs. 12, 38 at 7). They failed to interview key witnesses and absolved the City of wrongdoing. 2-ER-0066 (Diemert Decl. ¶ 57); 2-ER-0074; 3-ER-0497–0506 (D'Agostino Decl. ¶ 38, Ex. 37). Mr. Diemert ultimately resigned in 2021, citing ongoing racial hostility, retaliation, and the City's refusal to correct its practices. 4-ER-0633, 0734 (Groce Decl. ¶ 21, Ex. O at 159).

---

[10] Christy Kuna never reached out to Mr. Diemert to gather information. 2-ER-0060 (Diemert Decl. ¶ 39); 3-ER-0508–0509 (Ex. 38 at 7–8).

## Procedural History

On December 23, 2020, Mr. Diemert filed a charge of retaliation and discrimination on the basis of race, color, sex, and national origin with the EEOC (No. 551-2020-04009) and amended it on January 16, 2021. 5-ER-0826 (Plaintiff's First Amended Complaint, ¶¶ 15–25). On June 30, 2022, he filed a second EEOC charge (No. 551-2022-05568), detailing continuing acts of discrimination through September 7, 2021. *Id.*

After receiving Notices of Right to Sue on both charges, Mr. Diemert filed this action. *Id.* He filed a First Amended Complaint on January 19, 2023, alleging that the City subjected him to a hostile work environment, disparate treatment, and retaliation based on his race in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title VII of the Civil Rights Act, and the Washington Law Against Discrimination. *Id.*

On August 16, 2024, the City moved for summary judgment on all Mr. Diemert's claims. The Court held a hearing on the City's motion on October 31, 2024. 5-ER-1004 (Summ. J. Tr.). On February 10, 2025, the Court granted the City summary judgment on all of Mr. Diemert's

15

claims.1-ER-2. Mr. Diemert subsequently filed his timely notice of appeal to this Court on February 24, 2025. 5-ER-1018.

## Summary of the Argument

Title VII and the Equal Protection Clause protect individuals—regardless of race—from workplace discrimination. The District Court erred by imposing a higher burden on Mr. Diemert because he is white, holding that discrimination against "the majority" must be "rare and unusual" to be actionable. That is not the law. As the Supreme Court made clear in *Ames*, Title VII "focus[es] on individuals rather than groups" and does not allow courts to create heightened barriers for majority-group plaintiffs. *Ames*, 145 S. Ct. at 1546.

The District Court did exactly what *Ames* forbids: it imposed a heightened burden on Mr. Diemert because of his race, requiring him to prove that his case was "rare and unusual" to survive. But the Supreme Court made clear that Title VII applies equally to all individuals and that "judge-made" hurdles for majority plaintiffs are invalid. *Ames*, 145 S. Ct. at 1548–49 (Thomas, J., concurring). The ruling below cannot stand under that standard.

The District Court's decision should be vacated for four independent reasons:

1. The court applied the wrong summary judgment standard. It resolved disputed facts, made credibility determinations, and drew inferences in favor of the City—all in violation of Federal Rule of Civil Procedure 56 ("Rule 56").

2. It ignored genuine issues of material fact. The record is replete with triable disputes regarding the City's discriminatory policies, the hostile work environment Mr. Diemert endured, and the retaliatory actions taken against him.

3. It misapplied the *McDonnell Douglas* framework. *McDonnell Douglas Corp.*, 411 U.S. at 792. The court failed to credit direct evidence of discrimination, applied an improperly heightened standard, and overlooked the evidentiary disputes that preclude summary judgment on Mr. Diemert's disparate treatment claims.

4. It failed to apply strict scrutiny. The City's Race and Social Justice Initiative employs explicit racial classifications, yet the District Court treated it as presumptively lawful without the

constitutional analysis required for race-based government action.

For these reasons, this Court should reverse the District Court's judgment and remand for trial on Mr. Diemert's claims under the Equal Protection Clause, Title VII, and the Washington Law Against Discrimination.

## Standard of Review

This Court reviews the District Court grant of summary judgment de novo. *Maner v. Dignity Health*, 9 F.4th 1114, 1119 (9th Cir. 2021) (citing *Oyama v. Univ. of Haw.*, 813 F.3d 850, 860 (9th Cir. 2015)). Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In making that determination, the court must view the evidence in the light most favorable to the non-moving party, draw all justifiable inferences in that party's favor, and refrain from making credibility determinations or weighing the evidence. *Id.* at 255.

This standard applies with special force in employment discrimination cases, where intent is often proven through

circumstantial evidence. *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004). *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). Courts must "zealously guard an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *Liggett v. Wash. State Univ.*, No. C13-5176 RJB, 2014 WL 793150, at *5 (W.D. Wash. Feb. 26, 2014) (citing *McGinest*, 360 F.3d at 1112).

"[A] plaintiff in an employment discrimination case need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang*, 225 F.3d at 1124 (quoting *Schnidrig*, 80 F.3d at 1410. The ultimate question—whether discrimination occurred—is one best resolved by the factfinder upon a full record.

