No. 25-1188

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

JOSHUA A. DIEMERT, an individual,

Plaintiff - Appellant,

vs.

CITY OF SEATTLE, a municipal Corporation,

Defendant – Appellee

---

On Appeal from the United States District Court for the
Western District of Washington at Seattle
District Court No. 2:22-CV-01640-JNW

---

## ANSWERING BRIEF OF APPELLEE CITY OF SEATTLE

---

ANN DAVISON
Seattle City Attorney

Sarah Tilstra, WSBA #35706
Assistant City Attorney
Seattle City Attorney's Office
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7095
(206) 684-8230

Attorney for Appellee

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.........................................................iv-xiii

I.  INTRODUCTION ........................................................... 1

II. JURISDICTIONAL STATEMENT ................................ 2

III. STATEMENT OF ISSUES ........................................... 2

IV. STATEMENT OF THE CASE ...................................... 4

    A.  Diemert's Employment at the City's Human Services
        Department .................................................................. 4

    B.  The City's Race and Social Justice Initiative ....................... 4

    C.  Diemert and RSJI .................................................. 6

    D.  Alleged Racial Harassment ................................... 9

    E.  The City Responded Appropriately to Diemert's
        Complaints ................................................................ 11

    F.  Alleged Retaliation and Disparate Treatment ................... 12

    G.  Procedural History ................................................. 13

V.  SUMMARY OF ARGUMENT .................................... 14

VI. ARGUMENT ............................................................... 16

    A.  Standard of Review .................................................. 16

    B.  This Court Should Disregard Multiple Categories of
        Documents Cited by Diemert ............................................ 17

i

1. The district court's evidentiary rulings were not an abuse of discretion. .................................................. 17

2. Previously uncited materials should not be considered. ................................................................ 21

C. The District Court Properly Dismissed Diemert's Hostile Work Environment Claims ............................................. 23

1. RSJI did not create a racially hostile work environment. ........................................................... 24

2. Diemert did not demonstrate co-worker conduct sufficiently severe or pervasive. ............................. 37

D. The District Court Properly Dismissed Diemert's Disparate Treatment and Retaliation Claims...................................... 50

1. There is no direct evidence of racial animus, therefore the *McDonnell Douglas* analysis is appropriate. ............................................................ 53

2. Failure to investigate/inadequate investigation. ...... 55

3. FML mischaracterization. ....................................... 57

4. Treatment by supervisor. ......................................... 59

E. The District Court Properly Dismissed Diemert's Constructive Discharge Claim ........................................... 61

F. Diemert's and Amici's Use of *Ames* to Question the District Court's Title VII Analysis is Unavailing ........................... 67

G. The District Court Properly Dismissed Diemert's Equal Protection Claim................................................................ 70

VII. CONCLUSION .................................................................. 75

ii

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams v. Able Bldg. Supply*,
  57 P.3d 280 (Wash. Ct. App. 2002) .................................................. 42, 47

*Ames v. Ohio Dep't of Youth Servs.*,
  145 S. Ct. 1540 (2025) ....................................................... 67, 68

*Anthoine v. N. Cent. Counties Consortium*,
  605 F.3d 740 (9th Cir. 2010) ....................................................... 71

*Arpin v. Santa Clara Valley Transp. Agency*,
  261 F.3d 912 (9th Cir. 2001) ..................................................... 70

*Assoc. Builders & Contractors v. Carpenters Vacation & Holiday Trust Fund for N. Cal.*,
  700 F.2d 1269 (9th Cir. 1983) ........................................... 27, 28

*Bagdadi v. Nazar*,
  84 F.3d 1194 (9th Cir. 1996) ..................................................... 17

*Bank of Lake Tahoe v. Bank of America*,
  318 F.3d 914 (9th Cir. 2003) ..................................................... 70

*Barren v. Harrington*,
  152 F.3d 1193 (9th Cir. 1998) ................................................... 71

*Becker v. Cashman*,
  114 P.3d 1210 (Wash. Ct. App. 2005) ....................................... 58

*Bell v. Boeing*,
  599 F. Supp. 3d 1052 (W.D. Wash. 2022) ........................... 28, 41

*Blackburn v. State*,
   375 P.3d 1076 (Wash. 2016)......................................................................24

*Bodett v. CoxCom, Inc.*,
   366 F.3d 736 (9th Cir. 2004).....................................................................61

*Brooks v. City of San Mateo*,
   229 F.3d 917 (9th Cir. 2000)................................................... 40, 50. 57, 63

*Brown v. Dignity Health*,
   No. CV-18-03418-PHX-JJT, 2020 WL 3403088 (D. Ariz. June 19, 2020)
   ..............................................................................................................56

*Burlington Indus., Inc. v. Ellerth*,
   524 U.S. 742 (1998) ................................................................................35

*Burlington N. & Santa Fe Ry. Co.*,
   548 U.S. 53 (2006) ............................................................................ 51, 61

*Burrell v. Star Nursery*,
   170 F.3d 951 (9th Cir. 1999).....................................................................43

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011)...................................................................25

*Campbell v. Dep't Human Servs.*,
   384 F. Supp. 3d 1209 (D. Haw. 2019) .......................................................59

*Carmen v. San Francisco Unified Sch. Dist.*,
   237 F.3d 1026 (9th Cir. 2001)............................................................ 19, 22

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................16

*Chislett v. N.Y.C. Dep't of Ed.*,
   ___ F.4th ___, 2025 WL 2725669 (2d Cir. Sept. 25, 2025) .....................49

*Crawford v. Bd. of Educ. of City of Los Angeles*,
    458 U.S. 527 (1982) .......................................................................73

*Crownover v. State ex rel. Dep't of Transp.*,
    265 P.3d 971 (Wash. Ct. App. 2011) ................................... 46, 65

*Davis v. City of Seattle*,
    No. C06-1659Z, 2008 WL 202708 (W.D. Wash. Jan. 22, 2008)
    ...................................................................................................38

*Davis v. Fred's Appliance*,
    287 P.3d 51 (Wash. Ct. App. 2012) ...................................... 42, 48

*De Piero v. Pa. State Univ.*,
    711 F. Supp. 3d 410 (E.D. Pa. 2024) ................................... 35, 36

*De Piero v. Pa. State Univ.,*
    769 F. Supp. 3d 329 (E.D. Pa. 2025) ................................... 34, 36

*Deemar v. Bd. of Ed. of City of Evanston/Skokie*,
    No. 21-cv-3466, 2024 WL 3757169 (N.D. Ill. Aug. 9, 2024)..................75

*Doe No. 1 v. Wynn Resorts, Ltd.*,
    No. 2:19-cv-01904-GMN-VCF, 2023 WL 1782439 (D. Nev. Feb. 3, 2023)
    ...................................................................................................56

*Domingo v. Boeing Emps. Credit Union*,
    98 P.3d 1222 (Wash. Ct. App. 2004) .......................................23

*Dykzeul v. Charter Comm'ns, Inc.*,
    No. CV-18-5826-DSF-(GJSx), 2021 WL 4522545 (C.D. Cal. Feb. 3,
    2021)..........................................................................................21

*E.E.O.C. v. Boeing Co.*,
    577 F.3d 1044 (9th Cir. 2009).................................................53

*El Pollo Loco, Inc. v. Hashim*,
    316 F.3d 1032 (9th Cir. 2003).................................................16

*Ellison v. Brady*,
    924 F.2d 872 (1991) .................................................................24

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998) .................................................................47

*Fed. Deposit Ins. Co. v. Henderson*,
    940 F.2d 465 (9th Cir. 1991) ....................................................71

*Flooring Assocs., Inc. v. Design Mfg. Int'l, LLC*,
    No. 2:20-CV-00057-JCC-JRC, 2021 WL 1551473 (W.D. Wash. Apr. 1, 2021).........................................................................................18

*Fonseca v. Sysco Food Servs. of Ariz.*,
    374 F.3d 840 (9th Cir. 2004)....................................................38

*Foraker v. Apollo Grp., Inc.*,
    427 F. Supp. 2d 936 (D. Ariz. 2006).........................................60

*Forsberg v. Pac. N.W. Bell Tel. Co.*,
    840 F.2d 1409 (9th Cir. 1988)......................... 19, 25, 39, 45, 74

*Fraser v. Goodale*,
    342 F.3d 1032 (9th Cir. 2003)...................................................21

*Fulton v. State*,
    279 P.3d 500 (Wash. Ct. App. 2012) ................................. 26, 39

*Greenwood v. F.A.A.*,
    28 F.3d 971 (9th Cir. 1994)......................................................27

*Gunther v. Washington Cnty.*,
    623 F.2d 1303 (9th Cir. 1979)...................................................58

*Hardage v. CBS Broad.*,
    427 F.3d 1177 (9th Cir. 2005)...................................................64

*Harris v. Forklift Sys.*, 510 U.S. 17 (1993) ...................................42

vii

*Hawn v. Exec. Jet Mgmt., Inc.*,
   615 F.3d 1151 (9th Cir. 2010)............................................................. 50, 52

*Henderson v. Sch. Dist. of Springfield R-12*,
   650 F. Supp. 3d 786 (W.D. Mo. 2023) ...................................................32

*Henderson v. Thompson*,
   518 P.3d 1011 (Wash. 2022)...................................................................32

*Herrera v. N.Y.C. Dep't of Ed.*,
   No. 1:21-CV-7555-MV, 2024 WL 245960 (S.D.N.Y. Jan. 23, 2024) ......73

*Holly D. v. Cal. Inst. Tech.*,
   339 F.3d 1158 (9th Cir. 2003).................................................................66

*Honeyfund.com v. DeSantis*,
   622 F. Supp. 3d 1159, 1171, 1186 (N.D. Fla. 2022),
   *aff'd sub nom. Honeyfund.com, Inc. v. Governor,* 94 F.4th 1272 (11th Cir.
   2024)..........................................................................................................36

*Honeyfund.com, Inc. v. Governor*,
   94 F.4th 1272 (11th Cir. 2024) ......................................................... 34, 36

*Johnson v. Or. Dep't of Envtl. Quality*,
   No. 3:24-cv-00279-JR, 2024 WL 5038803 (D. Or. Dec. 9, 2024)............36

*Keenan v. Allen*,
   889 F. Supp. 1320 (E.D. Wash. 1995),
   *aff'd*, 91 F.3d 1275 (9th Cir. 1996)..................................................... 41, 72

*Kortan v. Cal. Youth Auth.*,
   217 F.3d 1104 (9th Cir. 2000).................................................................48

*Kurdi v. Cal. Dep't of Transp.*,
   No. 1:22-cv-00729-JLT-EPG, 2023 WL 267538 (E.D. Cal. Jan. 18, 2023)
   ..................................................................................................................56

viii

*Lam v. City and Cnty. of San Francisco*,
  868 F. Supp. 2d 928, (N.D. Cal. 2012),
  *aff'd*, 565 F. App'x 641, 644 (2014) ..........................................................72

*Mackey v. Home Depot USA, Inc*.,
  459 P.3d 371 (Wash. Ct. App. 2020) .........................................................53

*Mais v. Albemarle Cnty. Sch. Bd.*,
  No. 3:22-CV-51, 2024 WL 4126076 (W.D. Va. Sept. 9, 2024) ...............49

*Manatt v. Bank of Am., NA*,
  339 F.3d 792 (9th Cir. 2003) .....................................................................47

*Marin v King Cnty.*,
  378 P.3d 203 (Wash. Ct. App. 2016) ................................................. 50, 52

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ........................................................................ passim

*McEnroe v. Microsoft Corp*.,
  No. CV-09-5053-LRS, 2010 WL 4806864 (E.D. Wash. Nov. 18, 2010)
  ................................................................................................................56

*McGinest v. GTE Serv. Corp*.,
  360 F.3d 1103 (9th Cir. 2004) ...................................................................41

*McKissick v. City of Reno*,
  No. 3:17-cv-00458-MMD-CBC, 2019 WL 3241161 (D. Nev. July 18,
  2019) ..........................................................................................................57

*McMillan v. Abbott Labs., Inc*.,
  No. C10-1708-RAJ, 2013 WL 1003136 (W.D. Wash. Mar. 13, 2013) .....54

*Milligan v. Thompson*,
  42 P.3d 418 (Wash. Ct. App. 2002) ................................................... 50, 52

*Muldrow v. City of St. Louis, Mo.*,
  601 U.S. 346 (2024) ...................................................................................51

ix

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002) ............................................................ 38, 46

*Nelson v. Pima Cmty. Coll.*,
    83 F.3d 1075 (9th Cir. 1996) ...................................................... 16

*Nichols v. Azteca Rest. Enters., Inc.*,
    256 F.3d 864 (9th Cir. 2001) ...................................................... 35

*Norgren v. Minn. Dep't of Human Servs.*,
    No. CV-22-489-ADM/TNL, 2023 WL 35903 (D. Minn. Jan. 4, 2023) .... 63

