NO. 25-1188

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

JOSHUA DIEMERT,

*Plaintiff-Appellant,*

v.

THE CITY OF SEATTLE, a municipal corporation,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
Western District of Washington
No. 2:22-cv-01640-JNW, Honorable Jamal N. Whitehead, District Judge

---

## BRIEF OF *AMICUS CURIAE* KING COUNTY
## IN SUPPORT OF CITY OF SEATTLE, DEFENDANT-APPELLEE
## AND AFFIRMANCE

---

LEESA MANION (She/Her)
*King County Prosecuting Attorney*

HEIDI JACOBSEN-WATTS, WSBA 35549
YOUN-JUNG KIM, WSBA 23516
*Senior Deputy Prosecuting Attorneys*
701 Fifth Avenue, Suite 600
Seattle, WA 98104
Heidi.Jacobsen-Watts@kingcounty.gov
Jina.Kim@kingcounty.gov
*Attorneys for King County*

## **TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................ 2

INTRODUCTION AND SUMMARY OF ARGUMENT ................ 2

LEGAL ARGUMENT ....................................................................... 2

    A. King County History ............................................................ 2

    B. Equity and social justice principles and DEI are not limited
       to race ................................................................................ 5

    C. Diversity, equity, and inclusion (DEI) is crucial to local
       governments serving diverse communities ........................... 6

          1. Consciousness of diversity improves responsiveness
            and outcomes .............................................................. 7

    D. Diemert's response to Seattle's RSJI demonstrates the need
       for DEI policies and instruction ........................................... 12

    E. Recent appellate decisions do not require reversal of the
       district court........................................................................ 14

CONCLUSION ............................................................................... 16

i

# **TABLE OF AUTHORITIES**

## **Cases**

*Ames v. Ohio Dep. of Youth Svcs*., 605 U.S. 303, 309, 145 S.Ct. 1540, 221 L.Ed.2d 929 (2025)........................................................... 14

*Chislett v. New York City Dept. of Education*., 2025 WL 2725669 (2nd Cir., September 25, 2025)............................................15, 16

*Diemert v. City of Seattle*, 776 F. Supp. 3d 922, 945, n.6 (W.D. Wash. 2025) .............................................................................. 14, 16

## **Other Authorities**

King County Code 2.10.210.H ..................................................... 1

King County Code 2.10.210.F...................................................... 6

King County Code 2.10.200 ......................................................... 6

Elise C. Boddie, *The Indignities of Color Blindness*, 64 UCLA L. Rev. Discourse 64, 79-80 (2016)....................................................13

Stephen Menendian, *What Constitutes A "Racial Classification"?: Equal Protection Doctrine Scrutinized,* 24 Temp. Pol. & Civ. Rts. L. Rev. 81, 91-95 (2014)..........................................................13

## RULE 29(a)(4)(E) CERTIFICATION

Counsel for *amicus curiae* certifies that this brief was not authored in whole or in part by counsel for any party. Counsel further certifies that no person or entity has made a monetary contribution to the preparation or submission of this brief.

## <u>INTEREST OF AMICUS CURIAE</u>

King County is Washington State's most populous county and its county seat is the City of Seattle, Joshua Diemert's former employer.

King County is a racially and socio-economically diverse region. Like the City of Seattle, King County developed a robust equity and social justice program to ensure its services are delivered fairly and equitably. To effectuate this policy the county implemented the "fair and just" principle in its county-wide strategic plan in order to achieve equitable opportunities for all people and communities. For purposes of implementing its policies, the county defines "social justice" as "all aspects of justice, including legal, political, and economic, and requires the fair distribution of public goods, institutional resources and life opportunities for all people."[1] King County shares Seattle's commitment to equity and social justice, recognizing that it is critical to building trust with the diverse communities that make up the county's population and that identifying and addressing inequities is required to serve our communities.