## Argument

## I. The District Court failed to apply the correct standards

Summary judgment is appropriate only when there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. *Anderson*, 477 U.S. at 250–52. In assessing a motion for summary judgment, courts must draw all justifiable inferences in favor

of the non-moving party, refrain from making credibility determinations, and avoid weighing the evidence. *Id.* at 255. The District Court failed to do any of these things.

Instead, the court repeatedly drew inferences in the City's favor, ignored disputed facts, and made credibility determinations without hearing testimony. That is reversible error. *Chuang*, 225 F.3d at 1124 ("The ultimate question . . . is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder.").

At the October 31, 2024, hearing, Mr. Diemert's counsel highlighted multiple disputed material facts: whether the City excluded employees from racial caucuses based on race; whether the RSJI trainings were mandatory; whether supervisor Shamsu Said physically threatened Mr. Diemert; whether supervisor Chaney Kilpatrick Goodwill retaliated by canceling her meetings with Mr. Diemert after he filed his EEOC charges; and whether the City interfered with Mr. Diemert's FMLA rights. 5-ER-1004, 1008–1009:20, 1012:14–22; 1014:11–18; 1016:1–4. The briefing included many more. *See* 2-ER-0050–0074 (Diemert Decl. and D'Agostino Decl.). The District Court acknowledged the facts—but

then ignored them, adopting the City's version of events without the benefit of testimony from any of the individuals involved. *See* 1-ER-0005–07, 0011–0013, 0022, 0029–0030.

Worse, the court made credibility determinations without hearing from Mr. Diemert, concluding that Mr. Diemert "relished the opportunity to express a contrarian view." *See* 1-ER-0011, 0022, 0028–0030, 0036–37, 0039–0042, 0044–0045. Such credibility determinations must be reserved for trial.

The District Court also improperly excluded evidence. It granted the City's request—made for the first time in its reply brief—to strike Exhibits 6 and 36[11] to the D'Agostino Declaration.[12] The court claimed that the materials included in Exhibit 6 were not properly authenticated because the materials did not reference the RSJI and that Mr. Diemert provides no other information about it in his declaration. 1-ER-0015–

---

[11] Mr. Diemert had initially filed Exhibit 36 under seal but withdrew his motion after further discussion with the City at the summary judgment hearing. *See* 5-ER-1007 (Summ. J. Tr. at 4:1–11).

[12] Exhibit 6 is a true and accurate copy of an example of the types of materials regularly disseminated within Mr. Diemert's work environment. 2-ER-0056–0057 (Diemert Decl. ¶ 26). Exhibit 36 is an excerpt of the City's internal documentation regarding complaints of racial discrimination, harassment, and retaliation. 2-ER-0073 (D'Agostino Decl. ¶ 37).

0016. But this is incorrect. Not only are there references to RSJI (2-ER-0070 (D'Agostino Decl. ¶ 7), 2-ER-0094 (Ex. 6 at 2)), but there are references to the City, to its "API" or "Asian Pacific Islander" Caucus, and a portion of the documents even have the identifier the City stamped on them when they produced them as public records to Mr. Diemert. *See* 2-ER-0070 (D'Agostino Decl. ¶ 7), 2-ER-0094 (Ex. 6). Moreover, Mr. Diemert affirms these documents are ones "regularly disseminated within the workplace." *See* 2-ER-0056–0057 (Diemert Decl. ¶ 26).

As for Exhibit 36, the court considered the exhibit only "insofar as it shows that discrimination complaints were filed," dismissing the rest as "inadmissible hearsay." 1-ER-0019. But the court itself had ordered the City to produce this exhibit in discovery. Dkt. No. 52 at 7–9 (District Court Order granting in part and denying in part Parties' Expedited Joint Motion for Discovery). It falls squarely within the public records and business records exceptions and includes party admissions. *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir. 1992); *Sea-Land Serv., Inc. v. Lozen Int'l, LLC*, 285 F.3d 808, 819 (9th Cir. 2002); *United States v. Manibusan*, 529 F. App'x 818, 819 (9th Cir. 2013); *SEC v. Jasper*, 678

F.3d 1116, 1122 (9th Cir. 2012). Excluding it—and then faulting Mr. Diemert for lacking corroboration—was clear error.

In short, the District Court failed to apply the basic requirements of Rule 56. It resolved factual disputes, discredited the non-moving party, and ignored or excluded relevant evidence. This alone warrants reversal.

## II. The record is replete with triable issues of fact—the District Court erred in granting summary judgment

Summary judgment is inappropriate where genuine issues of material fact remain. Here, the record contains substantial evidence that Mr. Diemert was subjected to a hostile work environment, disparate treatment, and retaliation based on race. The District Court erred by resolving these disputes in favor of the City and dismissing the facts as mere exposure to DEI principles. That characterization ignores the depth and breadth of the race-based conduct Mr. Diemert endured.