*Orr v. Bank of Am., NT & SA*,
    285 F.3d 764 (9th Cir. 2002) ...................................................... 19

*Parris v. Wyndham Resorts, Inc.*,
    979 F. Supp. 2d 1069 (D. Haw. 2013) ......................................... 54

*Pavel v. Univ. of Or.*,
    No. 6:16-CV-00819-AA, 2018 WL 1352150 (D. Or. Mar. 13, 2018) ...... 32

*Pa. State Police v. Suders*,
    542 U.S. 129 (2004) ............................................................ 62, 63

*Phelps v. U.S. Gen. Servs. Agency*,
    No. C-07-01055-JSW, 2010 WL 1610070 (N.D. Cal. Apr 20, 2010),
    *aff'd*, 469 F. App'x. 548 (9th Cir. 2012) ...................................... 60

*Ramirez v. Nicholson*,
    No. 06cv0546-JM(NLS), 2007 WL 4208293 (S.D. Cal. Nov. 27, 2007)
    ............................................................................................ 38

*Reynaga v. Roseburg Forest Prods.*,
    847 F.3d 678 (9th Cir. 2017) ...................................................... 24, 41

*Rodriguez v. Boeing Co.*,
    No. C18-1213-JCC, 2021 WL 4847957 (W.D. Wash. Oct. 18, 2021),
    *aff'd*, No. 21-35951, 2024 WL 1328774 (9th Cir. Mar. 28, 2024) ........ 58

*San Jose Christian Coll. v. City of Morgan Hill*,
    360 F.3d 1024 (9th Cir. 2004) ................................................................... 17

*Sanders v. Univ. of Idaho by Bd. of Regents of Univ. of Idaho*,
    617 F. Supp. 3d 1200 (D. Idaho 2022) ..................................................... 71

*Shannon v. Cherry Creek Sch. Dist.*,
    No. 1:20-CV-03469-WJM-SKC, 2022 WL 4819537 (D. Colo. July 12,
    2022) ................................................................................................................ 35

*Shirley v. Yates*,
    807 F.3d 1090 (9th Cir. 2015) ................................................................... 32

*Sneed v. Barna*,
    912 P.2d 1035 (Wash. Ct. App. 1996) ..................................................... 65

*Spengler v. Coop. Educ. Serv. Agency 7*,
    No. 22-C-1199, 2025 WL 2207025 (E.D. Wisc. Aug. 4, 2025) ............... 33

*Stevens v. Cnty. of San Mateo*,
    No. C-04-02762-SI, 2006 WL 581092 (N.D. Cal. Mar. 7, 2006)
    *aff'd*, 267 F. App'x 684 (9th. Cir. 2008); .................................................. 48

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ........................................................................... 72, 73

*Sullivan v. Dollar Tree Stores, Inc.*,
    623 F.3d 770 (9th Cir. 2010) ..................................................................... 66

*Swenson v. Potter*,
    271 F.3d 1184 (9th Cir. 2001) ............................................................ 42, 44

*Taybron v. City and Cnty. of San Francisco*,
    341 F.3d 957 (9th Cir. 2003) ..................................................................... 22

*Townsend v. Walla Walla Sch. Dist.*,
    196 P.3d 748 (Wash. Ct. App. 2008) ....................................................... 62

xi

*Triton Energy Corp. v. Square D Corp.*,
68 F.3d 1216 (9th Cir. 1995)........................................................16

*Tyner v. State*,
154 P.3d 920 (Wash. Ct. App. 2007) ...........................................51

*U.S. E.E.O.C. v, MJC, Inc.*,
400 F. Supp. 3d 1023 (D. Haw. 2019) ..........................................57

*U.S. v. Modeste*,
No. 3:19-CR-00072-TMB-MMS, 2023 WL 2986933 (D. Alaska Apr. 18, 2023)........................................................................................32

*Vasquez v. Cnty. of Los Angeles*,
349 F.3d 634 (9th Cir. 2003)............................................ 23, 47, 53, 54

*Vavra v. Honeywell Int'l, Inc.*,
688 F. Supp. 3d 758 (N.D. Ill. 2023) ...........................................34

*Villanueva v. Cal.*,
986 F.3d 1158 (9th Cir. 2021).......................................................53

*Vitt v. City of Cincinnati*,
250 F. Supp. 2d 885 (S.D. Ohio 2002) .........................................48

*W. Radio Servs. Co. v. Qwest Corp.*,
678 F.3d 970 (9th Cir. 2012).........................................................28

*Washington v. Boeing Co.*,
19 P.3d 1041 (Wash. Ct. App. 2000) ...........................................62

*Wilson v. Safeway Inc.*,
No. 2:16-CV-0405-TOR, 2018 WL 4608477 (E.D. Wash. Sept. 25, 2018)
........................................................................................................60

*Wood v. Red Hat, Inc.*,
No. 2:24-CV-00237-DCN, 2025 WL 2777880 (D. Idaho Sept. 29, 2025)
........................................................................................................34

xii

*Yeager v. Bowlin*,
   693 F.3d 1076 (9th Cir. 2012) ...................................................................43

*Young v. Colo. Dep't. of Corr.*,
   94 F.4th 1242 (10th Cir. 2024) ...............................................................34

## CONSTITUTIONS

U.S. Const. amend. XIV, § 1 ................................................. passim

## STATUTES

42 U.S.C. § 1983 ................................................................... passim

42 U.S.C. § 2000e ("Title VII") .......................................... passim

Wash. Rev. Code § 49.60 ("WLAD") ................................ passim

## RULES

Fed. R. App. P. 28(a)(8)(A) ......................................................27

Fed. R. Civ. P. 12 ...................................................................13

Fed. R. Civ. P. 56(a) ................................................................16

Fed. R. Evid. 803(6) ................................................................21

Fed. R. Evid. 803(8)(A)(iii) .....................................................20

Fed. R. Evid. 805 ....................................................................21

W.D. Wash. Local R. 7(b)(2) ....................................................18

Wash. St. Gen. R. 37 ...............................................................32

## I.    INTRODUCTION

Like many employers around the country, the City of Seattle ("City") has implemented a program that recognizes our nation's history of institutionalized racism and seeks to eliminate the barriers that this racism has erected in the City's service of its constituents and its employees. Appellant and former City employee Joshua Diemert ("Diemert") did not agree with many of the principles of this program (the Race and Social Justice Initiative, or "RSJI"). Diemert engaged with co-workers regarding his disagreement, and ultimately decided he would not attend any more RSJI trainings. The City never disciplined Diemert, and he resigned voluntarily in September 2021.

In this lawsuit, Diemert, a white man, claims that exposure to RSJI created a hostile work environment ("HWE") for him based on race. In support of this claim, he relies on inadmissible evidence, vague and sweeping claims, factual allegations unsupported by the record, documents he never previously received, and meetings he never tried to attend. A review of the evidence properly before the district court on summary judgment reveals that the RSJI material to which Diemert <u>was</u> exposed did not create a HWE. Similarly, the smattering of interactions between Diemert and co-workers that

1

were properly before the district court on summary judgment also were not sufficiently severe or pervasive to create a HWE.

Diemert's other claims fail as well. His claims for disparate treatment and retaliation do not survive *McDonnell Douglas*, and his constructive discharge claim also fails. Finally, his claim for violation of the Equal Protection Clause fails because he has not prevailed on his Title VII claims and he was not subject to any racial classification. This Court should affirm the district court's grant of summary judgment.

## II. JURISDICTIONAL STATEMENT

The district court had jurisdiction over Diemert's claims under 28 U.S.C. §§ 1331 and 1367(a). This Court has jurisdiction over the appeal under 28 U.S.C. § 1291. The City agrees with Diemert's statements that the appeal is timely and that the appeal is from a final order or judgment.

## III. STATEMENT OF ISSUES

1.     Did the district court abuse its discretion in striking and considering only for a limited purpose two exhibits Diemert submitted in opposing summary judgment, when Diemert never provided argument to the contrary and the exhibits were unauthenticated and inadmissible hearsay?

2

2.  Did the district court correctly dismiss Diemert's HWE claim based on RSJI when the evidence properly before the court about RSJI trainings and materials to which Diemert was exposed shows that material is not discriminatory?

3.  Did the district court correctly dismiss Diemert's HWE claim based on co-worker conduct when the evidence properly before the court shows that the conduct was not sufficiently severe or pervasive?

4.  Did the district court correctly dismiss Diemert's disparate treatment and retaliation claims when Diemert did not make a prima facie case or show pretext?

5.  Did the district court correctly dismiss Diemert's constructive discharge claim when Diemert did not demonstrate working conditions so intolerable that a reasonable person would have felt forced to resign?

6.  Did the district court correctly dismiss Diemert's § 1983 equal protection claims when such claims in the employment discrimination context mirror Title VII and Diemert's Title VII claims fail, and Diemert was not subject to any racial classification?

3

## IV.   STATEMENT OF THE CASE

### A.   Diemert's Employment at the City's Human Services Department

Diemert began working for the Human Services Department ("HSD") of the City of Seattle in 2013.  2-ER-50, 4-ER-629.  He was hired as a Program Intake Representative for the City's Utility Discount Program ("UDP") and remained in this role for the duration of his employment.  *Id*.  Diemert received satisfactory performance evaluations at HSD, and was never disciplined or put on a performance improvement plan.  4-ER-630.  He voluntarily resigned on September 7, 2021.  *Id*.  Diemert identifies as a white male.  *See* 2-ER-55.

HSD is a City department that connects people with resources and services.  *See* 1-ER-3-4.  UDP offers eligible households assistance with their utility bills.  *Id*.  Diemert assessed applicants' eligibility for services.  *Id*., *see also* 4-ER-753.

### B.   The City's Race and Social Justice Initiative

The City's RSJI seeks to undo institutionalized racism and achieve racial equity in City government and in our community.  *See* 1-SER-171, 4-ER-680.  RSJI assesses City programs and procedures for whether barriers to entry exist for people from marginalized communities, and tries to undo those

4

barriers "to create a level playing field for all."  1-SER-171.

RSJI also recognizes that our society is one in which a person's race has impacts, as reflected in the data about life outcomes in areas such as economics, life expectancy, education, and criminal justice.  4-ER-680.  RSJI further recognizes that, while we all experience the impacts of structural racism (unearned advantage or disadvantage), none of us asked for those impacts.  *Id*.

RSJI does not involve racial quotas.  1-SER-178.  And the City's anti-harassment and anti-discrimination policies apply equally to all workers, regardless of racial identity.  1-SER-188-189, 1-SER-194-204.

One aspect of RSJI is voluntary caucuses, or affinity groups.  These groups focus on different areas of alignment (e.g., white, American Indian/Alaska Native, Black, LGBTQ, etc.), but are open to all City employees, regardless of how they identify.  *See* 1-SER-181, 1-SER-184. Each City department (including HSD) has an RSJI Change Team, which leads and coordinates RSJI activities within the department.  *See* 4-ER-632. Participation in the Change Team and the caucuses is voluntary.  1-SER-187. The goal of the caucuses is for employees to share their individual experience

5

and work towards the goal of ending institutionalized racism. 1-SER-181-183.

### C. Diemert and RSJI

HSD employees are required to participate in two RSJI activities per year. 4-ER-630. To fulfill this requirement, employees can take trainings or attend events regarding race or other social justice issues, such as gender, poverty, Indian affairs, LGBTQ issues, etc. *Id.* However, employees who do not meet this requirement can still receive a "meets expectations" or "fully performing" rating on their annual performance evaluation. 1-SER-239-240.

This was reflected in Diemert's experience. He did not meet the RSJI requirements in 2019 (*see* 4-ER-631), but still received a "Fully Performing" rating for Equity & Inclusion. *See* 1-SER-83. The RSJI requirements were waived in 2020 due to COVID. 4-ER-631. In 2021, Diemert informed HSD Human Resources ("HR") Manager Ryan Groce that he would no longer take any RSJI trainings because he found them offensive. 4-ER-0631, 4-ER-715-717. HSD took no corrective action against Diemert based on his statement. 4-ER-0631.

Before this exchange with Groce, Diemert had attended three

6

mandatory RSJI trainings: Race: The Power of an Illusion ("RPOI") in 2015, Racial Equity Lens/Why We Lead with Race in 2017, and Undoing Institutional Racism ("UIR") in 2019. 4-ER-636. RPOI is a documentary and accompanying facilitation (https://www.racepowerofanillusion.org) that teaches about the origins of race and racism in our society. *See* 4-ER-636-692. RPOI addresses different types of privilege (4-ER-660, 4-ER-662), structural racism (4-ER-680, 688), and teaches that none of us are responsible for the past. 4-ER-680. The Racial Equity Lens training (*see* 4-ER-693-713) addressed similar concepts: the history of race in our society (4-ER-698), types of privilege (4-ER-697, 4-ER-701-703), the impact that race has on life outcomes (4-ER-705-709), and creating equity for all (4-ER-697, 4-ER-709). The UIR training, put on by the People's Institute, was a workshop focused on understanding racism, learning from history, and undoing racist structures that hinder effective social change. *See* 1-SER-71-72. Diemert claims that when he took this last training in 2019, trainers said "white people are cannibals," "racism is in white people's DNA," and "white people are like the devil." 2-ER-61.