---

[1] King County Code (KCC) 2.10.210.H (updated 2022), https://aqua.kingcounty.gov/council/clerk/code/05_Title_2.htm#_Toc51932402 (on file with author).

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

The parties and amici are before this Court because Joshua Diemert vehemently disagreed with and was personally offended by his municipal employer's equity and social justice curriculum and discussions about race in the workplace. Diemert, under the guise of a "colorblind" ideology, responded to invitations to ally resource groups, trainings, online discussions, and articles about Black history by calling his colleagues racists and bigots and disparaging trainers and the materials.

As the district court noted, Diemert had the right to reject the City's RSJI programming. However, the City has a legitimate need to provide such education and programming to equitably serve its communities. For diverse municipalities like Seattle and King County, equity programming is essential on-the-job training. The district court correctly held that Seattle's RSJI programming was neither discriminatory, nor harassing.

## LEGAL ARGUMENT

### A. King County History

King County is home to the City of Seattle, Washington's largest city.

As of 2000, King County's population was 73% White and 27% BIPOC.[2] U.S. Census Bureau, Decennial Census, 2000.  By 2020 the county had experienced a population growth of 31% and the makeup changed to 54% White and 46% BIPOC.  U.S. Census Bureau, Decennial Census, 2020.  This trend has continued beyond 2020.  As of 2024 the county's population was 51% White and 49% BIPOC. U.S. Census Bureau, American Community Survey, 2024 1-year data.  In addition, between 2000 and 2020 King County's immigrant population grew from approximately 268,000 to 528,000, an increase of 97%. *Id.;* U.S. Census Bureau Decennial Census.

Demographic differences among the county's residents are not limited to racial categories.  It is one of many characteristics that make up the mosaic of the county and shapes decisions and actions.  Responsible governance requires recognizing that the population being served is neither static nor monolithic.  It also calls for proactively adapting to the changing needs of the residents that a municipality serves, which in turn requires a workforce trained to engage with its population to effectively deliver its services.

---

[2] BIPOC is the acronym for Black, Indigenous, People of Color.  King County recognizes classifying the population into White/BIPOC results in aggregating many discrete groups within those two categories and may present a distorted picture.  It is used strictly for purposes of demonstrating the general shift in population.

Originally named in 1852 after William Rufus King, the slave-owning Vice President-elect to Franklin Pierce, King County was officially renamed in honor of Dr. Martin Luther King Jr. on April 19, 2005. This momentous decision marked the culmination of efforts that began in 1986 when the King County Council, led by then councilmember Ron Sims, passed a motion to rename the county.[3]

The county's renaming was both symbolic and aspirational, a catalyst to embody the values of justice and equality that Dr. King championed. The renaming required a change in state law, a task that State lawmakers from King County undertook for eight consecutive years before achieving success. Effective July 24, 2005, the new law ushered in a fundamental shift in the county's identity, aligning it with Dr. King's legacy rather than its original namesake. Reverend Dr. Martin Luther King Jr.'s legacy in King County, as reflected in its renaming, is a constant reminder and inspiration to continue working toward a society that embodies the values of equality, justice, and human dignity for all.

---

[3] *See* https://kingcounty.gov/en/dept/executive/governance-leadership/equity-social-justice/office-of-equity-racial-social-justice/martin-luther-king (last accessed 10/23/2025 at 9:00 a.m.); *see also* https://www.historylink.org/File/11261 (last accessed 10/23/2025 at 9:01 a.m.).