### A. The City's Racial Initiative was not just training—it was a mandated, race-based workplace regime

The City's Race and Social Justice Initiative was more than a diversity program. The record shows that it was a mandatory policy framework that instructed employees to "lead with race" and embedded race-based expectations into every aspect of City employment. 2-ER-

0056–0057 (Diemert Decl. ¶ 26); 2-ER-0070–0071, 0261, 0275–0276, 0310, 3-ER-0391 (D'Agostino Decl. ¶ 10, Ex. 9 at 6, 20–21, 55; ¶ 19, Ex. 18 at 15); 4-ER-0630, 0694–0712 (Groce Decl. ¶ 10, Ex. D at 68–86). The Racial Initiative is meant to change "the fundamental nature of local government" and to embed "racial equity and social justice principles" into City "programs, budgets, and culture."[13] 4-ER-0630–0631, 0638–0713, 0726–0730 (Groce Decl. ¶¶ 8–10, 15 Exs. B–D, J).

The City assigned roles and responsibilities to employees based on their race. 2-ER-0054–0055, 0058–0059 (Diemert Decl. ¶¶ 17–19, 29–31, 33). The City segregated trainings, telling white employees to reflect on their privilege while BIPOC employees discussed internalized oppression. 2-ER-0067 (Diemert Decl. ¶ 63); 4-ER-0736, 0777–0786 (Slade Decl. ¶ 4, Ex. C at 116, 120–121, 123–124, 127–128, 130, 136); 4-ER-0630–0631, 4-ER-0637–0713, 0725–0730 (Groce Decl. ¶¶ 8–10, 15 Exs. B–D, J). Participation was not optional. 4-ER-0630–0631, 4-ER-0637–0730 (Groce Decl. ¶¶ 8–10, 14–15, Exs. B–D, I–J). The City evaluated employees based on how well they internalized and advanced

---

[13] *See also* City of Seattle, *RSJI Teams and Structure*, www.seattle.gov/documents/Departments/RSJI/RSJI-Org-Chart.pdf (last visited July 7, 2025).

the Racial Initiative's "equity" framework, with expectations varying based on racial identity. *See* 2-ER-0060–0061 (Diemert Decl. ¶¶ 40–43); 2-ER-0070, 0150–0255 (D'Agostino Decl. ¶ 9, Ex. 8); 4-ER-0630–0631, 0703, 0718 (Groce Decl. ¶ 10, Ex. D at 77; ¶ 14, Ex. I at 116).

The Racial Initiative extended far beyond formal trainings. 4-ER-0736, 0743–0751, 0754–0758, 0760 (Slade Decl. ¶ 2, Ex. A at 17, 20, 29–30, 37–39, 41–42, 45, 47–49, 52); 4-ER-0630–0631, 4-ER-0637–0725 (Groce Decl. ¶¶ 8–10, 14–15, Exs. B–D, I–J). It shaped work meetings, evaluations, daily expectations, and internal communications. *Id.*; 2-ER-0055–0057, 0061–0062 (Diemert Decl. ¶¶ 21–24, 27, 44–46). It taught employees that colorblindness was a form of racial evasion, that individualism and punctuality were signs of "white supremacy culture," and that "racism is in white people's DNA." 4-ER-0630, 0695, 0703 (Groce Decl. ¶ 10, Ex. D at 69, 77); 2-ER-0061 (Diemert Decl. ¶ 42); 2-ER-0070, 0107–0118 (D'Agostino Decl. ¶ 7, Ex. 6 at 15–26).

The District Court refused to engage with this record evidence. Instead, it treated the City's Initiative as a generic DEI program—suggesting that, because other jurisdictions have upheld certain DEI trainings, Seattle's must be lawful too. *See* 1-ER-0005–0006, 0022, 0024–

25

0026. But the question is not whether DEI programs writ large are permissible—the question is whether *this* Initiative, with its explicit race-based mandates and segregated practices, created a discriminatory workplace. The record shows it did.

## B. Mr. Diemert was not merely "exposed" to ideas—he was targeted and harassed because of his race

The District Court's suggestion that Mr. Diemert's claim amounted to "passive exposure" to uncomfortable concepts misrepresents the facts. 1-ER-0026. Mr. Diemert didn't just hear about "white privilege." The City told him he had to internalize it. It required him to participate in racially segregated trainings, singled him out for scrutiny, and retaliated against him when he objected. 4-ER-0736, 0757 (Slade Decl. ¶ 2, Ex. A at 48); 2-ER-0059, 0061–0065 (Diemert Decl. ¶¶ 33–35, 43–54); 2-ER-0070–0072, 0076–0346, 3-ER-0377–0389, 0393–0411 (D'Agostino Decl. ¶¶ 4–7, Exs. 3–6; ¶¶ 8–18, 20–23, Exs. 7–17, 19–22).

When Mr. Diemert reported racial harassment—both against himself and against white clients—City staff told him, "white people can't experience discrimination." 2-ER-0057–0058 (Diemert Decl. ¶¶ 27, 32). His supervisor rescinded his lead role due to his "white privilege." 2-ER-0054–0055 (Diemert Decl. ¶¶ 16–18). Another coworker threatened him

26

physically. 2-ER-0062–0063 (Diemert Decl. ¶ 47); 2-ER-0070, 0123 (D'Agostino Decl. ¶ 8, Ex. 7 at 5). Others sent racially charged messages, mocked his objections, and forwarded internal communications denigrating white employees. 2-ER-0054–0064 (Diemert Decl. ¶¶ 17, 27, 32, 47, 49–50).