Although Diemert was never required to attend any white caucus

7

meetings (4-ER-742-743), he nevertheless objected to the existence of these groups. In fact. when a colleague invited him to a monthly white caucus meeting in 2018, he asked to be removed from the mailing list and told her "I find your overt racism offensive and will file harassment charges with the EEOC if you continue." 4-ER-795. Diemert also apparently told his union representative in 2018 he was considering attending a training aimed at City employees of color as a form of protest, but ended up not signing up for it after the representative (not a City employee) told him they probably would not allow him to participate. *See* 4-ER-770-772. Diemert does not allege that the City ever prevented him from attending a caucus meeting or training focused on employees of color.

Despite never being required to or prevented from attending a caucus meeting, Diemert continued to claim the caucuses were discriminatory, and asked Groce in 2021 whether he could start his own non-race-based affinity group that rejected "stereotyping people by race." 4-ER-727. After Groce explained that Diemert would have to submit the proposal to the HSD Change Team, Diemert abandoned the proposal. 4-ER-631-632, 4-ER-726-730.

8

### D.    Alleged Racial Harassment

In addition to exposure to RSJI, Diemert also claims that incidents with co-workers over the last seven years of his employment created a HWE for him based on his race.  Much of his testimony about this alleged HWE lacks specificity about timeframe and actors.  *See, e.g.*, 2-ER-56 ("it is difficult for me to remember every single incidence in which I heard a racially pejorative comment against white people because it was a daily occurrence in my work environment.").  However, he does give specifics about some of the smattering of acts he alleges created a HWE.

Several of these acts occurred more than three years prior to Diemert's resignation.  Diemert alleges that manager Javier Pulido, upon meeting Diemert in 2015, asked him what a straight white male could possibly offer HSD.  1-SER-16, 5-ER-830.  In 2016 Diemert claims his co-worker Sabrina Budner denied assistance to an eligible white applicant because the applicant had "white privilege"; when Diemert corrected her, his manager Gloria Hatcher-Mays purportedly berated him and said it was impossible to be racist towards white people.  2-ER-57.  And in 2017, he claims his co-worker, Consuelo Crow, made comments about white supremacy and called him a

racist.  2-ER-61-62.

Diemert attempts to connect these older claims to more recent allegations.  He claims that his co-worker Shamsu Said told him in 2019 that Diemert was to blame for U.S. injustices because of his race and called Diemert a "colonist."  1-SER-28-29.  According to Diemert, Said said similar things and physically accosted Diemert in 2020.  2-ER-63.  Diemert also complains that his manager, Chaney Kilpatrick-Goodwill, and other employees engaged in a lunchroom discussion in 2020 about white privilege, and that when Diemert joined the conversation he was told his response was invalid because he was white and did not have their lived experiences.  2-ER-62.  He also felt harassed by a 2021 email introducing a new employee, in which the new employee noted that self-care for him included "being around Black and brown folks."  2-ER-84.  Finally, Diemert took offense to an article about the Tulsa Race Massacre that a City employee from another department, Edward Odom, posted on an internal City site in June 2021.  *See* 3-ER-511-514.  Diemert objected to a statement in the article that due to some states' bans on Critical Race Theory ("CRT"), historical events like these might not be taught.  Although the two engaged in dialogue wherein Odom's tone was

10

respectful and Diemert's was not (3-ER-524-529, 3-ER-517-521), Diemert claims Odom's comments were "racially demeaning." 1-SER-50.

### E. The City Responded Appropriately to Diemert's Complaints

Throughout his employment, the City addressed Diemert's complaints and did not admonish or discipline him for his inappropriate behavior. For example, after Diemert complained about Said's conduct in 2020, HSD moved Said's desk away from Diemert's. 1-SER-220-221, 1-SER-224-225, 1-SER-152-153. Diemert was not disciplined, despite Odom's complaint about their interaction. *See* 1-SER-211. And, as previously noted, Diemert was not disciplined for refusing to take additional RSJI trainings. 4-ER-631.

His complaints were also investigated. In December 2020, Diemert filed an EEOC charge, claiming that he was harassed and discriminated against due to his race, and that RSJI trainings were hostile. *See* 4-ER-632, 1-SER-88, 1-SER-94. The City's Human Resources Investigation Unit ("HRIU"), an independent investigatory unit within the City, investigated Diemert's claims. 4-ER-632. When Diemert claimed the first investigator assigned, Brandon Kuykendall, was biased because he had previously worked for the City department that provided RSJI trainings, a second investigator,

11

Christy Kuna, was assigned to investigate the RSJI-specific allegations. 1-SER-247-248.

Diemert purposefully did not cooperate with Kuykendall's investigation (1-SER-249-251, 4-ER-773-774), but Kuykendall nevertheless was able to complete his investigation (including investigating some of the incidents cited in this lawsuit) and concluded that the preponderance of the evidence did not support Diemert's claims of discrimination and harassment.[1] 1-SER-87-92. Kuna likewise concluded that the evidence did not support Diemert's allegations about the RSJI trainings. 1-SER-94-97.

### F. Alleged Retaliation and Disparate Treatment

Diemert alleges that, after his December 2020 EEOC complaint, he was subjected to several retaliatory and discriminatory acts: Kilpatrick-Goodwill sending an email he characterizes as subjecting him to scrutiny (*see* 2-ER-63, 2-ER-328), Kilpatrick-Goodwill allegedly refusing to meet with him and not helping him with an IT issue (*see* 2-ER-63, 2-ER-322-26), and the City erroneously misclassifying his FML leave (he was not denied leave or pay as

---

[1] Diemert claims Kuykendall failed to interview key witnesses but does not support this assertion. *See* Opening Brief at 14, 2-ER-66.

12

a result of the error, which was fixed when discovered). 4-ER-633.

Diemert resigned from City employment on September 7, 2021. 4-ER-633. He had been teleworking since April 2020 due to the COVID-19 pandemic, and, unbeknownst to HSD, had moved to Texas with his family earlier in 2021. 4-ER-634. Diemert had requested full-time telework as a disability accommodation, and HSD was awaiting additional information from his doctor. *Id.*; 4-ER-816-817. Diemert resigned before any final determination on an accommodation had been made. 4-ER-634.

## G.     Procedural History

Diemert filed this lawsuit in the Western District of Washington in November 2022 and amended his complaint in January 2023. *See* 5-ER-823-857. He brought claims for racially disparate treatment, racial HWE, and retaliation under 42 U.S.C. § 2000e ("Title VII") and the Washington Law Against Discrimination, WASH. REV. CODE § 49.60 ("WLAD"), as well as a claim for violation of the Equal Protection Clause. 5-ER-848-856. The City filed a FED. R. CIV. P. 12 motion to dismiss, which the district court granted in part and denied in part. *See* 2-SER-340-354. Specifically, the district court dismissed Diemert's Title VII disparate treatment and retaliation claims to the

13

extent based on discrete acts that occurred before February 27, 2020 (300 days before Diemert's EEOC charge was filed), and dismissed Diemert's WLAD disparate treatment and retaliation claims to the extent based on discrete acts that occurred before November 16, 2019 (three years before lawsuit was filed). 2-SER-352-353. The district court denied the motion as to all other claims, finding that Diemert had alleged sufficient facts that, if true, would support claims for HWE, disparate treatment, retaliation, and equal protection violations. 2-SER-345-351.

At the close of discovery, the City filed a summary judgment motion. 1-SER-268-298. The district court granted the City's motion and dismissed the case. 1-ER-2-48. Diemert appealed.

## V.    SUMMARY OF ARGUMENT

The district court properly dismissed Diemert's claims on summary judgment. First, the court did not abuse its discretion in striking and considering some of Diemert's exhibits for a limited purpose. The documents were inadmissible, and this Court should disregard additional documents cited by Diemert for the first time on appeal.

Second, the district court properly dismissed Diemert's Title VII and

14

WLAD claims for racial HWE based on RSJI. The admissible evidence properly before the court on summary judgment demonstrates that the tenets of RSJI to which Diemert was exposed were not discriminatory or sufficient to establish a HWE. Similarly, the admissible evidence properly before the court on summary judgment regarding the alleged incidents between Diemert and various co-workers demonstrates that these acts were insufficiently severe or pervasive to constitute a HWE.

Third, the district court properly dismissed Diemert's Title VII and WLAD claims for disparate treatment and retaliation. The alleged conduct does not constitute adverse acts, nor can Diemert's allegations survive the remaining prongs of the *McDonnell Douglas* analysis.

Fourth, the district court properly dismissed Diemert's Title VII and WLAD constructive discharge claims. The evidence does not demonstrate working conditions so intolerable that a reasonable person would feel forced to resign. Moreover, Diemert's and amici's citation to recent U.S. Supreme Court precedent in an attempt to cast doubt on the district court's Title VII analysis is unavailing.

Finally, the district court properly dismissed Diemert's claim for

15

violation of the Equal Protection Clause. This claim fails because Diemert's Title VII claims fail, and the admissible evidence properly before the court does not demonstrate that Diemert was subject to any "racial classification."

## VI. ARGUMENT

### A. Standard of Review

There are two standards of review applicable in this case. First, this Court reviews a district court's ruling on a motion to strike for abuse of discretion. *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1038 (9th Cir. 2003).

Second, summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081 (9th Cir. 1996). "[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Corp.*, 68 F.3d 1216, 1221 (9th Cir. 1995). This Court

16

reviews a grant of summary judgment de novo. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). The Court may affirm the grant of summary judgment on any basis supported by the record. *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1030 (9th Cir. 2004).

### B. This Court Should Disregard Multiple Categories of Documents Cited by Diemert

Before addressing the merits of Diemert's arguments, the City will address some evidentiary and admissibility issues raised by Diemert's briefing. Specifically, there are numerous materials Diemert cites that should be either disregarded or considered only for a limited purpose.

### 1. The district court's evidentiary rulings were not an abuse of discretion.

Diemert first contends the district court abused its discretion in its rulings regarding Exhibits 6 and 36 to Diemert's attorney's declaration. Opening Brief at 21-23. The district court struck Exhibit 6 because it was not authenticated, and considered Exhibit 36 only insofar as it showed that complaints had been made by other HSD employees. *See* 1-ER-15-19.

Diemert's objections to the district court's rulings fail for two reasons. First, Diemert did not oppose or otherwise respond to the City's motion to

17

strike these exhibits below.[2] Nor did he address the issue at oral argument. *See* 2-SER-300-339. Diemert's failure to respond to the City's motion to strike may be considered as an admission that the motion has merit. *See, e.g.*, W.D. WASH. LOCAL R. 7(b)(2); *Flooring Assocs., Inc. v. Design Mfg. Int'l, LLC*, No. 2:20-CV-00057-JCC-JRC, 2021 WL 1551473, at *7 (W.D. Wash. Apr. 1, 2021) (failure to respond to motion to strike contained in summary judgment motion may be deemed as an admission that the motion to strike has merit).

Second, even if this Court does consider the admissibility arguments that Diemert raises for the first time on appeal, the district court did not abuse its discretion. Exhibit 6 is a hodgepodge of undated and unsigned bulleted lists, photos of whiteboards, and purported excerpts from other documents. *See* 2-ER-93-118. Diemert claims it is "an example of the types of materials regularly disseminated within the workplace." 2-ER-57. He does not state that he ever received these materials in the workplace, or that they were used

---

[2] Diemert complains that the City moved to strike for the first time in its reply brief (Opening Brief at 21), but that was required by Local Rule 7(g).

18

in trainings he attended. Nor does he state who created them or when.[3] Because Diemert did not properly authenticate Exhibit 6, the district court did not abuse its discretion in excluding it.[4] *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("unauthenticated documents cannot be considered in a motion for summary judgment.").

Exhibit 36 purports to be intakes and summary reports regarding various discrimination complaints made by HSD employees. *See* 3-ER-479-495. The district court determined that it would consider these unsworn

---

[3] For the first time on appeal, Diemert states that Exhibit 6 consists of documents that the City produced to him pursuant to a Public Records Act request (not in discovery). Opening Brief at 22. That some City department possessed these records does not authenticate what they are. Diemert cannot plausibly argue these documents comply with the Rules of Evidence.

[4] In addition, the district court correctly noted that Diemert did not cite to Exhibit 6 in his opposition brief. 1-ER-16; *see* 1-SER-46-69. "The district judge is not required to comb the record to find some reason to deny a motion for summary judgment." *Forsberg v. Pac. N.W. Bell Tel. Co.,* 840 F.2d 1409, 1418 (9th Cir. 1988). Because Diemert did not cite Exhibit 6 in his opposition, he cannot show it was error for the district court not to consider it. *See id.; see also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.").