**B. <u>Equity and social justice principles and DEI are not limited to race</u>**

Diversity, Equity, and Inclusion (DEI) frameworks such as Seattle's

Race and Social Justice Initiative (RSJI) "aim to create fair opportunities and

environments that embrace the full range of human diversity...[and] are built on

the principle that equity and representation are essential rights that uphold the

democratic ideals of fairness, opportunity, and justice."[4]  DEI policies are

central to institutional success.  They work by "identifying and removing

barriers that have historically disadvantaged certain populations, while

promoting practices that ensure full participation, recognition, and support for

all individuals regardless of their racial, ethnic, gender, cultural, socio-

economic, or ability status."[5]

In institutions where DEI principles are embedded, a shift occurs toward

intentional inclusion.  These environments begin to reflect the complex

identities of the communities they serve.  They also become spaces where

diverse perspectives are not only heard but meaningfully integrated into

---

[4] Jose M. Rosa, *Critical Importance of Diversity, Equity, and Inclusion (DEI) and the Detrimental Impact of Anti-DEI Policies.* https://www.researchgate.net/publication/388819858_The_Critical_Importance_of_Diversity_Equity_and_Inclusion_DEI_and_the_Detrimental_Impact_of_Anti-DEI_Policies. (Last accessed 10/22/2025 3:12 p.m.)
[5] *Id*., (citing D.A. Williams & K.C. Wade-Golden, *The chief diversity officer: Strategy, structure, and change management,* Stylus Publishing (2013)).

decision-making processes.  This produces more equitable outcomes, fosters stronger innovation, and builds resilience in the face of change.[6]

Like Seattle, King County has chosen to embed equity and social justice frameworks into its policies.  Equity and social justice is "an integrative effort that applies to the county's principle of 'fair and just' intentionally in all the county does in order to achieve equitable opportunities for all people and communities."  King County Code (KCC) 2.10.200.  This is apparent in King County's Equity and Social Justice ordinance,  announcing the "fair and just" principle, which "means the county serves all residents by promoting fairness and opportunity and eliminating inequities through actions to which equity and social justice foundational practices are applied."  KCC 2.10.210.F.

### C. Diversity, equity, and inclusion (DEI) is crucial to local governments serving diverse communities.

"Organizations that reflect the diversity of the populations they serve are better positioned to understand consumer needs, innovate responsibly, and

---

[6] Scott E. Page, *The Difference: How the Power of Diversity Creates Better Groups, Firms, Schools, and Societies,* Princeton University Press (2007).  *See also Diversity wins: How inclusion matters, McKinsey & Company*, May 19, 2020 report https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-wins-how-inclusion-matters. (Last accessed 10/22/2025 3:14 p.m.)

build trust across multiple communities.  DEI initiatives improve employee engagement, reduce turnover, and increase overall organizational resilience."[7]

Local governments must be ready and able to engage with individuals and communities to effectively deliver services to people who have different experiences and needs, and while efficiently using taxpayer dollars.  This requires employees who are equipped with the necessary skills and competencies to carry out the mandate.  In today's world, DEI training for public employees is essential job-related training, such as training on cybersecurity and public records retention requirements.  And like complying with cybersecurity and public records retention requirements, DEI training is not a "one-and-done" event.  It becomes an evolving practice that is embedded into how local government work is done to ensure equitable delivery of services.

### 1. Consciousness of diversity improves responsiveness and outcomes.

DEI helps local government employees meet the needs of communities they serve by identifying and solving problems early.  For example, when medical education, healthcare policies, and clinical training integrate DEI

---

[7] David Rock & Heidi Grant, *Why Diverse Teams Are Smarter*, Harv. Bus. Rev., 94(11), at 2-5 (November 4, 2016).

principles, they help reduce health disparities and raise the overall quality of care, particularly for underserved communities.[8]

Experiences from the recent COVID-19 pandemic reinforced such findings. Many diseases including COVID-19, disproportionately impact those who are socially and economically disadvantaged.[9] Data from U.S. health departments revealed a disturbing, disproportionate impact of COVID-19 on racial and ethnic minorities, including Latinos and Black Americans. *Id.* Preliminary analyses within the University of Washington Medicine system comparing COVID-19 rates across race, ethnicity, and language demonstrated higher positive result rates among racial/ethnic minorities and populations with limited English proficiency. *Id.* Public Health - Seattle King County (PHSKC) surveillance data mirrored these findings. Local experts recognized that there were likely multiple factors responsible for these outcomes, including lack of culturally relevant messaging and education, living in multigenerational