The Racial Initiative encouraged this environment. 2-ER-0054–0061 (Diemert Decl. ¶¶ 16–35, 40–43); 2-ER-0070, 0072–0073, 0084–0315; 3-ER-0405–0411, 0458–0463, 0480–0495 (D'Agostino Decl. ¶ 5, Ex. 4; ¶ 6, Ex. 5; ¶ 7, Ex. 6; ¶ 8, Ex. 7 at 17; ¶ 9, Ex. 8 at 91; ¶ 10, Ex. 9 at 3, 27, 29, 40–45; ¶ 23, Ex. 22; ¶ 34, Ex. 33; ¶ 37, Ex. 36); 5-ER-0859–1003 (Pl's First Am. Compl., Exs. 7–15); 4-ER-0736, 0739, 0785, 0816–0819 (Slade Decl. ¶ 4, Ex. C at 135; ¶ 19, Ex. R at 382–385); 4-ER-0630–0631, 4-ER-0637–0713, 0725 (Groce Decl. ¶ 8, Ex. B; ¶ 9, Ex. C; ¶ 10, Ex. D; ¶ 15, Ex. J). The City's 30(b)(6) witness admitted that the City excluded employees from certain events based on race. 2-ER-0073, 3-ER-0479–0495 (D'Agostino Decl. ¶ 37, Ex. 36). Participation in segregated "affinity groups" and racial caucuses advanced careers and satisfied annual training requirements. 4-ER-0630 (Groce Decl. ¶ 7); 4-ER-0736, 0743 (Slade Decl. ¶ 2, Ex. A at 17; ¶ 7, Ex. F at 181). These are not academic

debates or abstract disagreements. They are facts—supported by declarations, emails, deposition transcripts, and internal City documents. The District Court erred by brushing them aside and resolving any disputes over them in the City's favor.

### C. The District Court misapplied the hostile work environment standard and ignored material facts

To establish a racially hostile work environment under Title VII, a plaintiff must show: (1) he was subjected to verbal or physical conduct of a racial nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment. *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 642 (9th Cir. 2003); *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003). This is a "totality of the circumstances" inquiry. Courts consider the frequency and severity of the conduct, whether it was humiliating or physically threatening, and whether it interfered with work performance. *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 687 (9th Cir. 2017); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).

The District Court conceded that Mr. Diemert was subjected to racial conduct and that it was unwelcome—but concluded it was not

sufficiently severe or pervasive. That conclusion ignored the record and misapplied the law.

1. <u>The conduct was racial in nature, unwelcome, and directed at Mr. Diemert</u>

The City's Race and Social Justice Initiative promoted race-based division and taught that "whiteness" was synonymous with privilege, oppression, and harm. The City trained employees to view "white" employees as inherently complicit in racism. 4-ER-0630–0631, 0669–0692, 0695, 0703 (Groce Decl. ¶ 8, Ex. B at 36; ¶ 9, Ex. C at 43–66; ¶ 10, Ex. D at 69, 77). Trainers told Mr. Diemert that "racism is in white people's DNA" and that "white people are like the devil." 2-ER-0061 (Diemert Decl. ¶ 42).

The City forced Mr. Diemert to participate in racially-segregated trainings that required white employees to admit complicity and defer to BIPOC colleagues. 4-ER-0736, 0757 (Slade Decl. ¶ 2, Ex. A at 48); 4-ER-0630–0631, 4-ER-0637–0713, 0725 (Groce Decl. ¶¶ 8–10, 15, Exs. B–D, J). The City removed him from a leadership role due to his "white privilege," told his discrimination complaints were invalid because of his race, and he was physically threatened by a supervisor. 2-ER-0054, 0057–0058, 0062–0064 (Diemert Decl. ¶¶ 17, 27, 32, 47, 49–50).

29

2. <u>The conduct was pervasive and ongoing</u>

The District Court downplayed this conduct as "[p]assive exposure" to difficult ideas. 1-ER-0026. But Mr. Diemert's experience was not academic. His supervisors and coworkers applied the Racial Initiative's teachings to justify discriminatory behavior, deny him advancement, and retaliate when he objected. 4-ER-0736, 0740–0786 (Slade Decl. ¶¶ 2, 4, Exs. A, C); 2-ER-0070, 0073, 0083–0118, 3-ER-0457–0474 (D'Agostino Decl. ¶¶ 5–6, 34–35, Exs. 4–5, 33–34).

The harassment was not isolated. It persisted over years, affected every aspect of his job, and ultimately compelled him to resign. *Reynaga*, 847 F.3d at 687 (harassment need not cause psychological injury and should be assessed in context). The City's own witnesses admitted that the City expected and rewarded race-based participation. 4-ER-0736, 0743 (Slade Decl. ¶ 2, Ex. A at 17); 2-ER-0073, 3-ER-0479–0495 (D'Agostino Decl. ¶ 37, Ex. 36).

The District Court refused to consider earlier events—like Diemert's removal from a lead role, coercion to work out of classification, or a supervisor excusing anti-white conduct—because they occurred outside the statutory window. 1-ER-0038–0039. That was legal error. A

hostile work environment is a cumulative claim, and courts must consider the full course of conduct so long as one act falls within the limitations period. *Morgan*, 536 U.S. at 117.