19

documents insofar as they showed that complaints had been filed, but not for the truth of the matters asserted therein. 1-ER-19. This was not an abuse of discretion. As a threshold matter, the documents were not authenticated. Moreover, the hearsay contained within does not fall into any hearsay exceptions. Diemert primarily focuses on a document that purports to be notes taken by Kuykendall from an interview with Terry McLellan, HSD's HR Director, in which she purportedly told Kuykendall that some Russian and Ukrainian employees "didn't know they couldn't" attend a training for people of color. 3-ER-495; Opening Brief at 5, 7 n.3, 27, 30, 43, 44. Diemert claims this double hearsay is admissible because it is a public record, a business record, and an admission of a party opponent. Opening Brief at 22. However, it does not fall under the public records exception because it purports to be only intake notes and does not contain "factual findings from a legally authorized investigation." FED. R. EVID. 803(8)(A)(iii). It does not qualify for the business records exception because Diemert has not established by testimony of a custodian or other qualified witness that it was made at or near the time by someone with knowledge, that it was kept in the regularly conducted activity of business, and that making it was a regular practice. FED.

20

R. EVID. 803(6). And it does not qualify as an admission from a party opponent because it is hearsay within hearsay, and, as noted above, there is no applicable exception for the interviewer's notes. Cf. FED. R. EVID. 805 (hearsay within hearsay not excluded if each part of the combined statements conforms with an exception). The district court did not abuse its discretion in limiting its consideration of Exhibit 36. *See, e.g., Dykzeul v. Charter Comm'ns, Inc*., No. CV-18-5826-DSF-(GJSx), 2021 WL 4522545, at *11-*13 (C.D. Cal. Feb. 3, 2021) (purported EEOC notes of interview with plaintiff excluded; business records, public records, and party admission exceptions inapplicable).

## 2. Previously uncited materials should not be considered.

In addition, Diemert cites materials in his opening brief (websites and links) that were not before the district court on summary judgment. *See* Opening Brief at 6 n.1 & n.2; at 10 n.5; and at 24 n.13. In reviewing summary judgment, this Court is limited to evidence available to the district court at the time the motion was made. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (appellate court did not consider deposition pages cited on appeal that were not in the summary judgment record). This Court should therefore

21

disregard this newly presented evidence.

Finally, on appeal Diemert cites numerous documents for the first time that, while part of the approximately 750 pages of exhibits attached to his attorney's declaration below, were not mentioned in his briefing before the district court. Specifically, Exhibits 3, 6, 9, 18-22, 30, 33, 37, and 42 to the D'Agostino Declaration were not cited or otherwise brought to the district court's attention anywhere in Diemert's opposition briefing below. Yet Diemert cites these exhibits numerous times on appeal. In addition, while Diemert only brought Exhibit 8 to his First Amended Complaint ("FAC") to the district court's attention in opposing summary judgment (*see* 1-SER-56), on appeal he asks this Court to review Exhibits 7 through 15 to his FAC. *See* Opening Brief at 7, 13, 27. "The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). This Court should disregard documents that were not brought to the district court's attention. *See, e.g., Taybron v. City and Cnty. of San Francisco*, 341 F.3d 957, 960 (9th Cir. 2003) (disregarding

22

evidence in the record that was not cited in appellees' opposition to summary judgment below, but was cited to the appellate court).

### C.  The District Court Properly Dismissed Diemert's Hostile Work Environment Claims

The City will now address the merits of each of Diemert's claims.  To establish a prima facie case of a racially HWE under Title VII, a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment.  *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).  State courts interpret WLAD similarly.  *See, e.g., Domingo v. Boeing Emps. Credit Union*, 98 P.3d 1222, 1228 (Wash. Ct. App. 2004) (WLAD HWE requires plaintiff prove harassment was unwelcome, was because she was a member of a protected class, affected the terms or conditions of her employment, and is imputable to the employer).

To determine whether a work environment is sufficiently hostile, a court examines the frequency of the conduct, its severity, whether it is physically threatening or humiliating or instead merely an offensive utterance, and whether it unreasonably interferes with an employee's work performance.

23

*Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 687 (9th Cir. 2017) (Title VII); *Blackburn v. State*, 375 P.3d 1076, 1081 n.4 (Wash. 2016) (WLAD). "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady*, 924 F.2d 872, 878 (1991).

Diemert's HWE claim fails. First, much of the basis for Diemert's claim based on RSJI consists of broad generalizations, unsupported factual allegations, and documents Diemert never was trained on during his employment, but only received in connection with his current claims. When all this chaff is swept away, the tenets of RSJI to which Diemert <u>was</u> exposed do not create a HWE for him as a matter of law. Second, the alleged acts by Diemert's co-workers do not support a HWE claim. Many of the acts cannot be considered, and those that <u>are</u> properly before the Court are insufficiently severe or pervasive as a matter of law. This Court should affirm.

### 1. RSJI did not create a racially hostile work environment.

The district court began its analysis of Diemert's HWE claim by analyzing whether the City's RSJI trainings subjected Diemert to a HWE. The district court did not err in concluding that they did not.

24

As an initial matter, Diemert's briefing regarding RSJI is rife with unsupported hyperbole, inadmissible evidence, and vague generalizations that this Court need not consider. First, Diemert makes broad generalizations about how RSJI infused every aspect of his employment to create a HWE, but, as the district court noted, he is short on details. 1-ER-25. For example, Diemert claims he was "repeatedly" told that it was impossible for white people to experience racism, and that it was impossible for Black people to be racist. 2-ER-58. He claims white employees had to "continuously" admit their own participation in the system of white supremacy. 2-ER-59. And he asserts that "every RSJI training [he] ended up attending would eventually mention some pejorative verbal or written comment against white people." *Id*. "To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc*., 637 F.3d 1047, 1061 (9th Cir. 2011). Diemert's sweeping statements about RSJI, devoid of names, dates, documents, or any concrete details that would allow the City to respond to those claims, should therefore be disregarded. *See, e.g., Forsberg v. Pac. N.W. Bell Tel. Co*., 840 F.2d 1409, 1419 (9th Cir. 1988) ("purely conclusory

25

allegations of alleged discrimination, with no concrete, relevant particulars, will not bar summary judgment" on Title VII claim); *Fulton v. State*, 279 P.3d 500, 506 (Wash. Ct. App. 2012) (to defeat summary judgment on WLAD claim, employee must establish specific and material facts to support case).

Second, many of the inflammatory assertions Diemert makes about RSJI are unsupported by the record cited. For example, he claims that the City forced him "to participate in racially-segregated trainings that required white employees to admit complicity and defer to BIPOC colleagues." Opening Brief at 29. None of the materials he cites support this assertion. *See* 4-ER-637-713, 4-ER-725, 4-ER-757. He claims that the "City's own witnesses admitted that the City expected and rewarded race-based participation." Opening Brief at 30. In support he cites his own unfounded testimony that it was necessary to participate in affinity groups and the Change Team to get promoted (4-ER-743), and Exhibit 36,[5] which contains nothing about the City expecting and rewarding race-based participation. His

---

[5] As demonstrated above in Section B(1), the district court did not abuse its discretion in determining it would only consider this exhibit to show that complaints were made.

26

assertion that RSJI "applauds reducing the number of white employees across the City" (Opening Brief at 7) and that RSJI expectations "varied depending on the employee's race" (Opening Brief at 7-8), are also wholly unsupported. Only allegations supported by the record cited should be considered. *See* FED. R. APP. P. 28(a)(8)(A) (contentions must be supported by citations to parts of the record); *Assoc. Builders & Contractors v. Carpenters Vacation & Holiday Trust Fund for N. Cal.*, 700 F.2d 1269, 1277 n.11 (9th Cir. 1983) (declining to consider allegation that was not supported by reference to the record).

Third, for many of his assertions regarding RSJI, Diemert improperly cites large swaths of the record. For example, Diemert makes a variety of assertions about RSJI trainings, workplace meetings, and caucuses, and claims RSJI applauds reducing the number of white City employees. Opening Brief at 6-7. In support, he cites to 332 pages of the record. *Id.* at 7. He similarly cites 493 pages of the record for the proposition that RSJI encouraged the environment of which he complains. *Id.* at 27. "Judges are not like pigs, hunting for truffles buried in briefs." *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) (cleaned up). This Court need not do Diemert's work for him "by combing the record on [his] behalf for factual support." *W.*

27

*Radio Servs. Co. v. Qwest Corp.*, 678 F.3d 970, 979 (9th Cir. 2012). Allegations unsupported by specific cites to the record should be disregarded. *Assoc. Builders,* 700 F.2d at 1277 n.11.

Finally, for many of the purported RSJI materials that Diemert and amici cite, there exists no evidence that they were ever used in any training Diemert attended, ever distributed to Diemert, or ever seen by Diemert except as a result of his searches and document requests in service of his EEOC complaint and the instant lawsuit. For example, there is no evidence that Diemert ever received Exhibits 7, 8, and 9 to his FAC (5-ER-858-899) in the context of his employment at the City. And there is no evidence that many of the purported screenshots in Exhibit 9[6] to the D'Agostino Declaration (2-ER-257-315) are from documents Diemert received at RSJI trainings. These documents therefore cannot contribute to his alleged HWE. *See, e.g., Bell v. Boeing*, 599 F. Supp. 3d 1052, 1076-77 (W.D. Wash. 2022) (negative emails about plaintiff that he only learned about in discovery after he was discharged did not alter the conditions of his employment).

---

[6] Further, as noted above in Section B(2), this Court need not consider this document because it was not cited to the district court on summary judgment.

28

When the unsupported hyperbole, inadmissible evidence, and vague generalizations about RSJI are set aside, the evidence about RSJI trainings and materials that Diemert personally experienced[7] and received that can properly be considered on summary judgment is as follows:

1) Diemert played "Privilege Bingo," an exercise in which employees identify the ways in which they have privilege, such as "thin," "wealthy," "white," "not a red-head," "male," etc. 2-ER-60, 4-ER-660, 701.

2) The City expressed its commitment to "leading with a racial equity lens." 4-ER-644, 4-ER-709-10.

3) Diemert was taught about concepts such as "white supremacy culture," institutional and structural racism, and different forms of privilege. *See* 4-ER-649, 4-ER-662, 4-ER-670, 4-ER-681, 4-ER-688. He was taught that the data shows that race impacts most areas

---

[7] The district court addressed separately the allegation that in the 2019 training Diemert attended, trainers said that white people were cannibals, that racism is in white people's DNA, and that white people are like the devil. *See* 2-ER-61, 1-ER-25, 1-ER-27. The City also addresses this allegation separately, in Section C(2) below.

of daily life, including life expectancy, economics, and education. 4-ER-680, 4-ER-705-708. And he was taught that, while everyone experiences the impacts of structural racism, none of us are responsible for what happened in the past. 4-ER-680.

4) Diemert was asked to be willing to "sit in discomfort" and be open to new concepts and ideas. *See* 4-ER-678.

5) Additional trainings on topics such as White Supremacy Culture, Power Analysis, and Internalized Racial Oppression were offered (4-ER-680), but Diemert did not take any of these trainings. *See* 4-ER-636.

6) Diemert never suffered any negative performance evaluations for not completing the required RSJI trainings. *See* 4-ER-631, 1-SER-83. He was not required to attend white caucus meetings (4-ER-742-743), and he does not allege that the City prevented him from

30

attending any trainings aimed at people of color.[8]

7) Diemert asked Groce if Diemert could start a non-race-based affinity group, and was told that such groups must be approved by HSD's Change Team. *See* 4-ER-631-632, 4-ER-726-728.

It is clear that Diemert not only disagreed with the tenets of RSJI, but perceived RSJI as stereotyping and attacking him and all white people. *See*, *e.g.,* 1-SER-130-131 (Diemert believes stating that existing systems perpetuate better outcomes for whites than for people of color is harassment and stereotyping him); 4-ER-751 (Diemert finds it offensive to be asked to identify his race in workplace); 4-ER-752 (Diemert finds it offensive to say that in this country white people historically bore responsibility for slavery); 4-ER-754-55 (Diemert believes saying he has white privilege is discriminating and stereotyping him). But his disagreement with these ideas

---

[8] Diemert alleged that his union representative (not a City employee) told him that "they" probably would not allow Diemert to participate in a training geared toward people of color, therefore he never signed up for it. 4-ER-770-771. Diemert does not explain how this conversation constitutes the City preventing his attendance.

31

does not mean that the City cannot present them.[9] *See Henderson v. Sch. Dist.*

*of Springfield R-12*, 650 F. Supp. 3d 786, 802 (W.D. Mo. 2023) (rejecting

plaintiffs' objections to their employer's trainings on equity and anti-racism;

claim that employer should not conduct training on policies applicable to their

work because plaintiffs disagree with the policies is "untenable").