---

[8] J.R. Betancourt, et al, *Defining cultural competence: a practical framework for addressing racial/ethnic disparities in health and health care.* Public Health Reports (July-August 2003) Volume 118, pp. 293–302.
[9] Steven H. Mitchell, MD et al, *Western Washington State COVID-19 Experience: Keys to Flattening the Curve and Effective Health System Response*, Journal of the American College of Surgeons 231(3):p 316-324e1, September 2020 at https://pmc.ncbi.nlm.nih.gov/articles/PMC7297171/ (last accessed 10/21/2025, 3:29 p.m.).

households, and higher likelihood of working in essential jobs resulting in inability to physically distance. *Id.*

PHSKC engaged racially and linguistically diverse communities and convened nine taskforces and a community advisory group to collaborate across sectors and provide tools and resources to support physical distancing and reduce the risk of disease transmission. *Id.*

In 2020 PHSKC joined more than 250 government entities in 40 states to declare that racism is a public health crisis.[10]  In response to the dual public health crises of racism and COVID-19, PHSKC convened the Pandemic and Racism Community Advisory Group (PARCAG) in March 2020. *Id.*  PARCAG was intended foster collaborations between BIPOC-led community-based organizations (CBOs), PHSKC, and large institutional partners (e.g., University of Washington, Microsoft, the Port of Seattle) to advise and problem-solve barriers to racial and ethnic equity in COVID-19 response efforts. *Id.*

---

[10] Kirsten Wysen, et. al, *Public Health Accountability in Action: The King County Pandemic and Racism Community Advisory Group. Public Health Reports*, 2024;139(1_suppl):30S-36S. https://doi.org/10.1177/00333549231223923 (last accessed 10/22/2025, 12:47 p.m.).

Between early 2020 and early 2022, PHSKC adopted PARCAG recommendations to improve COVID-19 information materials and to report King County COVID-19 case data by race and ethnicity. PHSKC also partially adopted recommendations to translate COVID-19 information into more languages and to acknowledge and act on the mental health effects of the pandemic. *Id.* In its second year, PHSKC adopted additional PARCAG recommendations to hold vaccine events in community settings, prioritizing community funding in a Centers for Disease Control grant application and modifying a vaccine verification ordinance to eliminate an identification card requirement. Pacific Islander staff worked with Pacific Islander CBOs to promote vaccinations in this group. *Id.* PARCAG and PHSKC used an accountability tool to provide transparency and accountability for the health department's actions to the BIPOC communities it serves, contributing to the deepening of relationships, trust-building, and long-term collaboration that are foundational for a culture of health for organizations and communities alike. *Id.*

PHSKC's work with PARCAG likely contributed to Seattle having one of, if not the lowest rate of COVID cases among major U.S. cities.[11]  City and County employees working intentionally with CBOs to understand and meet communities' needs with cultural competencies, thereby building trust and producing healthier outcomes for all, made these results possible.

Another example of using cultural competency to engage and build trust with a diverse or marginalized community resulted in quickly determining the source of a high incidence of lead exposure in Afghan refugee families.  A project team from King County Department of Natural Resources and Parks Hazardous Waste Management Program partnered with King County's Afghan refugee community to better understand the problem and identify solutions.[12] The project grew from work with a single immigrant community to other communities and jurisdictions, resulting in state-wide legislation.[13]

---

[11] *See* https://www.seattletimes.com/seattle-news/data/seattle-may-have-lowest-rate-of-covid-19-cases-among-major-u-s-cities/ (last accessed 10/3/2025).
[12] https://kcemployees.com/2024/07/10/reducing-lead-in-cookware-leads-to-brg-innovation-award-for-equity-racial-social-justice/#:~:text=A%20joint%20team%20from%20the,the%20problem%20and%20identify%20solutions (last accessed 10/19/2025, 1:39 p.m.).
[13] https://ecology.wa.gov/waste-toxics/reducing-toxic-chemicals/washingtons-toxics-in-products-laws/lead-in-cookware-law (last accessed 10/19/2025, 1:42 p.m.).