### 3. Whether the environment was objectively hostile is a fact finder question

The court also held that a reasonable person would not find the environment abusive. 1-ER-0029–0030. But the standard is whether a reasonable person in the plaintiff's position would find it hostile. *Reynaga*, 847 F.3d at 687. Here, other City employees—including Jennifer Yost—reported experiencing racial hostility under RSJI. 2-ER-0073, 3-ER-0464 (D'Agostino Decl. ¶ 35, Ex. 34). Exhibit 36, which the lower court ignored, includes additional complaints from City employees about race-based treatment.

The Court should not have substituted its judgment for that of the ultimate fact finder. *Fried v. Wynn L.V., LLC*, 18 F.4th 643, 648 (9th Cir. 2021) ("When severity is questionable, 'it is more appropriate to leave the assessment to the fact-finder.'").

## D. The District Court misapplied the disparate treatment standard and overlooked material facts

Title VII's core provision prohibits intentional discrimination on the basis of race. 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove disparate treatment either through direct evidence or through the burden-shifting framework set out in *McDonnell Douglas* and its progeny. *Ames*, 145 S. Ct. at 1545–46, 1552; *Reynaga*, 847 F.3d at 691. The District Court misapplied that framework and failed to credit direct and circumstantial evidence of discrimination.

### 1. Mr. Diemert presented direct evidence of racial animus

Mr. Diemert submitted direct evidence that City policies and personnel decisions were motivated by race. The City's RSJI trainings classified employees by race, assigned different expectations to white and non-white employees, and encouraged conduct that disparaged "whiteness." 2-ER-0062 (Diemert Decl. ¶¶ 17–33, 39–46, 53); 4-ER-0630, 0695, 0703 (Groce Decl. ¶ 10, Ex. D at 69, 77). Supervisors relied on this framework when revoking his lead role, ignoring his complaints, and denying him workplace support. *See* 4-ER-0736, 0743 (Slade Decl. ¶ 2, Ex. A at 17); 2-ER-0054, 0057–0058, 0062–0063 (Diemert Decl. ¶¶ 17, 27, 32, 47).

Because this is direct evidence of discrimination, the *McDonnell Douglas* burden-shifting test need not apply. *Reynaga*, 847 F.3d at 691 ("Nothing compels the parties to use the *McDonnell Douglas* framework").[14]

> 2. Even under *McDonnell Douglas*, Mr. Diemert established a prima facie case

Even if the framework applies, Mr. Diemert easily met his burden at the prima facie stage. To do so, he had to show: (1) He is a member of a protected class; (2) he was qualified for his position; (3) he suffered adverse employment actions; and (4) similarly situated employees outside his class were treated more favorably, or circumstances give rise to an inference of discrimination. *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004).

The first two elements are undisputed. As to the third and fourth, Mr. Diemert identified multiple adverse employment actions, including:

- The City's refusal to investigate his discrimination complaints;

---

[14] Justice Thomas questions whether this framework is even compatible with the summary judgment standard of Federal Rule of Civil Procedure 56 and notes that it fails to "capture all the ways in which a plaintiff can prove a Title VII claim." *See Ames*, 145 S. Ct. at 1553–54 (Thomas, J., concurring).

- Retaliation from supervisors, including refusal to meet or assist him;

- Unequal scrutiny and workload compared to similarly situated employees;

- Interference with his FMLA rights;

- Assignment of biased investigators from the RSJI "change team"; and

- Constructive discharge due to an intolerable work environment.

*See* 2-ER-0057–0066 (Diemert Decl. ¶¶ 27, 37, 47, 50, 55–59); 2-ER-0070–0074, 2-ER-0320–0326, 3-ER-0377, 3-ER-0444–0451, 0507 (D'Agostino Decl. ¶¶ 13, 17, 31–32, 39, Exs. 12, 17, 30–31, 38).

The District Court wrongly considered only three of these actions. 1-ER-0035. It also ignored favorable comparators, such as Mr. Said and Mr. Odom, whose complaints were promptly addressed while Mr. Diemert's were dismissed. 2-ER-0072, 3-ER-0439–0443, 2-ER-0074, 3-ER-0619 (D'Agostino Decl. ¶ 26, Ex. 25 at 124–128; ¶ 43, Ex. 42).

3. The City's proffered justifications are disputed and pretextual

Once a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its

actions. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). If it does so, the plaintiff must show that the reason is pretextual. At summary judgment, that means identifying a genuine dispute of material fact as to whether the employer's rationale is credible. *Ames*, 145 S. Ct. at 1553 (Thomas, J., concurring).

Here, the City gave superficial justifications—paperwork mix-ups, management discretion, internal misunderstandings—and the District Court accepted them without scrutiny. But those rationales are disputed. For example, the City's refusal to grant FMLA leave was deemed unlawful by the Department of Labor. 2-ER-0064–0065 (Diemert Decl. ¶ 54); 2-ER-0071, 3-ER-0369 (D'Agostino Decl. ¶ 17, Ex. 16). The City offered no explanation until forced to by that investigation. *See Jackson v. United Parcel Serv., Inc.*, 548 F.3d 1137, 1142 (8th Cir. 2008) (post hoc corrections do not shield employer from liability).