Nor does Diemert's disagreement with the ideas mean that exposing

_____

[9] Notably, many of the concepts Diemert disagrees with have been embraced by courts in Washington State and this Circuit. *See, e.g., Shirley v. Yates*, 807 F.3d 1090, 1110 n.26 (9th Cir. 2015) (noting that vague preferences in jury selection "are particularly likely to conceal implicit bias"); *U.S. v. Modeste*, No. 3:19-CR-00072-TMB-MMS, 2023 WL 2986933, *3 n.29 (D. Alaska Apr. 18, 2023) (acknowledging that racism is "deeply embedded in systems, laws, written or unwritten policies, and entrenched practices and beliefs that produce, condone, and perpetuate widespread unfair treatment and oppression of people of color") (cleaned up); *Pavel v. Univ. of Or.*, No. 6:16-CV-00819-AA, 2018 WL 1352150, at *4 (D. Or. Mar. 13, 2018) (in race discrimination case, noting that "[t]he impacts of our shameful racial history, pervasive implicit bias, and institutionalized racism are now part of any meaningful discussion on social or institutional responsibility in America today."); *Henderson v. Thompson*, 518 P.3d 1011, 1028 (Wash. 2022) (recognizing need for people comprising the courts to "comprehend the legacy of injustices built into our legal systems" and "recognize how our participation in these systems may reify them"); WASH. ST. GEN. R. 37 (rule aimed at eliminating unfair exclusion of potential jurors based on race or ethnicity uses viewpoint of objective observer, who "is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State").

him to them was discriminatory or a violation of Title VII or WLAD. Case law from other jurisdictions provides useful analysis. Like Diemert, the plaintiff in *Spengler v. Coop. Educ. Serv. Agency 7*, No. 22-C-1199, 2025 WL 2207025, at *4 (E.D. Wisc. Aug. 4, 2025) believed her employer's trainings on concepts like equity and white supremacy culture reflected a racist ideology and stereotyped all white people. She openly disagreed with this approach to her employer's provision of special education services, and due to her refusal to follow the tenets her employer adopted, was demoted. *Id.*, at*6-9. The court held that the plaintiff's case turned on whether her employer's adoption of the tenets of CRT violated Title VII, and held that it did not. *Id.*, at*10, *12. The court noted that, rather than being "racist," CRT assumes that all races are equal and thus, "absent white racism, all racial groups should be equally represented in all areas of civic life." *Id.* at *12. The employer's embrace of CRT did not, by itself, constitute a violation of Title VII. *Id.*

As the *Spengler* court recognized, teaching about concepts like institutionalized racism and white privilege is not proscribed by Title VII. Indeed, numerous courts around the country have held that the mere act of

33

being required to attend training on these concepts is not discriminatory. *See, e.g., Honeyfund.com, Inc. v. Governor,* 94 F.4th 1272, 1281 (11th Cir. 2024) (rejecting state's argument that law banning employer-mandated DEI training based on CRT is a law targeting discrimination; "[t]hat many people find these views deeply troubling does not mean that by banning them Florida is targeting discrimination"); *Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1246-48, 1251-52 (10th Cir. 2024) (plaintiff's exposure to concepts like white fragility and privilege in an employer training was insufficient to plead HWE based on race); *Wood v. Red Hat, Inc.,* No. 2:24-CV-00237-DCN, 2025 WL 2777880, at *4 (D. Idaho Sept. 29, 2025) ("d]iversity seminars do not categorically constitute harassment"); *De Piero v. Pa. State Univ.,* 769 F. Supp. 3d 329, 333-40, 349-50 (E.D. Pa. 2025) (granting summary judgment to employer on white professor's claim; emails and interactions with colleagues discussing antiracist scholarship and campus-wide meetings discussing racism and white supremacy in academia not sufficiently severe to constitute a HWE); *Vavra v. Honeywell Int'l, Inc.*, 688 F. Supp. 3d 758, 770-71 (N.D. Ill. 2023) (white employee who was terminated for refusing to take mandated training on unconscious bias failed to provide evidence training was

34

discriminatory; plaintiff's belief that the training was racially discriminatory, "however sincere, was not objectively reasonable"); *Shannon v. Cherry Creek Sch. Dist.*, No. 1:20-CV-03469-WJM-SKC, 2022 WL 4819537, at *11-12 (D. Colo. July 12, 2022) (Black plaintiff's claim that employer diversity training promoted white privilege and focused on negative stereotypes of Black people insufficient to state claim for HWE).

In fact, as the district court noted, employer trainings on diversity, harassment, and discrimination can help <u>prevent</u> violations of Title VII and further its goals. *See* 1-ER-23-24. "Title VII is designed to encourage the creation of antiharassment policies . . ." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764 (1998). Trainings can help employers further these goals. *See, e.g., Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 977 (9th Cir. 2001) (employer's written anti-harassment policy and related mandatory trainings showed it exercised reasonable care to prevent harassment); *De Piero v. Pa. State Univ.*, 711 F. Supp. 3d 410, 424 (E.D. Pa. 2024) ("Training on concepts such as 'white privilege,' 'white fragility,' implicit bias, or critical race theory can contribute positively to nuanced, important conversations about how to form a healthy and inclusive working environment.").

35

The cases cited by some amici do not dictate a different result. In both *Johnson v. Or. Dep't of Envtl. Quality*, No. 3:24-cv-00279-JR, 2024 WL 5038803 (D. Or. Dec. 9, 2024) and *De Piero*, a white plaintiff claimed his/her employer's DEI policies created a HWE. In both cases, as in the instant case, the district court denied the employer's initial motion to dismiss, holding that the allegations plausibly stated a claim for a racial HWE under the Rule 12 standard. *Johnson*, 2024 WL 5038803, at *4; *De Piero*, 711 F. Supp. 3d at 423-24. But at the summary judgment stage, the *De Piero* court, like the district court here, found the evidence insufficient.[10] 769 F. Supp. 3d at 333-40, 349-50.

In sum, Diemert has not demonstrated that the RSJI trainings he attended created a HWE. Indeed, to compare trainings on topics like institutional racism and white privilege "to true hostile work environments rings hollow. Worse still, it trivializes the freedom protected by Title VII . . . to suggest that the two are the same." *Honeyfund.com v. DeSantis*, 622 F. Supp. 3d 1159, 1171, 1186 (N.D. Fla. 2022), *aff'd sub nom. Honeyfund.com,*

---

[10] *Johnson* is still in the discovery phase and no summary judgment motion has been filed.

36

*Inc. v. Governor,* 94 F.4th 1272 (11th Cir. 2024) (cleaned up).  The district court properly dismissed Diemert's HWE claim based on RSJI trainings.

### 2. Diemert did not demonstrate co-worker conduct sufficiently severe or pervasive.

Diemert has not shown that the RSJI trainings he attended created a HWE.  He also lists other acts by various co-workers that he contends created a HWE.  However, for the reasons set forth below, many of these events cannot be considered for Diemert's HWE claim.  Moreover, the events that properly remain for consideration are insufficiently severe or pervasive to constitute a HWE under Title VII or WLAD as a matter of law.

### a) *Many of the acts Diemert alleges should not be considered as part of his HWE claim.*

Diemert cites to a litany of alleged events that he claims created a HWE based on race.  However, as demonstrated below, many of these alleged events should not be considered.

First, events that occurred outside the limitations period cannot constitute part of a HWE if they are discrete acts.  Hatcher-Mays' hiring of a woman of color in 2015 as a supervisor instead of Diemert (2-ER-53) and Inay's successful pressuring of Diemert to step down from his lead role in

37

2017 (2-ER-54) are both discrete, adverse acts that occurred outside the limitations period, and thus cannot be considered as part of Diemert's HWE claim. *See, e.g., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 (2002) (under Title VII, failure to promote or refusal to hire are discrete acts different in kind from a HWE, and must have occurred within the appropriate time period to be actionable); *Davis v. City of Seattle*, No. C06-1659Z, 2008 WL 202708, at *15 (W.D. Wash. Jan. 22, 2008) (failure to hire is a discrete act and therefore not cognizable under WLAD unless it occurs within the limitations period). Similarly, the City's "coercion" of Diemert to work outside of his classification (Opening Brief at 30, 2-ER-52-53), and alleged failure to provide back pay (2-ER-55) are discrete adverse acts outside the limitations period that are not actionable as part of a HWE.[11] *Fonseca v. Sysco Food Servs. of Ariz.*, 374 F.3d 840, 847 (9th Cir. 2004) (adverse action occurs when employer's action negatively affects employee's compensation); *Ramirez v. Nicholson*, No. 06cv0546-JM(NLS), 2007 WL 4208293, at *3-*4

---

[11] The district court also correctly noted that Diemert failed to give any timeframe or details about this alleged denial of payment (1-ER-9), and thus properly did not consider this incident when analyzing Diemert's HWE claim.

38

(S.D. Cal. Nov. 27, 2007) (denial of pay increase was discrete act so Title VII/ADEA claim based on denial had to be timely filed). Indeed, the district court already granted the City's motion to dismiss Diemert's HWE claims to the extent they were based on discrete acts occurring before November 2019. 2-SER-351-353. These acts therefore cannot be considered.

Second, for many of the events he claims comprise his HWE, Diemert offers only broad statements and fails to give the requisite level of detail. For example, he claims that racially pejorative comments about white people were a "daily" occurrence at work, that there were times when management would say "you need to shut up because of your race and you should let this race or gender speak," and that he would often hear discussions about how federal laws were instruments of white supremacy. 2-ER-55-56, 2-ER-59. He does not include names, dates, or any other specifics that would permit the City to defend against his claim. The Court should not consider events lacking specifics and supported only by conclusory allegations. *See, e.g., Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1988) ("purely conclusory allegations of alleged discrimination, with no concrete, relevant particulars, will not bar summary judgment" on Title VII claim); *Fulton v.*

39

*State*, 279 P.3d 500, 506 (Wash. Ct. App. 2012) (to defeat summary judgment on WLAD claim, employee must establish specific and material facts to support her case).

Third, Diemert relies on documents of which he had no knowledge when he was employed and only uncovered through public records requests or declarations from others. *See* 2-ER-56, 2-ER-85-89 (Crow comments about white mothers); 3-ER-467 (Jennifer Yost declaration that she heard co-workers refer to another white co-worker as a "stupid white bitch"); 3-ER-457-463 (Microsoft Teams conversations between other HSD employees that include discussions of internalized racial inferiority and superiority); 3-ER-534-618 (messages between other City employees about Diemert's interaction with Odom). Because Diemert did not know of these statements during his employment, and does not demonstrate how they affected the terms and conditions of his employment, he cannot rely on them to support his HWE claim. *See, e.g., Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000) (plaintiff could not rely on co-worker's harassment of others to support her HWE claim; "[h]arassment directed towards others of which an employee is unaware can, naturally, have no bearing on whether she reasonably

40

considered her working environment abusive"); *Keenan v. Allen*, 889 F. Supp. 1320, 1374-75 n.68 (E.D. Wash. 1995) (plaintiff could not rely on statements made to others to defeat summary judgment on her Title VII and WLAD HWE claim), *aff'd*, 91 F.3d 1275 (9th Cir. 1996); *see also Bell v. Boeing*, 599 F. Supp. 3d 1052, 1076-77 (W.D. Wash. 2022) (negative emails about plaintiff that he only learned of in discovery after he was discharged did not alter the conditions of his employment).[12]

Fourth, the exchange Diemert had with Odom about the Tulsa Race Massacre does not contribute to a HWE. Diemert asserted that Odom subjected him to "racially demeaning comments" (1-SER-50), but review of the record reveals otherwise. Odom posted information about the Tulsa Race Massacre on an internal City site, including a statement that due to some states' bans on CRT, many of these historical events might not be taught. 3-ER-511-514. Diemert responded, defending CRT bans, decrying racial stereotyping, and claiming that saying it was "white people who enslaved

---

[12] *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 683 (9th Cir. 2017) and *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117-18 (9th Cir. 2004), both cited by Diemert in opposing summary judgment, are distinguishable because the plaintiff witnessed the hostile conduct that was directed towards others.

black people" was bigoted.  3-ER-526-529.  The two engaged in additional dialogue about guilt, history, and CRT in the comments; Odom's tone remained respectful and Diemert's did not.  3-ER-524-525, 3-ER-517-521. No reasonable person could find Odom's conduct offensive or abusive. *Adams v. Able Bldg. Supply*, 57 P.3d 280, 284 (Wash. Ct. App. 2002) (HWE under WLAD must entail objectively abusive conduct) (citing *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993)).[13]

Fifth, the City cannot be liable for conduct committed by a co-worker that Diemert did not report.  *See, e.g., Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001) (in Title VII HWE claim, "an employer cannot be held liable for misconduct of which it is unaware"); *Davis v. Fred's Appliance*, 287 P.3d 51, 58-59 (Wash. Ct. App. 2012) (supervisor/co-worker harassment can be imputed to employer under WLAD if employer authorized, knew, or should have known of the harassment and failed to take reasonably prompt and adequate remedial action).  For example, Diemert complains about a 2017 incident in which co-worker Crow made comments about white supremacy

---

[13] Moreover, as the district court noted, Diemert initiated and continued the discussion, indicating that Odom's responses were not unwelcome.