Examples such as these demonstrate that DEI principles and the skills necessary to apply the principles are critical for local government employees to identify and meet the needs of increasingly diverse populations and generate improved outcomes for the entire population they serve.

### D. **Diemert's response to Seattle's RSJI demonstrates the need for DEI policies and instruction.**

Diemert espoused colorblindness in his opposition to Seattle's RSJI. To support his narrative, Diemert referred to and included in his signature block, a quote from Dr. Martin Luther King's "I Have a Dream" speech to suggest that Dr. King's vision of a colorblind society is contrary to DEI programming. *See, e.g.,* ER-0283, ER-0322, ER-049, ER-0359. Insisting that Dr. King espoused colorblindness ignores that his vision was about a future utopia and that Dr. King spent much of the last six years of his life actively promoting what we would describe today as race-conscious affirmative action.[14]

Advocates of colorblindness are likely to label race-conscious policies (those involving awareness of race, either for an action or policy's purpose or

---

[14] Andrew Hartman, *Martin Luther King and Colorblind Conservatism*. (August 27, 2013). https://s-usih.org/2013/08/martin-luther-king-and-colorblind-conservatism/ (last accessed 10/20/2025 at 11:32 a.m.)(citations omitted).

in terms of possible or likely effects) as discriminatory race-based classifications (policies that use race as a decision or selection criteria).[15]

But race-consciousness is the crux of DEI work, especially for local governments – acknowledging inequality and inequity is necessary to effectively and efficiently serve our communities.  Colorblindness is corrosive to the community engagement and trust building necessary for local government employees to serve increasingly diverse populations.  Research shows that colorblindness not only fails to eliminate race consciousness, but that it can entrench racial bias by inhibiting positive cross-racial interactions and degrading any contact that does occur.  Elise C. Boddie, *The Indignities of Color Blindness*, 64 UCLA L. Rev. Discourse 64, 79-80 (2016).  Colorblind dynamics reduce engagement and inhibit growth and understanding necessary to bridge racial divides, leading to racial isolation, exclusion, and limited access to social and economic resources and opportunities.  *Id*.  In short, colorblindness jeopardizes local governments' ability to effectively and efficiently serve their citizens and communities.

---

[15] *See* Stephen Menendian, *What Constitutes A "Racial Classification"?: Equal Protection Doctrine Scrutinized*, 24 Temp. Pol. & Civ. Rts. L. Rev. 81, 91-95 (2014).

**E. Recent appellate decisions do not require reversal of the district court**

Diemert and several of his amici argue that the district court ran afoul of the Supreme Court's decision in *Ames v. Ohio Dep. of Youth Svcs*., 605 U.S. 303, 309, 145 S.Ct. 1540, 221 L.Ed.2d 929 (2025). Finding no such heightened evidentiary standard in Title VII, the Court rejected the requirement that majority-group plaintiffs show background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority in order to carry their burden under the first step of the *McDonnell Douglas* framework. *Id*. at 313.

Here, the district court acknowledged that some courts required a heightened standard in "reverse discrimination" cases, and noted that Diemert was a member of the majority group and that instances of discrimination against the majority are rare. But the court did not hold Diemert to the higher standard. *See Diemert v. City of Seattle*, 776 F. Supp. 3d 922, 945, n.6 (W.D. Wash. 2025). Instead, recognizing that this Court had not taken a position on the inter-circuit dispute, the district court found that that Diemert failed to meet his burden under the traditional *McDonnell Douglas* standard, making it unnecessary to decide whether an extra showing was needed. *Id*.