A reasonable factfinder could view the City's stated reasons as pretext. That is sufficient to defeat summary judgment. *Reynaga*, 847 F.3d at 691.

## E. The District Court misapplied the retaliation standard and overlooked triable issues of fact

To establish retaliation under Title VII, a plaintiff must show: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between the two. *Vasquez*, 349 F.3d at 646.

The same standard applies under the Washington Law Against Discrimination. *Currier v. Northland Servs., Inc.*, 182 Wash. App. 733, 742 (2014). Adverse employment actions include any treatment likely to dissuade a reasonable employee from engaging in protected activity. *Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2007).

Mr. Diemert engaged in protected activity repeatedly: he objected to race-based conduct throughout his employment and filed EEOC charges in December 2020 and June 2022. 2-ER-0053–0065 (Diemert Decl. ¶¶ 15, 19, 27, 47, 55). After doing so, the City subjected him to multiple retaliatory actions.

1. The City violated Mr. Diemert's Family and Medical Leave Act rights after he filed EEOC charges

Shortly after Mr. Diemert filed his first EEOC complaint in December 2020, the City denied him FMLA leave. The Department of

Labor later found that this denial violated federal law. 2-ER-0064–0065 (Diemert Decl. ¶ 54); 2-ER-0071, 3-ER-0369 (D'Agostino Decl. ¶ 17, Ex. 16). The City did not correct the violation until it was formally admonished.

The City called this a "paperwork issue," but provided no explanation at the time of the denial. The District Court accepted the City's after-the-fact justification and held that Mr. Diemert failed to show a causal link. 1-ER-0036. That was error. Causation may be inferred from temporal proximity. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). The close timing between the EEOC complaint and the FMLA denial supports an inference of retaliation.

   2.   The City favored complaints by others while dismissing
        Mr. Diemert's

When Mr. Diemert complained of race-based mistreatment, the City ignored him. By contrast, when supervisors Mr. Said and Mr. Odom complained about Mr. Diemert, the City acted quickly. 2-ER-0072, 3-ER-0439–0443, 2-ER-0074, 3-ER-0619 (D'Agostino Decl. ¶ 26, Ex. 25 at 124–128; ¶ 43, Ex. 42). Mr. Groce wrote that Mr. Said "needs to be protected"

37

and discussed damage control on his behalf—but no one expressed concern for Mr. Diemert's safety or wellbeing.

This disparate treatment of comparable complaints supports a retaliation inference. *EEOC v. MJC, Inc.*, 400 F. Supp. 3d 1023, 1026 (D. Haw. 2019).

### 3. The City compromised its own investigation by assigning biased investigators

Mr. Diemert objected to the City assigning RSJI "change team" members—Brandan Kuykendall and Christy Kuna—to investigate his complaints. 2-ER-0065–0066 (Diemert Decl. ¶¶ 55–59). Both were affiliated with the very Initiative he was challenging. He repeatedly raised this conflict, but the City ignored his concerns. 2-ER-0074 (D'Agostino Decl. ¶ 43); 3-ER-0619 (Ex. 42).

Other employees were afforded outside investigations or protective action. The City's refusal to do the same for Mr. Diemert, despite available mechanisms to do so, further supports an inference of retaliation. 2-ER-0073 (D'Agostino Decl. ¶¶ 31–32); 3-ER-0444–0451 (Exs. 30–31).

38

### 4. The District Court misconstrued the evidence and drew inferences against Mr. Diemert

The District Court faulted Mr. Diemert for being uncooperative during the investigation, concluding this undercut his retaliation claim. 1-ER-0036. But Mr. Diemert had a legitimate basis to distrust the process, given the City's refusal to assign neutral investigators. *Vasquez v. Atrium, Inc.*, No. CIV. 00-1265 PHXLOA, 2002 WL 818066, at *6 (D. Ariz. Apr. 24, 2002) (employees may reasonably feel complaints are futile if prior efforts were ignored).

At minimum, these factual disputes should have been resolved by a factfinder—not by the court at summary judgment.

## F. The District Court misapplied the constructive discharge standard and ignored ongoing discriminatory conditions

A constructive discharge occurs when working conditions are so intolerable that a reasonable person in the employee's position would feel compelled to resign. *Sanchez v. City of Santa Ana*, 915 F.2d 424, 431 (9th Cir. 1990); *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000). This standard is objective, based on the totality of the circumstances. Whether working conditions are intolerable is generally a jury question.

*Sanchez*, 915 F.2d at 431; *Washington v. Boeing Co.*, 105 Wash. App. 1, 15–16 (2000).

Here, the City subjected Mr. Diemert to continued harassment, retaliation, and race-based messaging through its Race and Social Justice Initiative. Supervisors refused to meet with him, assigned him to work in proximity to someone who had physically accosted him, and failed to protect him from a racially hostile environment. *See* 2-ER-0054–67 (Diemert Decl. ¶¶ 16–18, 22–24, 27, 29–30, 32–36, 38, 40, 43, 47, 64); 4-ER-0630–0631, 4-ER-0637–0713, 0725–0730 (Groce Decl. ¶¶ 8–10, 15, Exs. B–D, J); 2-ER-0071, 0073, 3-ER-0393–0403, 0464, 0479 (D'Agostino Decl. ¶¶ 20–22, 35, 37, Exs. 19–21, 34, 36).