42

and called him a racist. 2-ER-61-62. Because there is no evidence he reported this incident, the City cannot be liable. *See, e.g., Burrell v. Star Nursery*, 170 F.3d 951, 955 (9th Cir. 1999) (employer not liable for harassment by co-workers that plaintiff did not report).

Sixth, Diemert's 2020 interaction with Said cannot be part of his HWE, for several reasons. Diemert claims Said physically accosted him in 2020, telling Diemert he had white privilege and that he and his race were responsible for the world's atrocities. 2-ER-63. However, as the district court noted, a contemporaneous e-mail Diemert sent reporting the incident does not mention Said making racial comments, only that Said was angry about the underlying ethical concerns Diemert had raised about Said and the UDP and that "the tone of this discussion was not normal office etiquette and had elevated to confrontational tones from both of us." 2-ER-316-318. It was therefore not an abuse of discretion for the district court to disregard Diemert's later inconsistent declaration. *See, e.g., Yeager v. Bowlin*, 693 F.3d 1076, 1080-81 (9th Cir. 2012) (district court did not abuse its discretion in concluding that no reasonable juror would believe the subsequent inconsistent declaration). Moreover, it is undisputed that after Diemert reported this

43

incident, HSD moved Said's desk away from Diemert's and Diemert did not recall any ensuing negative interactions with Said. 1-SER-220-221, 1-SER-224-225, 1-SER-152-153. This response was appropriate and insulates the City from liability for this conduct. *See, e.g., Swenson*, 271 F.3d at 1192-97 (employer not liable when, after being informed of the harassment, it investigated, separated harasser and harassee, and the harassment then stopped).

>    **b)**    ***The remaining acts are insufficient to create a HWE.***

As demonstrated above, many of the acts Diemert claims contributed to a HWE based on his race should not be considered. This leaves the following remaining acts:

- Pulido, upon meeting Diemert in 2015, asked Diemert what a straight white male could possibly offer HSD (1-SER-16, 5-ER-830)

- In 2016 co-worker Budner denied assistance to an eligible white applicant because he had "white privilege"; when Diemert corrected her, manager Hatcher-Mays berated him and said it was impossible to be racist towards white people (2-ER-57)

- Said told Diemert in March 2019 that Diemert was to blame for U.S.

44

injustices because of his race and called Diemert a "colonist" (1-SER-28-29)[14]

- Trainers in a November 2019 RSJI training said "white people are cannibals," "racism is in white people's DNA," and "white people are like the devil" (2-ER-61)

- Kilpatrick-Goodwill and other employees engaged in a lunchroom discussion in 2020 about white privilege; when Diemert joined the conversation he was told his response was invalid because he was white and did not have their lived experiences (2-ER-62)

- An HSD manager forwarded an email to the work group in February 2021 introducing a new employee, in which the new employee noted that self-care for him included "being around Black and brown folks" (2-ER-84)

---

[14] Diemert alleged that Said told him these things "repeatedly" in 2019 (2-ER-62), but the March 2019 and February 2020 incidents are the only ones about which Diemert gives specifics. *See, e.g., Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1988) ("purely conclusory allegations of alleged discrimination, with no concrete, relevant particulars, will not bar summary judgment" on Title VII claim).

45

First, because the 2015 and 2016 events are outside the limitations period, they must be part of the same alleged HWE as the timely events to support liability. *See, e.g., Morgan*, 536 U.S. at 120 (court must determine whether acts are part of the same HWE, and if so, whether any event falls within the statutory time period). In determining whether acts inside and outside the limitations period constitute part of the same HWE, courts consider whether the acts involved the same type of employment actions, occurred relatively frequently, and were committed by the same individuals. *Crownover v. State ex rel. Dep't of Transp.*, 265 P.3d 971, 978 (Wash. Ct. App. 2011) (citing *Morgan*, 536 U.S. at 120). "Acts that are 'so discrete in time or circumstances that they do not reinforce each other' do not constitute a single hostile work environment in order to defeat the statute of limitations." *Id*. at 978 (cleaned up). Here, the Pulido and Budner/Hatcher-Mays incidents were isolated, [15] infrequent, and did not involve the same actors as the conduct inside the limitations period. Moreover, <u>three years</u> passed between the latest of those and

---

[15] Indeed, Diemert told Kuykendall that Pulido's comment was a one-time utterance, Pulido apologized, and Diemert and Pulido were then on good terms. 1-SER-90.

46

the next incident within the limitations period. The district court correctly noted that the earlier acts cannot form part of the same HWE as the incidents that occurred within the limitations period.

However, even if the 2015 and 2016 incidents are considered, the case law is clear that this smattering of incidents over the course of six years, all perpetrated by different individuals and occurring in different contexts, is insufficiently severe or pervasive to constitute a HWE as a matter of law. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not suffice for a HWE. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (cleaned up). Neither Title VII nor WLAD is a civility code. *Id.* (Title VII); *Adams v. Able Bldg. Supply, Inc*., 57 P.3d 280 (Wash. Ct. App. 2002) (WLAD).

Indeed, this Court has found more severe and pervasive conduct insufficient to constitute a HWE. *See, e.g., Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642-43 (9th Cir. 2003) (no HWE when co-worker said plaintiff had "typical Hispanic macho attitude," that "Hispanics do good in the field," and yelled at plaintiff in front of clients); *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798-99 (9th Cir. 2003) (no HWE when Asian plaintiff overheard jokes

47

using phrase "China man," heard references to China and communism, experienced ridicule from co-workers for mispronouncing "Lima," and whose co-workers pulled their eyes back to mock her appearance, as these did not alter conditions of plaintiff's employment); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1108, 1110-11 (9th Cir. 2000) (no HWE when supervisor made misogynistic comments, calling employees "regina," "bitch," "castrating bitch," "Madonna," and "histrionics"; comments offensive but not severe or pervasive enough to unreasonably interfere with employment); *see also Stevens v. Cnty. of San Mateo*, No. C-04-02762-SI, 2006 WL 581092, at *5 (N.D. Cal. Mar. 7, 2006) (no HWE when plaintiff's co-workers called him an "old barking dog," a "stupid old man," and an "old lion"), *aff'd*, 267 F. App'x 684 (9th. Cir. 2008); *Vitt v. City of Cincinnati*, 250 F. Supp. 2d 885, 887, 889-90 (S.D. Ohio 2002) (no Title VII HWE when manager told white employee that perhaps she just resented Black women telling her what to do, and that all white people are prejudiced). Cases interpreting WLAD hold similarly. *See, e.g., Davis v. Fred's Appliance, Inc.*, 287 P.3d 51, 58 (Wash. Ct. App. 2012) (while offensive, no HWE when supervisor called plaintiff "Big Gay Al" three times in one week).

Other cases are distinguishable. In *Mais v. Albemarle Cnty. Sch. Bd.*, No. 3:22-CV-51, 2024 WL 4126076, at \*2-\*4 (W.D. Va. Sept. 9, 2024), the court denied summary judgment because the white plaintiff produced evidence she was called "white racist bitch" and many staff stopped interacting with her altogether over the course of four months, affecting the terms and conditions of her employment and leading to her resignation. In contrast, Diemert's allegations of a handful of events over the course of multiple years are not severe or pervasive. Similarly, in *Chislett v. N.Y.C. Dep't of Ed.*, ___ F.4th ___, 2025 WL 2725669, at \*2-\*4 (2d Cir. Sept. 25, 2025), the plaintiff provided admissible evidence that she was required to attend multiple trainings over the course of a year and a half in which "white culture" was criticized and the plaintiff was cited as emblematic of white supremacy. During the same period, she was also subject to numerous instances of racial harassment by her co-workers outside of the trainings, complained numerous times, and nothing was done. *Id*. at \*3-\*5. Again, the instances of which Diemert complained were far from this severe or pervasive, and the City took steps to address his complaints when made. The district court, therefore, did not err in dismissing Diemert's HWE claim.

49

**D.    The District Court Properly Dismissed Diemert's Disparate Treatment and Retaliation Claims**

To establish a prima facie case of disparate under Title VII, a plaintiff must generally show that: 1) he is a member of a protected class, 2) he was qualified for his position and was performing his job satisfactorily, 3) he experienced an adverse employment action, and 4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse action give rise to an inference of discrimination. *Hawn v. Exec. Jet Mgmt., Inc*., 615 F.3d 1151, 1156 (9th Cir. 2010).  Prima facie disparate treatment claims under WLAD are analyzed similarly. *Marin v King Cnty.*, 378 P.3d 203, 211-212 (Wash. Ct. App. 2016) (plaintiff must demonstrate he was in a protected class, was doing satisfactory work, suffered a tangible adverse employment action, and the action occurred under circumstances raising a reasonable inference of unlawful discrimination).  To make a prima facie Title VII or WLAD retaliation claim, Diemert must show: 1) he participated in a protected activity, 2) he suffered an adverse employment action, and 3) there is a causal link between the protected activity and the adverse action. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (Title VII); *Milligan v. Thompson*, 42 P.3d 418,

50

424 (Wash. Ct. App. 2002) (WLAD).

A plaintiff alleging an adverse action for a Title VII discrimination claim "must show some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 354-55 (2024). For a Title VII retaliation claim, an adverse action is one that is materially adverse, which means that it might well have dissuaded a reasonable person from engaging in protected activity. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 68 (2006). However, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* Cases interpreting WLAD hold similarly. *See, e.g., Tyner v. State*, 154 P.3d 920, 929 (Wash. Ct. App. 2007) (adverse action for WLAD retaliation claim requires something more than inconvenience or alteration of job responsibilities).

Disparate treatment and retaliation claims under both Title VII and WLAD are analyzed under the same *McDonnell Douglas*[16] burden-shifting

---

[16] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

51

scheme: once the plaintiff has made a prima facie case, the employer must present a non-discriminatory or non-retaliatory reason for its actions; if the employer does so, to survive summary judgment the plaintiff must then provide evidence that reason is pretextual. *Hawn*, 615 F.3d at 1155 (Title VII disparate treatment); *Marin*, 378 P.3d at 212 (WLAD disparate treatment); *Brooks*, 229 F.3d at 928 (Title VII retaliation); *Milligan*, 42 P.3d at 424 (WLAD retaliation).

Diemert argues that three[17] categories of alleged acts by the City constituted adverse actions for purposes of his disparate treatment and retaliation claims: 1) the City's failure to investigate and its inadequate investigation of his claims; 2) the City's initial mischaracterization of his FMLA leave; and 3) his supervisor's treatment of him, including unfair scrutiny and refusing to meet with and assist him.[18]  Opening Brief at 33-34. His claims on all these actions fail.

---

[17] Diemert also lists "unequal workload" as an adverse action he experienced (Opening Brief at 34), but he offers no examples or analysis in support.

[18] Diemert also claims that his constructive discharge due to an "intolerable work environment" constituted an adverse action.  Opening Brief at 34. This claim is addressed below in Section E.

### 1. There is no direct evidence of racial animus, therefore the *McDonnell Douglas* analysis is appropriate.

As a threshold matter, Diemert claims this Court need not apply *McDonnell Douglas'* burden shifting analysis because he has provided direct evidence of racial animus.[19]  Opening Brief at 32-33.  "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003) (cleaned up).  If a plaintiff has no direct evidence of discriminatory animus, he must proceed under the *McDonnell Douglas* framework. *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009) (Title VII plaintiff can make prima facie case either through *McDonnell Douglas* test "or by providing direct evidence suggesting that the employment decision was based on an impermissible criterion"); *Mackey v. Home Depot USA, Inc.*, 459 P.3d 371, 381 (Wash. Ct. App. 2020) (when employee lacks direct evidence of discriminatory intent, courts analyzing WLAD

---

[19] Diemert did not make this direct evidence argument in opposing summary judgment; this Court therefore need not consider it.  *Villanueva v. Cal.,* 986 F.3d 1158, 1164 n.4 (9th Cir. 2021) (declining to reach qualified immunity defense because party did not raise it before the district court).

53

discrimination and retaliation claims apply the *McDonnell Douglas* analysis).

Diemert contends that RSJI is direct evidence of animus, and that supervisors relied on RSJI when engaging in adverse actions against him. Opening Brief at 32. But Diemert offers no evidence that those taking the allegedly adverse actions discussed below harbored any discriminatory animus, nor that animus infected their decision to engage in the adverse actions. Diemert therefore has not offered direct evidence and *McDonnell Douglas* is the appropriate analysis.[20] *See, e.g.*, *Vasquez*, 349 F.3d at 640-41 (plaintiff must proceed under *McDonnell Douglas* because no nexus between co-worker's remarks and director's employment decisions); *McMillan v. Abbott Labs., Inc.*, No. C10-1708-RAJ, 2013 WL 1003136, at *5 (W.D. Wash. Mar. 13, 2013) (no direct evidence of discrimination under WLAD because no nexus between discriminatory statement and treatment of plaintiff; thus plaintiff must proceed under *McDonnell Douglas*).