14

The district court's decision is consistent with published cases cited

therein, in which *minority* group plaintiffs failed to show discrimination or

hostile work environment based on race because the comments were either

isolated incidents or generalizations. *See id.* at 942. In short, the district court

held Diemert to the same burden as a minority group plaintiff.

Diemert may also argue that a recent Second Circuit case supports his

hostile work environment theory. *See Chislett v. New York City Dept. of

Education.*, 2025 WL 2725669 (2nd Cir., September 25, 2025). Like Diemert,

Chislett claimed that she suffered a hostile work environment fostered by

mandatory implicit bias trainings. The Second Circuit reversed the grant of

summary judgment, holding that the cumulative evidence created a genuine

issue of material fact about whether the work environment was racially hostile.

*Id*. at *10-11.

Even if *Chislett* was binding upon this Court, it is materially

distinguishable. Most of the references to "white privilege" and "white

supremacy" that Diemert complained of occurred in City trainings and were

not directed at him personally. Further, Diemert was not a supervisor, whereas

Chislett's subordinates accused her of operating out of white privilege for

performing her ordinary supervisory duties. Perhaps the greatest distinction is

15

that Diemert provoked and invited the discourse with racially charged and divisive comments about the trainings and Black history.  *Diemert*, 76 F. Supp. 3d at 943; *see, e.g.,* ER-0511-529.  Unlike Chislett, City employees responded to Diemert's provocative behavior and statements about race, not the way he performed his job.  *Chislett* does not require reversal of the district court.

## **<u>CONCLUSION</u>**

For the reasons stated above, the Court should affirm the district court's decision.

RESPECTFULLY SUBMITTED this 24th day of October, 2025.

> LEESA MANION (She/Her)
> *King County Prosecuting Attorney*
>
> By: *<u>s/ Heidi Jacobsen-Watts</u>*
> HEIDI JACOBSEN-WATTS, WSBA 35549
> YOUN-JUNG KIM, WSBA 23516
> *Senior Deputy Prosecuting Attorneys*
> 701 Fifth Avenue, Suite 600
> Seattle, WA 98104
> Heidi.Jacobsen-Watts@kingcounty.gov
> Jina.Kim@kingcounty.gov
> *Attorneys for King County*

## CERTIFICATION OF COMPLIANCE WITH FED. R. APP. P. 32 AND CIRCUIT RULE 32-3

Pursuant to Fed. R. App. P. 32 and Ninth Circuit Rule 32-3, the attached *Amicus Curiae* Brief of King County is proportionately spaced and has a typeface of 14 points or more and contains, exclusive of tables, 16 pages.

RESPECTFULLY SUBMITTED this 24th day of October, 2025.

LEESA MANION (She/Her)
*King County Prosecuting Attorney*

By: *s/ Heidi Jacobsen-Watts*
HEIDI JACOBSEN-WATTS, WSBA 35549
*Senior Deputy Prosecuting Attorney*
YOUN-JUNG KIM, WSBA 23516
*Senior Deputy Prosecuting Attorneys*
701 Fifth Avenue, Suite 600
Seattle, WA 98104
Heidi.Jacobsen-Watts@kingcounty.gov
Jina.Kim@kingcounty.gov
*Attorneys for King County*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-1188

I am the attorney or self-represented party.

**This brief contains** | 2,845 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [               ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Heidi Jacobsen-Watts | **Date** | 10/24/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                                          *Rev. 12/01/22*

## <u>CERTIFICATE OF SERVICE</u>

I, RAFAEL MUNOZ-CINTRON, hereby certify that on October 24, 2025,

I electronically filed the foregoing *Amicus Curiae* Brief with the Clerk of the

Court for the United States Court of Appeals for the Ninth Circuit by using the

appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF System.

Dated this 24th day of October, 2025 at Seattle, Washington.

_____
RAFAEL MUNOZ-CINTRON
Paralegal
King County Prosecuting Attorney's Office