The District Court erroneously concluded that "months had passed" between the last discriminatory act and Mr. Diemert's resignation, suggesting there was no causal link. 1-ER-0002–0047. But Mr. Diemert continued to experience racial hostility up to and through his final weeks of employment—including continued exposure to RSJI content, lack of accommodation, and retaliation. The record contradicts the notion that the discrimination had abated. *See* 2-ER-0060–0063 (Diemert Decl. ¶¶ 37, 43, 47–49).

The court also relied on the City's assertion that it had excused Mr. Diemert from RSJI trainings by 2021. But the City's own documents show the Initiative remained embedded in his performance evaluations and day-to-day expectations. 4-ER-0630–0631, 0693–0724 (Groce Decl. ¶¶ 10, 14, Exs. D, I).

Under Washington and federal law, an employer acts "deliberately" if it creates the intolerable condition, regardless of whether it subjectively intended the employee to quit. *Sneed v. Barna*, 80 Wash. App. 843, 849 (1996). Here, the City created and maintained an environment in which Mr. Diemert was harassed, retaliated against, and then denied fair treatment when he reported it. A reasonable person in his position would have felt compelled to resign. That is a question for the factfinder—not a determination to be made at summary judgment. *Sanchez*, 915 F.2d at 431.

## III. The District Court failed to apply strict scrutiny to the City's use of explicit racial classifications

The Equal Protection Clause prohibits the government from classifying individuals by race unless it satisfies strict scrutiny—a "daunting two-step examination" under which racial classifications are presumed unconstitutional. *Students for Fair Admissions, Inc. v.*

*President & Fellows of Harvard Coll.*, 600 U.S. 181, 206–07 (2023) (*SFFA*); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989). To survive, the government must prove that its use of race is necessary to further a compelling interest and is narrowly tailored to achieve that interest. *SFFA*, 600 U.S. at 206–07.

The City's Race and Social Justice Initiative is a facially race-based policy that classifies employees by race, assigns them race-specific expectations, and encourages race-segregated groups and trainings. *See* 4-ER-0630–0631, 4-ER-0637–0713, 0725 (Groce Decl. ¶¶ 8–10, 15, Exs. B–D, J); 4-ER-0736–0737, 4-ER-0740, 0775, 0791 (Slade Decl. ¶¶ 2, 4, 8, Exs. A, C, G). Yet the District Court failed to apply strict scrutiny. Instead, it treated RSJI as a benign or race-neutral DEI program and credited the City's claim that participation was open to all, despite contrary evidence. 1-ER-0042–0046.

That was legal error. Facial racial classifications do not require proof of discriminatory intent to trigger strict scrutiny. *Shaw v. Reno*, 509 U.S. 630, 642 (1993). The Supreme Court has repeatedly held that race-based classifications are "invidious in all contexts." *SFFA*, 600 U.S. at 214 (cleaned up). The Court's decision in *Ames* confirms this point in the

42

Title VII context as well, rejecting the notion that "majority" plaintiffs face a higher burden. 145 S. Ct. at 1545–47.

The District Court relied on cases like *Navarro v. Block*, 72 F.3d 712 (9th Cir. 1995), and *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), which apply only to facially neutral laws. But RSJI is not facially neutral—it divides employees into "white" and "BIPOC," assigns them separate training tracks, and holds them to different standards based on race. 2-ER-0073 (D'Agostino Decl. ¶ 37), 3-ER-0479–0495 (Ex. 36) (City's 30(b)(6) witness acknowledging race-based exclusions from caucuses); 4-ER-0736, 0743 (Slade Decl. ¶ 2, Ex. A at 17) (race-based expectations and advancement opportunities).

The District Court further erred in finding that no "discriminatory policy was nested within" the RSJI. 1-ER-0045. That conclusion contradicts the record and Supreme Court precedent. A policy that requires employees to attend segregated trainings and to accept race-based stereotypes in the workplace is presumptively unconstitutional. *Croson*, 488 U.S. at 500 (benign racial purpose does not immunize racial classifications from strict scrutiny); *see also Adarand Constructors, Inc.*

*v. Pena*, 515 U.S. 200, 227 (1995) ("benign" racial classifications are subject to strict scrutiny).

The Equal Protection Clause does not permit government programs that divide employees by race, assign them different moral standing based on ancestry, and compel participation in race-based exercises. Seattle's Initiative is not a diversity policy—it is a system of compelled racial identity. That system is presumptively unconstitutional, and the District Court erred by failing to say so.

## Conclusion

The City's Race and Social Justice Initiative is not a race-neutral diversity program—it is a mandatory, government-imposed classification system based on race. It divides employees into "white" and "BIPOC" categories, assigns different expectations, segregates trainings, and promotes messaging that attributes collective guilt and privilege based solely on skin color. *See* 4-ER-0630–0631 (Groce Decl. ¶¶ 8–10, 15), 4-ER-0637–0713, 0724–0730 (Exs. B–D, J); 4-ER-0736, 0743 (Slade Decl. ¶ 2, Ex. A at 17); 2-ER-0073 (D'Agostino Decl. ¶ 37), 3-ER-0479–0495 (Ex. 36).