_____

[20] Even if Diemert proceeded under the direct evidence analysis, however, he would have to demonstrate that he suffered an adverse action. *Parris v. Wyndham Resorts, Inc.*, 979 F. Supp. 2d 1069, 1076 (D. Haw. 2013). As explained in the following sections, he cannot make that showing.

54

## 2.     Failure to investigate/inadequate investigation.

Diemert's allegations about investigations do not support his claims. First, although Diemert asserts that the City refused to investigate his discrimination complaints (Opening Brief at 33), other than his EEOC complaint, he has not provided sufficient information about his alleged complaints, or to whom or when they were made.  He broadly claims that he "reported racial harassment and discrimination for years to numerous managers and Human Resources Professionals" (2-ER-65), but provides no information that would allow this claim to proceed.[21]   Unsurprisingly, the district court found this argument "incoherent," noting that it was not clear what "complaint" Diemert referred to or what actions he wanted the City to take.  1-ER-36.

Second, the case law overwhelmingly holds that neither a failure to

---

[21] Diemert cites to the 2016 incident involving Budner and Hatcher-Mays, claiming he reported it in 2016 to "multiple managers and directors," and referenced it again in a June 2021 email to Groce, but the City did not act.  2-ER-57.  A failure to investigate in 2016 is a discrete act that the district court has already dismissed as untimely.  *See* 2-SER-351-353.   And Diemert provides no authority for the proposition that the failure to investigate a five-year-old incident in 2021 could constitute an adverse action.

investigate nor an allegedly inadequate investigation constitutes an adverse action for purposes of a discrimination claim. *See e.g., Kurdi v. Cal. Dep't of Transp.,* No. 1:22-cv-00729-JLT-EPG, 2023 WL 267538, at *8 (E.D. Cal. Jan. 18, 2023) (collecting cases regarding failure to investigate); *Brown v. Dignity Health*, No. CV-18-03418-PHX-JJT, 2020 WL 3403088, at *7 (D. Ariz. June 19, 2020) (inadequate investigation not an adverse employment action under Title VII); *McEnroe v. Microsoft Corp*., No. CV-09-5053-LRS, 2010 WL 4806864, at *5 (E.D. Wash. Nov. 18, 2010) (plaintiff's claim for failure to investigate under Title VII and WLAD failed because it is not an adverse employment action). The mere failure to investigate does not affect the terms and conditions of a plaintiff's employment.[22] *McEnroe*, 2010 WL 4806864, at *5. Moreover, treating an inadequate investigation as an adverse action "would erode the policy reason for encouraging employers to investigate complaints for fear that an investigation would lead to a claim of

_____

[22] In opposing summary judgment, Diemert cited *Doe No. 1 v. Wynn Resorts, Ltd*., No. 2:19-cv-01904-GMN-VCF, 2023 WL 1782439 (D. Nev. Feb. 3, 2023) for the proposition that failures to investigate are adverse employment actions. 1-SER-63. But *Wynn Resorts* held that in such a case, plaintiffs must show how that failure made it more difficult to assert their rights. 2023 WL 1782439, at *16. Diemert has not made any such showing.

56

retaliation based on an inadequate investigation." *McKissick v. City of Reno*, No. 3:17-cv-00458-MMD-CBC, 2019 WL 3241161, at *12 (D. Nev. July 18, 2019). The district court properly dismissed Diemert's claim based on these acts.[23]

### 3. FML mischaracterization.

Diemert bases his claim on the City's initial mischaracterization of leave that should have been FML. This claim fails for several reasons.

First, Diemert has not shown that the initial mischaracterization of his FML was an adverse action. He does not dispute that the error was fixed and he took off the time requested. 1-SER-161-162. This is not an adverse action as a matter of law. *See, e.g., Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (rescheduling to unfavorable shift and denying vacation preference not adverse action under Title VII, because employer

---

[23] Diemert cites *U.S. E.E.O.C. v, MJC, Inc*., 400 F. Supp. 3d 1023 (D. Haw. 2019) for the proposition that the City's purported disparate treatment of complaints by Said and Odom supports a retaliation inference. *MJC* involved failure to hire due to disability and does not stand for this proposition. In addition, like many other sections of Diemert's brief, the record portions cited (3-ER-439-443, 3-ER-620-627) do not support Diemert's allegations; they do not reflect that the City promptly addressed any complaints by Said or Odom.

accommodated plaintiff's preferences after she complained); *Rodriguez v. Boeing Co.*, No. C18-1213-JCC, 2021 WL 4847957, at *4 (W.D. Wash. Oct. 18, 2021) (employer's initial reluctance to approve transfer not adverse action under Title VII or WLAD when plaintiff ultimately received the transfer), *aff'd*, No. 21-35951, 2024 WL 1328774 (9th Cir. Mar. 28, 2024).

Second, Diemert submitted no evidence connecting the mischaracterization to his race or protected activity. He provides no evidence that the individual processing his FML claim knew of his protected activities. 1-SER-162-163; *see, e.g., Gunther v. Washington Cnty.*, 623 F.2d 1303, 1316 (9th Cir. 1979) (no evidence individual committing adverse action knew plaintiffs had engaged in protected activity). Moreover, the fact that he had sought FML in the past and not had any issues (1-SER-162) destroys any inference that the mischaracterization in 2021 was due to his race. *See, e.g., Becker v. Cashman*, 114 P.3d 1210, 1214 (Wash. Ct. App. 2005) (affirming summary judgment on WLAD disability discrimination claim; no juror could reasonably conclude disability was basis for termination when employer knew of disability when it hired him).

Finally, even if Diemert did establish a prima facie case, he has

58

provided no evidence that the City's explanation was pretextual. Groce explained that the failure to initially designate Diemert's leave under FML was an error. 4-ER-633. Diemert has not demonstrated that this explanation is pretext; thus, his claims based on his FML mischaracterization fail.[24] *See, e.g., Campbell v. Dep't Human Servs.*, 384 F. Supp. 3d 1209, 1224-27 (D. Haw. 2019) (Title VII claim dismissed; employer's admission that bypassing plaintiff for assignment was a mistake was a legitimate, non-discriminatory reason, and plaintiff did not show pretext).

### 4. Treatment by supervisor.

Diemert claims that the following acts by Kilpatrick-Goodwill constituted disparate treatment and/or retaliation: 1) emailing Diemert asking about applications and delays after Diemert raised this issue (2-ER-63-64, 2-ER-328, 2-ER-344-346); 2) canceling meetings with Diemert (3-ER-416-417); and 3) not supporting Diemert with an IT issue, causing him to have to ask another to help (3-ER-417). Opening Brief at 34.

---

[24] Diemert does not explain how the Department of Labor's involvement demonstrates that the mischaracterization was not a mistake.

59

First, these incidents do not rise to the level of adverse action. Diemert characterizes Kilpatrick-Goodwill's email asking about delays as unfair scrutiny. This single email about a work issue may have been frustrating, but it had no impact on the terms and conditions of Diemert's employment. Even if Diemert's interpretation of this benign email was reasonable, courts have held that increased scrutiny cannot constitute an adverse act for purposes of disparate treatment and retaliation claims. *See, e.g., Wilson v. Safeway Inc.*, No. 2:16-CV-0405-TOR, 2018 WL 4608477, at *6 (E.D. Wash. Sept. 25, 2018) (increased scrutiny not adverse action for WLAD discrimination claim); *Phelps v. U.S. Gen. Servs. Agency*, No. C-07-01055-JSW, 2010 WL 1610070, at *3 (N.D. Cal. Apr 20, 2010) (excessive monitoring and scrutiny not adverse action under Title VII), *aff'd*, 469 F. App'x. 548 (9th Cir. 2012). Canceling a meeting is also the type of trivial act that cannot constitute an adverse employment action. *See, e.g., Foraker v. Apollo Grp., Inc.*, 427 F. Supp. 2d 936, 941 (D. Ariz. 2006) (failure to advise plaintiff of meetings not an adverse action for Title VII retaliation claim). An alleged refusal to elevate Diemert's technological issue also cannot be an adverse action, particularly when Kilpatrick-Goodwill requested another employee elevate the issue. *See*

60

4-ER-806-808. Diemert did not demonstrate that any of these alleged actions are more than "those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 68 (2006).

Second, even if cancelling meetings was an adverse action, Diemert admitted he did not know how many meetings she canceled with her other subordinates (3-ER-416), and Kilpatrick-Goodwill denied canceling more meetings with Diemert than with others (1-SER-260-261). Therefore, he cannot show that similarly situated individuals were treated more favorably, nor can he show a causal link between his EEOC complaint and meeting cancellations. *See, e.g., Bodett v. CoxCom, Inc.*, 366 F.3d 736, 744 (9th Cir. 2004) (plaintiff did not make a prima facie case of discrimination under Title VII because she did not show that similarly situated individuals outside her protected class were treated differently).

### E. The District Court Properly Dismissed Diemert's Constructive Discharge Claim

Diemert did not plead a separate constructive discharge claim; rather, his Title VII and WLAD HWE claims include an assertion that the harassment was so stressful that it forced him to resign. 5-ER-849, 5-ER-854. A plaintiff

61

alleging a HWE must show conduct sufficiently severe or pervasive that it alters the conditions of employment and creates an abusive working environment, but a plaintiff alleging constructive discharge based on a HWE must show "something more": "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 146-47 (2004); *see also* 2-SER-348 (citing constructive discharge standard). Washington law is in accord. *See, e.g., Washington v. Boeing Co.*, 19 P.3d 1041, 1049 (Wash. Ct. App. 2000) (constructive discharge requires working conditions so difficult or unpleasant that a reasonable person in the plaintiff's shoes would have felt compelled to resign), *abrogated on other grounds by Antonius v. King Cnty.*, 103 P.3d 729 (2004). A constructive discharge-HWE claim is a "graver" claim than an ordinary HWE claim. *Suders*, 542 U.S. at 149. Resignations are presumed voluntary, "and an undesirable work situation does not, in itself, obviate the voluntariness of a resignation." *Townsend v. Walla Walla Sch. Dist.*, 196 P.3d 748, 752 (Wash. Ct. App. 2008).

For the reasons explained above in Section C, Diemert did not demonstrate an issue of fact that suffered a HWE based on race. Therefore,

62

because Diemert's state and federal HWE claims fail, he cannot demonstrate the "something more" than a HWE required by *Suders*. *See, e.g., Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (where plaintiff could not show harassment sufficient to support a HWE claim, it was impossible to meet the higher standard of constructive discharge); *see also Norgren v. Minn. Dep't of Human Servs.*, No. CV-22-489-ADM/TNL, 2023 WL 35903, at *4 (D. Minn. Jan. 4, 2023) (requiring all employees to undergo diversity training did not amount to abusive working conditions to support employee's constructive discharge claim).

In addition, as the district court recognized, too much time passed between the allegedly harassing behavior and Diemert's resignation to support a constructive discharge claim. Diemert resigned in September 2021, but the acts he describes with sufficient specificity to support his HWE claim occurred many months, if not years, before. Diemert attended his last required RSJI training in November 2019. 4-ER-636. His last negative interaction with Said occurred in 2020. 2-ER-63. And the "Black and brown folks" email was sent in February 2021. 2-ER-84. Courts find far shorter time gaps between the last allegedly intolerable act and the resignation to be too long to

63

support causation. *See, e.g., Hardage v. CBS Broad.*, 427 F.3d 1177, 1184-85 (9th Cir. 2005) (five-month gap between last alleged sexual advance/comment and plaintiff's resignation too large to support causation in Title VII/WLAD constructive discharge claim).

In an attempt to overcome this hurdle, Diemert claims broadly that he experienced racial hostility "up to and through his final weeks of employment-including continued exposure to RSJI content, lack of accommodation[25] and retaliation." Opening Brief at 40. These arguments fail for several reasons. First, most of the events Diemert cites still occurred too remotely from Diemert's resignation to support a constructive discharge claim. *See, e.g.*, 2-ER-62-63, 2-ER-319 (incidents in 2019 and 2020), 2-ER-54 (2016 and 2017).

Second, the events that <u>did</u> occur closer to Diemert's resignation do not support a constructive discharge claim. Less than a month before he resigned, Diemert's request for telework as an accommodation was awaiting additional information from his doctor (*see* 4-ER-816-817), yet Diemert resigned before any final determination had been made. *Brooks*, 229 F.3d at 929-30 (because

---

[25] Notably, Diemert did not bring a claim for failure to accommodate.