Such a policy is subject to strict scrutiny under the Equal Protection Clause. *SFFA*, 600 U.S. at 206–07; *Croson*, 488 U.S. at 500. The

government cannot sort individuals by race—even for ostensibly benign reasons—unless it demonstrates a compelling interest and narrow tailoring. The City made no such showing, and the District Court did not require it.

For those reasons, the District Court's grant of summary judgment should be reversed. The record contains extensive evidence that Mr. Diemert was subjected to race-based harassment, discrimination, and retaliation in violation of Title VII, the Equal Protection Clause, and the Washington Law Against Discrimination.

The City's official policy imposed racial classifications that shaped the conditions of Mr. Diemert's employment and compelled his resignation. The District Court failed to apply the correct legal standards, disregarded material factual disputes, and declined to subject the City's race-based policies to the constitutional scrutiny they require.

This Court should reverse the judgment and remand the case for trial.

45

DATED: July 18, 2025.

Respectfully submitted,

PACIFIC LEGAL FOUNDATION

*s/  Laura M. D'Agostino*
LAURA M. D'AGOSTINO
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
LDAgostino@pacificlegal.org

ANDREW R. QUINIO
ERIN E. WILCOX
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
AQuinio@pacificlegal.org
EWilcox@pacificlegal.org

*Attorneys for Plaintiff – Appellant*

## Statement of Related Cases

Counsel for Appellant states there are no related cases within the meaning of Circuit Rule 28-2.6.

## Certificate of Service

I hereby certify that on July 18, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system.

  s/ *Laura M. D'Agostino*
Laura M. D'Agostino

## Certificate of Compliance for Briefs

9th Cir. Case Number: 25-1188

I am the attorney or self-represented party.

**This brief contains  8,944  words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief (select only one):

> [X] complies with the word limit of Cir. R. 32-1.
> [ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.
> [ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
> [ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.
> [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):
> [ ] it is a joint brief submitted by separately represented parties;
> [ ] a party or parties are filing a single brief in response to multiple briefs; or
> [ ] a party or parties are filing a single brief in response to a longer joint brief.
> [ ] complies with the length limit designated by court order dated _____.
> [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

DATE:  July 18, 2025.        s/ *Laura M. D'Agostino*
                                          Laura M. D'Agostino

                                          *Attorney for Plaintiff – Appellant*

# ADDENDUM

# Addendum

# Table of Contents

U.S. Const. amend. XIV, § 1..............................................................1

42 U.S.C. § 1983............................................................................1

42 U.S.C. § 2000e-2(a) ..................................................................1

42 U.S.C. § 2000e-3(a) ..................................................................2

Wash. Rev. Code § 49.60.180(1) (2023)........................................2

Wash. Rev. Code § 49.60.210(1) (2023)........................................4

**U.S. Const. amend. XIV, § 1**

No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**42 U.S.C. § 1983**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**42 U.S.C. § 2000e-2(a)**

(a) Employer practices

It shall be an unlawful employment practice for an employer—

1. to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

2. to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any

1

individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

## 42 U.S.C. § 2000e-3(a)

a. Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

## Wash. Rev. Code § 49.60.180(1) (2023)

It is an unfair practice for any employer:

(1) To refuse to hire any person because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability, unless based upon a bona fide occupational qualification: PROVIDED, That the prohibition against discrimination because of such disability shall not apply if the particular disability prevents the proper performance of the particular worker involved: PROVIDED, That this section shall not be construed to require an employer to establish employment goals or quotas based on sexual orientation.

(2) To discharge or bar any person from employment because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability.

(3) To discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability: PROVIDED, That it shall not be an unfair practice for an employer to segregate washrooms or locker facilities on the basis of sex, or to base other terms and conditions of employment on the sex of employees where the commission by regulation or ruling in a particular instance has found the employment practice to be appropriate for the practical realization of equality of opportunity between the sexes.

(4) To print, or circulate, or cause to be printed or circulated any statement, advertisement, or publication, or to use any form of application for employment, or to make any inquiry in connection with prospective employment, which expresses any limitation, specification, or discrimination as to age, sex, marital status, sexual orientation, race, creed, color, national origin, citizenship or immigration status, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability, or any intent to make any such limitation, specification, or discrimination, unless based upon a bona fide occupational qualification: PROVIDED, Nothing contained herein shall prohibit advertising in a foreign language.

3

**Wash. Rev. Code § 49.60.210(1) (2023)**

1. It is an unfair practice for any employer, employment agency, labor union, or other person to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter.

2. It is an unfair practice for a government agency or government manager or supervisor to retaliate against a whistleblower as defined in chapter 42.40 RCW.

3. It is an unfair practice for any employer, employment agency, labor union, government agency, government manager, or government supervisor to discharge, expel, discriminate, or otherwise retaliate against an individual assisting with an office of fraud and accountability investigation under RCW 74.04.012, unless the individual has willfully disregarded the truth in providing information to the office.