64

employee resigned while her appeal of negative performance review was pending, she could not claim it was an adverse employment action). Similarly, although Diemert asked Groce in June 2021 about creating his own affinity group, Diemert never followed through before he resigned. 4-ER-631-632, 4-ER-726-730. And although the City initially misclassified some of Diemert's FMLA leave in 2021, Groce told Diemert in July 2021 that he was correcting the issue. 4-ER-633. Pending requests for an accommodation and to create an affinity group, along with a corrected paperwork error, cannot, as a matter of law, create an intolerable working environment supporting constructive discharge. *See, e.g., Crownover v. State,* 265 P.3d 971, 981 (Wash. Ct. App. 2011) ("An employee's frustration, and even receipts of direct or indirect negative remarks, is not enough to show intolerable working conditions."); *Sneed v. Barna*, 912 P.2d 1035, 1039 (Wash. Ct. App. 1996) (summary judgment on constructive discharge claim affirmed because demotion with same pay and additional administrative difficulties, while frustrating, was not so difficult that a reasonable person would have resigned).

Finally, much of Diemert's evidence of "continued exposure" lacks any

65

dates or specifics; Diemert claims only that RSJI was "embedded"[26] in his daily work life and harassment occurred "throughout his employment." *See, e.g.*, Opening Brief at 40-41, 2-ER-60-61. These vague allegations cannot defeat a motion for summary judgment, particularly when it is undisputed that the events for which Diemert <u>has</u> supplied specifics occurred many months or years before his resignation. *See, e.g., Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 779-80 (9th Cir. 2010) (plaintiff's allegation that "most" employees were rehired too vague and conclusory to defeat defendant's explicit evidence to the contrary); *Holly D. v. Cal. Inst. Tech.*, 339 F.3d 1158, 1176 (9th Cir. 2003) (vague and general assertions about supervisor's behavior when plaintiff rejected his advances insufficient to overcome summary judgment). Diemert's constructive discharge claim was properly dismissed.

---

[26] Although HSD employees are required to participate in two RSJI activities per year, these activities need not pertain to race and can be non-City events. 4-ER-630. Groce also assured Diemert that he would not be penalized if he did not meet this requirement. 4-ER-631.

**F.      Diemert's and Amici's Use of *Ames* to Question the District Court's Title VII Analysis is Unavailing**

Prior to June 2025, a Circuit split existed as to whether majority-group plaintiffs claiming discrimination based on their majority-group status had to satisfy a heightened evidentiary burden under Title VII.  *See Ames v. Ohio Dep't of Youth Servs.*, 145 S. Ct. 1540, 1545 (2025).  In addition to the standard prima facie case under *McDonnell Douglas*, majority-group plaintiffs in some Circuits had to also establish "background circumstances" to support the suspicion that their employer discriminated against the majority.  *Id*. at 1545-46.  *Ames* resolved that split and rejected the "background circumstances" requirement, holding that "the standard for proving disparate treatment under Title VII does not vary based on whether the plaintiff is a member of the majority group." *Id*.

The district court in the instant case granted summary judgment four months prior to the *Ames* decision.  The district court noted that the Ninth Circuit had not weighed in on this Circuit split and that the court did not need to do so either, because Diemert did not meet the less onerous traditional *McDonnell Douglas* test.  1-ER-34.  In other words, the district court did exactly what the Supreme Court directed in *Ames* and applied the traditional

67

*McDonnell Douglas* balancing test to Diemert's claims, without an additional "background circumstances" requirement.

This should be the end of the matter. However, Diemert and several amici attempt to seize upon the following language from the opinion's introduction to argue that the district court applied an improper heightened standard to Diemert as a majority-group plaintiff in contravention of *Ames*:

> Controlling precedent makes clear that the legal protections against workplace discrimination apply with equal force regardless of the plaintiff's race. Yet we must acknowledge what history and common sense tell us: instances of discrimination against the *majority* are rare and unusual. Diemert does not present that rare and unusual case here.

1-ER-3. Because the district court acknowledged that majority-group discrimination cases are rare, Diemert and amici argue, it must have applied a heightened and incorrect standard to his claims.[27]

---

[27] Diemert and amici rely upon *Ames* and the district court's introductory language to make various hyperbolic and attenuated arguments. One amicus points to the district court's language as apparent evidence that the court required Diemert to show that the City <u>routinely</u> discriminated against white people. Brief of Amicus Curiae Equal Protection Project at 4. Another amicus argues that even though the district court stated its decision did not turn on the "background circumstances" requirement, the fact that the court did not take a stance on the Circuit split calls into question whether it applied a heightened requirement. Brief of Amicus Curiae Manhattan Institute at 10-

This argument is unavailing. At multiple points in its order, the district court set forth and applied the appropriate standard for Diemert's claims. *See* 1-ER-3 ("Controlling precedent makes clear that the legal protections against workplace discrimination apply with equal force regardless of the plaintiff's race."); 1-ER-19-20 (law puts racial discrimination in employment against whites on the same terms as racial discrimination in employment against non-whites); 1-ER-20-33, 1-ER-38-40 (citing and applying traditional legal standards for HWE under Title VII and WLAD); 1-ER-33-37 (citing and applying traditional legal standards for disparate treatment and retaliation under Title VII and WLAD); 1-ER-40-42 (citing and applying traditional legal standards for constructive discharge under Title VII and WLAD).

Diemert and amici may disagree with the district court's statement that so-called "reverse discrimination" cases are rare. But even if the district court

_____

11. And another amicus argues that, because the district court only addressed the "background circumstances" Circuit split in the disparate treatment and retaliation section of its opinion, its analysis of Diemert's HWE claim is suspect. Brief of Amicus Curiae United States at 10. Diemert himself equates the district court's language with a statement that "white people can't experience discrimination." Opening Brief at 1. These arguments do not hold water and should be rejected.

69

was wrong and these cases are commonplace, there is no evidence that the district court applied a heightened standard to Diemert's claims as a result. Certainly Diemert and amici have not shown that any of the cases upon which the district court relied themselves relied upon the "background circumstances" rule. This Court should reject Diemert's and amici's arguments that the district court did not mean what it said and instead ran afoul of *Ames*.

### G. The District Court Properly Dismissed Diemert's Equal Protection Claim

Diemert claims that the City violated the Equal Protection Clause of the U.S. Constitution by treating him differently due to his race, including segregating meetings, trainings, and affinity groups by race. 5-ER-848. "To state a claim under 42 U.S.C. § 1983[28] for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the

---

[28] Though Diemert does not explicitly invoke § 1983 in his complaint, a litigant complaining of a violation of a Constitutional right must bring such a claim under 42 U.S.C. § 1983. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th Cir. 2001); *see also Bank of Lake Tahoe v. Bank of America*, 318 F.3d 914, 917 (9th Cir. 2003) (construing claim for "equal protection" violations as brought under § 1983).

70

defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). Courts deciding summary judgment motions on § 1983 equal protection claims in the employment discrimination context typically follow Title VII's framework.[29] *See, e.g., Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 753 (9th Cir. 2010) (appropriate to apply Title VII *McDonnell Douglas* burden shifting analysis to plaintiff's § 1983 Equal Protection Clause employment discrimination claim); *Fed. Deposit Ins. Co. v. Henderson*, 940 F.2d 465, 472 n.14 (9th Cir. 1991) ("the status of the § 1983 equal protection claim generally depends on the outcome of the Title VII analysis"); *Sanders v. Univ. of Idaho by Bd. of Regents of Univ. of Idaho*, 617 F. Supp. 3d 1200, 1214 (D. Idaho 2022) ("elements of a hostile work environment claim based on an equal protection violation under § 1983 . . . mirror those under Title VII").

As demonstrated above in Sections C-E, Diemert's Title VII claims fail. Therefore, his § 1983 equal protection claim fails as well. *See, e.g., Lam v.*

---

[29] Diemert acknowledged below that on summary judgment, "§ 1983 claims are 'remarkably similar' to Title VII claims. 1-SER-60.

71

*City and Cnty. of San Francisco*, 868 F. Supp. 2d 928, 951-52 (N.D. Cal. 2012) (plaintiffs' § 1983 equal protection claims based on allegations their supervisors treated them differently due to their race failed for the same reason as did their Title VII claims based on the same conduct), *aff'd*, 565 F. App'x 641, 644 (2014); *Keenan v. Allen*, 889 F. Supp. 1320, 1362-63 (E.D. Wash. 1995) (dismissing equal protection sexual harassment claim on summary judgment because plaintiff did not prove a sexually hostile work environment under Title VII or intent to harass based on sex), *aff'd*, 91 F.3d 1275 (1996).

Diemert and several amici cite *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. ("SFFA")*, 600 U.S. 181 (2023) for the proposition that this Court should apply strict scrutiny in its analysis of Diemert's equal protection claim. In *SFFA*, the U.S. Supreme Court found that university admissions policies that took the applicant's race into account violated the Equal Protection Clause. 600 U.S. at 230. Because the case involved racial classifications, the Court applied a strict scrutiny analysis, which requires that the classification be used to further a compelling governmental interest, and if so, that the use of race was narrowly tailored to achieve that interest. *Id*. at 206-07.

72

Here, unlike in *SFFA*, there is no racial classification because RSJI does not direct that employees be treated differently because of their race.[30]  *See Crawford v. Bd. of Educ. of City of Los Angeles*, 458 U.S. 527, 537 (1982) (law did not involve a racial classification because it did not state or imply that persons are to be treated differently on account of their race).  Diemert certainly <u>alleges</u> that it does: he claims that RSJI classifies employees by race, assigns them race-specific expectations, holds them to different standards based on race, and requires employees to attend segregated trainings.  *See* Opening Brief at 42-43.  But the evidence he cites does not support these allegations.  Moreover, he cites no case law to support that the City merely <u>presenting</u> concepts such as institutionalized racism (as opposed to taking actions regarding its employees based on the employees' race) constitutes a racial classification—or, indeed, any classification at all.  *See SFFA*, 600 U.S.

--------------------------------

[30] For this reason, *Herrera v. N.Y.C. Dep't of Ed.*, No. 1:21-CV-7555-MKV, 2024 WL 245960 (S.D.N.Y. Jan. 23, 2024), cited by one amicus, is readily distinguishable.  In *Herrera*, the court found that plaintiffs had produced sufficient evidence of an employer policy of using race as a determinative factor in hiring (i.e., a racial classification) to avoid summary judgment on plaintiffs' equal protection claim.  *Id*. at *14.  Diemert, however, has offered no evidence of race as a determinative factor in City hiring.

at 230-31 (Court's opinion does not prevent universities from considering an applicant's discussion of how race has affected their life, "be it through discrimination, inspiration, or otherwise.").

The district court focused mainly on the affinity groups in analyzing this claim. *See* 1-ER-42-46. However, the admissible[31] evidence in the case demonstrates that the affinity groups were open to any City employee. *See* 1-SER-181-185. Joining an affinity group was voluntary. 1-SER-187. There is no evidence (other than Diemert's conclusory, unsupported statement[32]) that the City rewarded participation in affinity groups.

Moreover, Diemert did not demonstrate that the City prevented him

---

[31] Diemert claims Exhibit 36 shows McLellan acknowledging race-based exclusions from caucuses; however, as discussed above in Section B(1), the district court's consideration of this exhibit only to show that complaints had been made was not an abuse of discretion.

[32] Diemert testified that participating in the Change Team or an affinity group was the only way to promote. 4-ER-743. He has provided no evidence supporting this conclusory allegation; therefore the Court should not consider it. *See, e.g., Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1988) ("purely conclusory allegations of alleged discrimination, with no concrete, relevant particulars, will not bar summary judgment" on Title VII claim).

74

from attending any meetings or trainings due to his race,[33] nor that it made meetings or trainings aimed at certain groups mandatory. Diemert admits he was never required to attend a white employee affinity group. 4-ER-742-743. He therefore cannot show that his right to equal protection was violated due to "racial classification." *See, e.g., Deemar v. Bd. of Ed. of City of Evanston/Skokie*, No. 21-cv-3466, 2024 WL 3757169, at *9 (N.D. Ill. Aug. 9, 2024) (teacher could not base equal protection claim on racially segregated meetings or trainings when she did not attend any of the trainings and they were not mandatory).

## VII. CONCLUSION

Diemert has failed to raise any genuine issue of material fact that he experienced a HWE, disparate treatment, retaliation, constructive discharge, or a violation of equal protection. The judgment of the district court should be affirmed.

---

[33] Diemert alleged that his union representative (not a City employee) told him that "they" probably would not allow Diemert to participate in a training geared toward people of color, therefore he never signed up for it. 4-ER-770-71. This is not the City preventing Diemert's attendance.

75

DATED this 17th day of October, 2025.

ANN DAVISON
Seattle City Attorney

By:  s/ Sarah Tilstra
SARAH TILSTRA, WSBA #35706
Assistant City Attorney
Seattle City Attorney's Office
701 Fifth Ave., Suite 2050
Seattle, WA  98104-7095
Ph: (206) 684-8230
Fax: (206) 684-8284
sarah.tilstra@seattle.gov

Attorney for Appellee

76

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-1188

I am the attorney or self-represented party.

**This brief contains 14,963 words,** including  0  words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[X] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [X] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** s/ Sarah Tilstra_____        **Date October 17, 2025**
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                                     *Rev. 12/01/22*