UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NO. 25-1188

——————————————————

JOSHUA A. DIEMERT, an individual,

Plaintiff-Appellant

v.

CITY OF SEATTLE, a municipal Corporation,

Defendant-Appellee

——————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF
WASHINGTON AT SEATTLE

DISTRICT COURT NO. 2:22-CV-01640-JNW

——————————————————

**AMICUS CURIAE BRIEF OF
WASHINGTON STATE ASSOCIATION OF MUNICIPAL ATTOREYS
SUPPORTING THE POSITION OF DEFENDANT-APPELLEE CITY OF
SEATTLE AND AFFIRMANCE OF THE DISTRICT COURT DECISION.**

——————————————————

Timothy J. Filer, WSBA #16285
Bob C. Sterbank, WSBA #19514
FOSTER GARVEY PC

1111 Third Avenue
Suite 3000
Seattle, Washington 98101
(206) 447-4400

Jonathan Collins, WSBA #48807
SMITH GOODFRIEND, P.S.

1619 8th Avenue North
Seattle, WA 98109
(206) 624-0974

*Attorneys for Washington State Association of Municipal Attorneys*

## TABLE OF CONTENTS

Page

I.  CORPORATE DISCLOSURE STATEMENT .......................................................1

II. IDENTITY AND INTEREST OF AMICUS CURIAE .........................................1

III. STATEMENT REGARDING BRIEF AUTHORSHIP AND
     AUTHORITY ...................................................................................................2

IV. INTRODUCTION AND SUMMARY OF ARGUMENT ....................................2

V.  ARGUMENT .....................................................................................................5

    A.  The Court Should Apply the Well-Established Legal Standards
        and Burden of Proof Applicable to Title VII and WLAD Claims,
        and Affirm the District Court's Summary Judgment Dismissal ................5

    B.  To the Extent the Court Reaches the Question Whether DEI
        Programs Are Inherently or *Per Se* Discriminatory or Unlawful,
        the Court Should Answer in the Negative and Affirm the District
        Court ......................................................................................................19

VI. CONCLUSION .................................................................................................24

- i -

## TABLE OF AUTHORITIES

Page

**Cases**

*Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362 (1975)..........................20

*Bell v. Boeing*, 599 F. Supp. 3d 1052 (W.D. Wash. 2022) ............................................13

*Blackburn v. State*, 375 P.3d 1076, n.4 (Wash. 2016) ......................................................7

*Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir.2000) ......................................7, 10

*Burlington N & Santa Fe Ry. Co*., 548 U.S. 53 (2006) .................................................11

*Crownover v. State ex rel. Dep 't of Transp*., 265 P.3d 971 (Wash. Ct. App. 2011) ...................................................................................................................12

*Daniels v. Essex Group, Inc*., 937 F.2d 1264 (7th Cir. 1991)..........................................10

*Davis v. Fred 's Appliance*, 287 P.3d 51 (Wash. Ct. App. 2012) ...................................12

*Davis v. Monsanto Chemical Co*., 858 F.2d 345 (6th Cir. 1988), *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989) .................................10

*DePiero v. Penn State University*, CV No. 23-2281, 2025 WL 1139260 (E.D. Pa. April 16, 2025)............................................................................................16

*Domingo v. Boeing Emps. Credit Union*, 98 P.3d 1222 (Wash. Ct. App. 2004) ...........6

*Dykzeul v. Charter Comm 'ns,* Inc., No. CV-18-5826-DSF-(GJSx), 2021 WL 4522545 (C.D. Cal. Feb. 3, 2021)........................................................................14

*EEOC v. Prospect Airport Servs., Inc*., 621 F.3d 991 (9th Cir. 2010) ...........................9

*Ellison v. Brady*, 924 F.2d 872 (1991)..............................................................................7

*Equal Employment Opportunity Comm'n v. OSI Rest. Partners, Inc*., 2010 WL 11519281 (D. Ariz. Feb. 5, 2010).................................................................8

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) .................................................7, 8

*Forsberg v. Pac. NW Bell Tel. Co*., 840 F.2d 1409 (9th Cir. 1988) ..............................14

*Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643 (2021) .......................................................9

- ii -

*Fulton v. State*, 279 P.3d 500 (Wash. Ct. App. 2012) .................................................14

*Griggs v. Duke Power Co.*, 401 U.S., at 429-30, 91 S.Ct., at 853, 28 L.Ed.2d 158 (1971) .................................................................................................................20

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367 (1993) .............................7

*Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151 (9th Cir. 2010) ...................................10

*Keenan v. Allen*, 889 F. Supp. 1320, n.68 (E.D. Wash. 1995) ....................................13

*Kortan v. California Youth Authority*, 217 F.3d 1104 (9th Cir.2000) ...........................8

*Marin v. King Cnty.*, 378 P.3d 203 (Wash. Ct. App. 2016)..........................................11

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 181, 736 L.Ed.2d 668 (1973).................................................................................................................20

*McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004) .......................................8

*Milligan v. Thompson*, 42 P.3d 418 (Wash. Ct. App. 2002)..........................................11

*Montero v. AGCO Corp.*, 192 F.3d 856 (9th Cir.1999)..................................................16

*Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346 (2024) ...............................................11

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ................................11, 12

*Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864 (9th Cir. 2001) ......................20

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)..............................................................................................8

*Orr v. Bank of Am., NT & SA*, 285 F.3d 764 (9th Cir. 2002) .......................................13

*Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000)...........................................................7

*Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678 (9th Cir. 2017) ...............................7

*Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).......................................................................10

*Ryan v. Barrick Goldstrike Mines Inc.*, No. 3:19-CV-00286-MMD-CLB, 2021 WL 2018879 (D. Nev. 2021)...................................................................................8

- iii -

*Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir.1990) .........................................8

*Snell v. Suffolk County*, 782 F.2d 1094 (2nd Cir. 1986) .................................................10

*Stepien v. Raimondo*, No. 2:21-cv-01410-LK, 2024 WL 5169969 (W.D. Wash. 2024) .................................................................................................................................8

*Swenson v. Potter*, 271 F.3d 1184 (9th Cir. 2001).........................................................12

*Tyner v. State*, 154 P.3d 920 (Wash. Ct. App. 2007).....................................................11

*Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634 (9th Cir. 2003) ..............................6, 7, 8

**Other Authorities**

Title VII of the Civil Rights Act of 1964, 78 Stat. 253 ...................................................1

FG: 104447171.3

## I.     CORPORATE DISCLOSURE STATEMENT

Amicus curiae Washington State Association of Municipal Attorneys ("WSAMA") is a Washington nonprofit corporation, EIN 91-1347635. It is not a publicly held corporation, has no parent corporation, and does not issue stock.

## II.     IDENTITY AND INTEREST OF AMICUS CURIAE

WSAMA members are attorneys representing cities and towns throughout Washington State. Because WSAMA members represent their local government clients regarding Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended and the Washington Law Against Discrimination (WLAD), ch. 49.60 RCW, WSAMA will be directly affected by this Court's interpretation and application of burdens of proof and legal standards applicable to the Plaintiff-Appellant's claims of disparate treatment and hostile work environment under Title VII and/or WLAD. WSAMA members and clients will also be directly affected by the extent to which this Court's ruling affects local governments' ability to address diversity, equity and inclusion within their workforce. Many Washington local governments already implement DEI programs, in a variety of forms, and rely on those programs to help provide service to their growing and diverse communities, as well as part of providing antiharassment training aimed at preventing violations of Title VII and/or the WLAD. *See, e.g.*, https://mrsc.org/stay-informed/mrsc-insight/january-2022/diversity-equity-and-inclusion-initiatives-in-wa; https://mrsc.org/explore-topics/engagement/inclusion/diversity-equity-inclusion.

- 1 -

## III.   STATEMENT REGARDING BRIEF AUTHORSHIP AND AUTHORITY

No party's counsel authored this Brief in whole or in part; no party nor a party's counsel contributed money intended to fund preparation or submittal of this Brief; nor did any person other than *amicus curiae* WSAMA and its undersigned members / counsel contribute money for preparation or submittal of this Brief.

WSAMA's amicus brief is anticipated to be authorized pursuant to leave of court sought by motion pursuant to Fed. R. App. P. 29(a)(3). WSAMA sought consent from both parties. Defendant-Appellee City of Seattle consented. WSAMA received neither a response nor objection from counsel for Plaintiff-Appellant Joshua Diemert.

## IV.   INTRODUCTION AND SUMMARY OF ARGUMENT

This case concerns Plaintiff-Appellant Joshua Diemert's ("Diemert's")[1] claims for racial discrimination in violation of Title VII, WLAD and 42 U.S. §1983. Diemert complains that a City of Seattle program, the Race and Social Justice Initiative (RSJI), "created a hostile-work environment by 'infusing race into all City functions' and 'reduc[ing] [him] to an embodiment of his race.'" 1-ER-2-48 (District Court opinion), citing Dkt. #67. WSAMA adopts the Defendant-Appellee City of Seattle's Statement of Facts regarding Diemert's employment with the City, subsequent claims and procedural history below.

---

[1] Because the record is replete with many names, for ease of reference this brief refers to Plaintiff-Appellant and other witnesses by last name. No disrespect is intended.

- 2 -

Additional context is important, however. After Seattle created its own RSJI program by 2019, the 2020 murder of George Floyd catalyzed substantial growth in similar programs at public and private employers across the country. On millions of TV, computer, and phone screens, Americans witnessed an experienced, uniformed police officer intentionally suffocate Mr. Floyd for over 9 agonizing minutes until he died while a growing crowd looked on. The resulting epiphany was unavoidable—that existing laws and anti-discrimination and anti-harassment programs were insufficient, and that more direct conversations about institutionalized racism and its consequences were urgently needed. Local governments in Washington State—represented by WSAMA members— formally adopted their own programs to consider and implement diversity, equity and inclusion training for employees, address past inequitable practices, and work towards and more equitable and inclusive municipal workforce for everyone.[2]

The backlash moved just as quickly. A movement backed by wealthy corporate donors formed to wage an anti-DEI crusade, alleging any program even remotely associated with DEI concepts was inherently "racist."[3]  Organizations such as Diemert's

---

[2] *See, e.g.*, Everett Mayoral Directive 2018-03 (Community Engagement and Inclusion); King County Resolution 20-08.2 (declaring racism a public health crisis); Issaquah Resolution 2020-08 (statement rejecting racial bias); Shoreline Resolution 467 (2020) (outlining steps to address persistent racism); Tacoma Resolution No. 40622 (2020)(identifying anti-racism as a top priority and directing city manager to prioritize anti-racism in post-COVID of an economic recovery planning). The Court may take judicial notice of legislatively-adopted municipal resolutions. *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006).

[3] "*How a liberal billionaire became America's leading anti-DEI crusader*," February 11, 2024 Washington Post https://www.washingtonpost.com/technology/2024/02/10/bill-ackman-end-dei-industry/ ; "*Tech billionaire Trump adviser says universities will pay the price for DEI*," July 12, 2025 Washington Post, https://www.washingtonpost.com/technology/2025/07/12/marc-andreessen-private-chat-universities-diversity/ (combination of DEI and immigration "systematically cut most of the children of the Trump voter base out of any realistic prospect of access to higher education and corporate America. . . .They declared war on 70% of the country and now they're going to pay the price.").

FG: 104447171.3

counsel and some *amici* undertook broad efforts to represent clients willing to sue DEI programs.[4]  More recently, the President fueled these efforts by declaring via executive order that any program designed to achieve DEI goals "presumptively violates Federal law," terminating federal DEI programs, and imposing strict limits on federal funding to coerce state and local governments into terminating their own DEI programs.[5]

That this appeal is one part of an overarching comprehensive legal and political effort to destroy DEI programs nationwide explains why the Opening Brief struggles so mightily to expand what should be a straightforward appeal of an employment law summary judgment order into a broader attack.  It also explains why the appeal focuses more on rhetorical (mis)characterizations of Seattle's RSJI program rather than on the actual evidence and impact on him (or lack thereof) of the RSJI's content.  Finally, it also explains why Diemert's appeal has drawn *amici* who broadly malign DEI programs by insisting it is a "sin" whenever "the government tak[es] *any notice of the race* of a U.S. citizen"[6]—despite the fact that determining whether racial discrimination has occurred under federal and state anti-discrimination laws requires employers, employees, judges and litigants to *do exactly that*.

This Court should not take the bait. Instead, for the reasons discussed below, it should ignore Diemert's political project and carefully apply the longstanding principles

---

[4] https://pacificlegal.org/equality-and-opportunity/; https://equalprotect.org/wp-content/uploads/2025/10/EPP-Impact-Report-September-2025-combined.pdf.
[5] Executive Orders 14151 and 14173 (2025).  Helpfully, E.O. 14173 declares that it "does not prevent State or local governments" "from engaging in First Amendment-protected speech."
[6] Dkt. Entry 20.2 at 2 (Buckeye Institute Motion for Leave to File Amicus Curiae Brief) (emphasis added).

- 4 -

governing Title VII and the WLAD in light of the admissible evidence in the record – such as it is --  regarding Diemert's particular claims.  To the extent that the Court reaches the legality of DEI programs—either in general or specifically as to Seattle's RSJI—the Court should reaffirm that DEI programs like RSJI are objectively consistent with Title VII longstanding, primary purpose to "*achieve equality* of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees."[7] State and local governments' DEI programs not only further Title VII's purpose but are necessary to achieve it, given Title VII calls on employers to provide training and education in an effort to *prevent* discrimination *before* it occurs – not just remedy it afterwards.

## V.    ARGUMENT

**A.    The Court Should Apply the Well-Established Legal Standards and Burden of Proof Applicable to Title VII and WLAD Claims, and Affirm the District Court's Summary Judgment Dismissal.**

Diemert repeatedly argues that the District Court applied the wrong legal standard.   Opening Brief at 16 (arguing District Court contravened Ames) at 17 (summary); at 19-20 (arguing District resolved factual issues and made credibility determinations); at 28-31 (arguing hostile work environment standard misapplied); at 32-35 (arguing disparate treatment standard misapplied).  But, in truth, Diemert himself fails to acknowledge the correct legal standards here, including as to Title VII claims,

---

[7] Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362 (1975), *quoting Griggs v. Duke Power Co.*, 401 U.S., at 429—430, 91 S.Ct., at 853, 28 L.Ed.2d 158 (1971).

- 5 -

his burden of proof, and the District Court's role in applying the law and burden of proof to the facts. After applying these well-established legal standards to the admissible evidence in the record, this Court must affirm summary judgment dismissal.

Diemert alleges multiple claims under Title VII, including hostile work environment ("HWE"), disparate treatment ("DT") and retaliation. A plaintiff facing summary judgment must satisfy the specific legal standard and burden of proof that applies to each individual claim.

For example, to establish a prima facie case of a racially HWE under Title VII, a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial nature, (2) that the conduct was unwelcome, and  (3) that the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). State courts interpret the Washington Law Against Discrimination (WLAD) similarly. *See, et., Domingo v. Boeing Emps. Credit Union*, 98 P.3d 1222, 1228 (Wash. Ct. App. 2004) (WLAD HWE requires plaintiff prove harassment was unwelcome, resulted from her protected class status, affected the terms or conditions of her employment, and is imputable to the employer).

To determine whether a work environment was sufficiently hostile for a HWE claim to survive summary judgment, a court examines the frequency of the conduct, its severity, whether it is physically threatening or humiliating or instead merely an

- 6 -

offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Vasquez*, 349 F.3d at 642; *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 687 (9th Cir. 2017) (Title VII), *Blackburn v. State*, 375 P.3d 1076, 1081 n.4 (Wash. 2016) (WLAD). "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady*, 924 F.2d 872, 878 (1991).

"In addition, '[t]he working environment must both subjectively *and* objectively be perceived as abusive.' " *Vasquez*, 349 F.3d at 642, *quoting Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir.2000) (emphasis added). Thus, a plaintiff may not rest on allegations that he subjectively perceived conduct as abusive. "Conduct that is not severe or pervasive enough to create an *objectively* hostile or abusive work environment—an environment *that a reasonable person would find hostile or abusive*—is beyond Title VII's purview." *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21, 114 S.Ct. 367 (1993) (emphasis added). "Not every insult or harassing comment will constitute a hostile work environment." *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not suffice for a HWE. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). These limitations on judging hostility are meant to "ensure that Title VII does not become a 'general civility code.' " *Faragher*, 524 U.S. at 788, 118

- 7 -

S.Ct. 2275 (*quoting Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

Importantly, here, the determination of whether a work environment is objectively hostile or abusive enough to state a prima facie HWE claim is a <u>legal</u> determination that courts may determine on summary judgment, and they often do. *See, e.g., Vasquez, Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir.1990); *Kortan v. California Youth Authority*, 217 F.3d 1104, 1107, 1111 (9th Cir.2000) (multiple instances of offensive name-calling insufficient to interfere with plaintiff's employment); *Equal Employment Opportunity Comm'n v. OSI Rest. Partners, Inc*., 2010 WL 11519281, at *8-9 (D. Ariz. Feb. 5, 2010) (single humiliating incident of physical contact in front of other people not severe or pervasive enough to deny summary judgment dismissing HWE claim); *Ryan v. Barrick Goldstrike Mines Inc*., No. 3:19-CV-00286-MMD-CLB, 2021 WL 2018879 at *1, *4-5 (D. Nev. 2021) (severity of single 30-minute exchange between coworkers insufficient to outweigh fact it occurred on only one occasion) *quoting McGinest v. GTE Serv. Corp*., 360 F.3d 1103, 1113 (9th Cir. 2004)); *Stepien v. Raimondo*, No. 2:21-cv-01410-LK, 2024 WL 5169969 at * (W.D. Wash. 2024) (affirming summary judgment and denying reconsideration where plaintiffs' allegations of two arguably gender-specific incidents were "not objectively severe and pervasive enough to create hostile work environment" and questions about employee's move of goods and failure to attend

FG: 104447171.3

mandatory conference were "ordinary tribulations of the workplace."). See also Appellee Answering Brief at 47-48 and cases discussed therein.

Diemert cites *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643 (2021), suggesting that the severity of workplace conduct should not be resolved on summary judgment and must instead be left to the finder of fact. Opening Brief at 31. But, in *Fried*, this Court *affirmed* the district court's summary judgment dismissal of plaintiff's HWE claim, holding that 4 instances of allegedly discriminatory remarks "were insufficiently severe or pervasive to support a hostile work environment claim." *Fried*, 18 F.4th at 648. This Court further held that statements at issue—like a supervisor's suggestion that plaintiff look for another job "outside of a female-oriented field"—were merely "the type of infrequent joking or teasing [that are] part of the ordinary tribulations of the workplace" and therefore lacked "objective severity" and "pale[d] in comparison to the statements and conduct" in more serious cases involving "either sexually or racially motivated derogatory language[.]" *Id.* at 649, *citing EEOC v. Prospect Airport Servs., Inc*., 621 F.3d 991, 998 (9th Cir. 2010) (acknowledging sporadic gender-related jokes or occasional teasing do not support a hostile work environment claim). Although this Court also held that the supervisor's failure to take prompt action regarding plaintiff's sole complaint based on severe conduct—a sexual proposition from salon customer— could survive summary judgment, *id.* at 652, Diemert never alleges anything, even remotely analogous or extreme here.

- 9 -

Similarly, in the race discrimination context, "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not sufficiently alter terms and conditions of employment to violate Title VII. *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972), at 238; *see also Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271–1272 (7th Cir. 1991); *Davis v. Monsanto Chemical Co.*, 858 F.2d 345, 349 (6th Cir. 1988), *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989); *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2nd Cir. 1986).

Diemert's other claims fare no better. For a disparate treatment (DT) claim, a plaintiff must 1) he is a member of a protected class, 2) he was qualified for his position and was performing his job satisfactorily, 3) he experienced an adverse employment action, and 4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse action give rise to an inference of discrimination. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151 , 1156 (9th Cir. 2010). Notably, these tests *expressly* require employers, litigants and courts to identify race, in order to determine the category to which plaintiff belongs, as well as the treatment of individuals putatively outside it. Applying the legal test for "disparate treatment" requires the very behavior condemned by Diemert and supporting amici, who suggest we must be at all times "colorblind."

- 10 -

To establish a *prima facie* retaliation claim, Diemert must show: 1) he participated in a protected activity, 2) he suffered an adverse employment action, and 3) there is a causal link between the protected activity and the adverse action. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). Under the WLAD, the prima facie elements for both disparate treatment and retaliation mirror Title VII. *See Marin v. King Cnty*., 378 P.3d 203, 211-212 (Wash. Ct. App. 2016) (DT under the WLAD); *Milligan v. Thompson*, 42 P.3d 418, 424 (Wash. Ct. App. 2002) (Retaliation under the WLAD).

For purposes of either a DT or retaliation claim, a plaintiff alleging an adverse employment action "must show some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis, Mo*., 601 U.S. 346, 354-55 (2024). An adverse action is one that is *materially* adverse, which means that it might have dissuaded a reasonable person from engaging in protected activity. *Burlington N & Santa Fe Ry. Co*., 548 U.S. 53, 68 (2006). But, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id*. Cases interpreting WLAD hold similarly. *See, e.g., Tyner v. State*, 154 P.3d 920, 929 (Wash. Ct. App. 2007) (adverse action for WLAD retaliation claim requires something more than inconvenience or alteration of job responsibilities).

When considering Diemert's claims, the District Court had to apply the summary judgment standard corresponding to each claim. For example, a plaintiff cannot support

FG: 104447171.3

a HWE claim with evidence of discrete, discriminatory acts occurring outside the statute of limitations period. *See, et., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 (2002) (under Title VII, failure to promote or refusal to hire were discrete acts different in kind from acts constituting a HWE, and must have occurred within the appropriate time period to be actionable); *see also* Answering Brief at 38-39 and cases cited therein.

Discrete acts outside the limitations period may only be considered for a HWE claim if the acts are part of a pattern of conduct that includes at least one incident *within* the statute of limitations. *See, et., Morgan*, 536 U.S. at 120 (court must determine whether acts are part of the same HWE, and if so, whether any event falls within the statutory time period). In determining whether allegedly discriminatory acts outside the statute of limitations nevertheless were part of an actionable pattern of conduct for a HWE claim, courts consider whether the untimely acts involved the same type of employment actions, occurred relatively frequently, and were committed by the same individuals. *Crownover v. State ex rel. Dep 't of Transp*., 265 P.3d 971 , 978 (Wash. Ct. App. 2011) *(citing Morgan*, 536 U.S. at 120). "Acts that are 'so discrete in time or circumstances that they do not reinforce each other' do not constitute a single hostile work environment in order to defeat the statute of limitations." *Id*. at 978.

A Title VII plaintiff must also have notified the employer of alleged misconduct in order for the employer to be vicariously liable. *See, et., Swenson v. Potter*, 271 F.3d

- 12 -

1184, 1192 (9th Cir. 2001) (in Title VII HWE claim, "an employer cannot be held liable for misconduct of which it is unaware"); *Davis v. Fred 's Appliance*, 287 P.3d 51, 58-59 (Wash. Ct. App. 2012) (supervisor/co-worker harassment can be imputed to employer under WLAD if employer authorized, knew, or should have known of the harassment and failed to take reasonably prompt and adequate remedial action).

A plaintiff must also be aware of the hostile statements or conduct *during his employment* for those events to support a valid HWE claim. *See, e.g., Brooks*, 229 F.3d at 924 (plaintiff could not rely on co-worker's harassment of others to support her HWE claim, "[h]arassment directed towards others of which an employee is unaware can, naturally, have no bearing on whether she reasonably considered her working environment abusive"); *Keenan v. Allen*, 889 F. Supp. 1320, 1374-75 n.68 (E.D. Wash. 1995) (plaintiff could not rely on statements made to others to defeat summary judgment on her Title VII and WLAD HWE claim), aff'd, 91 F.3d 1275 (9th Cir. 1996), *see also Bell v. Boeing*, 599 F. Supp. 3d 1052, 1076-77 (W.D. Wash. 2022) (negative emails about plaintiff that he only learned of in discovery after he was discharged did not alter the conditions of his employment).

Even if proffered evidence meets these standards, any allegedly hostile events, statements or conduct must be described with sufficient specificity to be admissible and state a *prima facie* claim. Evidence offered in support of a claim of disputed issues of material fact must be admissible.  Documents must meet evidentiary standards of

- 13 -

authenticity. *See, e.g., Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("unauthenticated documents cannot be considered in a motion for summary judgment."). They may not constitute hearsay, unless they fall within applicable business record, public record, party admission or other exceptions. *See, et., Dykzeul v. Charter Comm 'ns,* Inc., No. CV-18-5826-DSF-(GJSx), 2021 WL 4522545, at *11-* 13 (C.D. Cal. Feb. 3, 2021) (purported EEOC notes of interview with plaintiff excluded, business records, public records, and party admission exceptions inapplicable).

The Court should not consider alleged acts that lack specificity or are supported only by conclusory allegations. *See, et., Forsberg v. Pac. NW Bell Tel. Co*., 840 F.2d 1409, 1419 (9th Cir. 1988) ("purely conclusory allegations of alleged discrimination, with no concrete, relevant particulars, will not bar summary judgment" on Title VII claim); *Fulton v. State*, 279 P.3d 500, 506 (Wash. Ct. App. 2012) (to defeat summary judgment on WLAD claim, employee must establish specific and material facts to support her case).

Applying the correct summary judgment standard, these Title VII and WLAD principles reveal the litany of flaws underlying Diemert's claims and unquestionably bar them. Diemert essentially asks this Court to "leapfrog" those standards and instead consider a variety of baseless allegations and inadmissible "evidence" the District Court properly excluded—without Diemert preserving any objection to the ruling. Diemert's other complaints lack sufficient specificity, pertain to untimely discrete acts outside of

- 14 -

the limitations period, were unknown to Diemert during his employment, were not brought to the City's attention by Diemert while employed there, and therefore the District Court properly ignored them, as this Court should.

Diemert alleges only a handful of incidents warranting consideration as part of a HWE claim. Answering Brief at 29-31. Even then, the District Court properly concluded they were neither sufficiently pervasive nor sufficiently abusive to constitute an *objectively* hostile work environment as a matter of law. This Court should do the same and affirm.

In a normal case, the foregoing might all be chalked up to a garden-variety evidentiary dispute between a plaintiff and his employer. Here, however, important policy reasons—in addition to *stare decisis*—call for this Court to reaffirm its longstanding precedents discussed above.

First, as the Supreme Court noted, the legal principles underlying Title VII serve an important gate-keeping function for the courts. If every subjectively-offensive look, gesture or statement constituted a *prima facie* case, trial courts would be inundated with discrimination claims. But courts have long emphasized that Title VII is not "a general civility code." *Faragher*, 524 U.S. at 788, and the purpose of the standards for judging hostility exist precisely to prevent this result. *See, e.g.*, *Faragher*, 524 U.S. at 788 (when judicial "standards are properly applied they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language,

- 15 -

gender-related jokes, and occasional teasing,'" because the Court has "made it clear that *conduct must be extreme to amount to a change in the terms and conditions of employment*.")(emphasis added); *see also Montero v. AGCO Corp*., 192 F.3d 856, 860 (9th Cir.1999).

In turn, this precedent protects local governments as employers. Local governments must carefully allocate their strained budgets to provide important public services, including police, fire, emergency medical services, roads, water, sewer, stormwater and electrical utility services, and beyond—all while supervising their employees to ensure compliance with anti-discrimination and other laws. But these workplaces rightly reflect America's diversity and are therefore comprised of people from different political, ethnic and racial backgrounds. These public servants inevitably express and sometimes strenuously argue individual viewpoints on many topics, including race, sex, and gender issues.

Diemert did that here, as have other plaintiffs objecting to DEI programs. *DePiero v. Penn State University*, CV No. 23-2281, 2025 WL 1139260 at *5-6 (E.D. Pa. April 16, 2025). If the Court accepts Diemert's invitation to eschew the judicial standards for assessing Title VII claims, it will transform every objectionable workplace utterance or disagreement into an actionable civil rights claim and result in disastrous consequences for local governments, who will face a Hobson's choice: either restrict

- 16 -

employee speech and face potential First Amendment liability, or allow it and risk Title VII liability for claimed harassment instead.

And, given the factual nature of many aspects of RSJI and other DEI programs, the "objectively hostile" standard applicable to HWE claims is also important here. Underlying Diemert's and *amici*'s position is the dubious assumption that any reference to race in the workplace is *per se* objectionable, irrespective of whether past racial discrimination—including institutional racism—is objectively demonstrable. Diemert himself engaged in a heated online argument with a co-worker about the Tulsa Race Massacre on exactly this basis, contending that the Massacre should be described as having been committed by "Democrats"—rather than whites—against black Tulsans, because the Tulsa County KKK was then comprised of Democrats. 1 ER 0030. But the District Court correctly noted the official U.S. DOJ report on the Massacre concludes otherwise. 1 ER 0030, n. 5. Diemert likewise argued that the Civil War should not be viewed as motivated by anti-black racism because the majority of soldiers on the Union and Confederate sides were white. 1 ER 0030. But, the southern States' own Declarations of Secession expressly acknowledge that preservation of black ("African") slavery was the driving force behind secession and, therefore, the War.[8]

---

[8] *See, e.g.*, DECLARATION OF CAUSES: February 2, 1861 (Texas) (noting Texas had joined the United States intending that "the institution known as negro slavery--the servitude of the African to the white race within her limits--. . .should exist in all future time," and proclaiming opposition to "the debasing doctrine of the equality of all men, irrespective of race or color. . ."). This is but one example.

- 17 -

A complaint about DEI program components that are *verifiably true* cannot be objectively hostile or abusive from a reasonable person's perspective. The same is true for Diemert's objections that it is "offensive to state that the United States was built on a system of white supremacy." 1 ER 0021. But, even a short list of federal actions codifying institutional racism proves the point.[9] When a DEI program provides verifiably true historical evidence, such a program cannot, as a matter of law, be objectively viewed as evidence of an HWE. As the District Court put it, "[p]assive exposure to these concepts cannot reasonably be construed as a threat to Diemert's safety or well-being or an impediment to his job." While it may be an employee's *subjective*

---

[9] Three Fifths Clause – Art. I, Section 2, cl. 3 of U.S. Constitution (apportioning representatives among states by population ("whole number of free persons") but only "three fifths of all other persons," viz., enslaved persons)
Fugitive Slave Clause Art. IV, Section 2, cl. 3 of U.S. Constitution (no person escaping servitude or labor to another state shall be discharged from service, but shall be "delivered up" upon claim) Extradition Clause (U.S. Const. Article 4, Section 2, Clause 2) (any fugitive who has committed treason, felony or any other state crime to be delivered up to State with jurisdiction over the crime); *Fugitive Slave Act of 1793* (implementing Fugitive Slave Clause of U.S. Const. Art. IV, Section 2, cl. 3 (Superseded by Thirteenth Amendment); *Missouri Compromise of 1820* (admitting Missouri as a slave state and Maine as a free state); *Chinese Exclusion Act of 1882* (10 year ban on immigrants from China coming to or remaining in U.S.); *Geary Act of 1892* (extended then made permanent *Chinese Exclusion Act*; required each Chinese resident to obtain certificate of residence without which they could be deported); *Plessy v. Ferguson*, 163 U.S. 537 (1896) (upholding as constitutional "separate but equal" racially-segregated train car and other public facilities); Home Owners Loan Corporation (HOLC) creation, 1933 (HOLC created color-coded maps identifying areas of "hazardous" mortgage risk in red, which was assigned to black-owned home areas); Federal Housing Administration creation (1934) FHA insured home mortgages due to the Depression, but only for white-owned homes); *Breedlove v. Suttles*, 302 U.S. 277 (1937) (upholding as constitutional a poll tax on the right to vote in Georgia); Executive Order 9066, signed by President Roosevelt February 19, 1942 (authorized forcible removal of people of Japanese ancestry (including U.S. citizens) and incarceration in concentration camps) *Korematsu v. U.S.*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (upholding E.O. 9066); Executive Order Nos. 13,769 and 13,780 (barring entry into the U.S. foreign nationals from seven specific, Muslim countries); *Trump v. Hawaii*, 585 U.S. 667, 138 S.Ct. 239, 2201 L.Ed.2d 775 (2018) (abrogating *Korematsu* but upholding ban of foreign national entry from seven predominantly Muslim countries).

- 18 -

view that, for whatever reason, such information is "offensive," subjective perception alone does not constitute a HWE. This Court should not allow this case to become a vehicle to make it become so.

**B.    To the Extent the Court Reaches the Question Whether DEI Programs Are Inherently or *Per Se* Discriminatory or Unlawful, the Court Should Answer in the Negative and Affirm the District Court.**

The District Court reviewed and rejected the claim it understood Diemert to have made, *i.e.*, that efforts to address racism through DEI programs are themselves racist, and answered in the negative. 1 ER 0022. But Diemert now argues here the "question is not whether DEI programs writ large are permissible – the question is whether this Initiative [RSJI] . . .created a discriminatory workplace." Opening Brief at 27. To the extent Diemert concedes that the Court need not address the legality of DEI programs generally, and should limit its consideration here to only Seattle's RSJI, WSAMA agrees. But, then, the Court should affirm the District Court's conclusion that the RJSI did *not* create an "objectively hostile" WE, for all of the reasons the District Court succinctly summarized. 1 ER 0024-26. And Diemert's other "sweeping" contentions about the RSJI, that he was not merely passively exposed to it but was required to "internalize" its concepts, that he was classified based on his race, and other allegations, are simply unsupported by the record, for all the reasons the City urges and the District Court concluded. Answering Brief at 24-36; 1 ER 24-25.

Some amici supporting Plaintiff-Apellant, however, argue otherwise, and invite the Courtto determine that DEI programs writ large are essentially inherently

- 19 -

discriminatory. *See, e.g*., Amicus Brief of Equal Protection Project, Dkt.Entry #27.1 at 16-21 (Court improperly assumed DEI training necessary to avoid liability); Amicus Brief of Mountain States Legal Foundation, Dk. Entry #21.1 at 16-25. To the extent that this Court takes on that assertion, however, it should be rejected.

As the District Court correctly explained, Title VII's "primary objective was a prophylactic one," to "achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group" of employees over another. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362 (1975), *quoting Griggs v. Duke Power Co*., 401 U.S., at 429-30, 91 S.Ct., at 853, 28 L.Ed.2d 158 (1971); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 181, 736 L.Ed.2d 668 (1973). The purpose of DEI programs like the RSJI – including utilizing a racial equity lens – fit squarely within Title VII's purposes.

Further, as the District Court recognized, our Supreme Court crafted a specific affirmative defense to Title VII liability, the *Faragher-Ellerth* defense, "allowing employers to avoid liability for supervisory harassment by taking a proactive approach to harassment prevention, including by implementing training." 1 ER 0024. This Court recognizes that affirmative defense. *Id.*, *citing Nichols v. Azteca Rest. Enterprises, Inc*., 256 F.3d 864, 877 (9th Cir. 2001) (holding defendant exercised reasonable care to prevent sexual harassment by maintaining an anti-harassment policy and a "company-wide [anti-harassment] training program."). Many Washington cities and towns use DEI

- 20 -

programs in conjunction with other trainings, to meet their Title VII obligations and reduce potential liability.  Training is far more likely to be successful when employees understand the historical context of racial discrimination in the United States, which is precisely what DEI programs provide.  While Diemert and some *amici* rely heavily on a certain study at the Rutgers University Network Contagion Lab, "Instructing Animosity: How DEI Pedagogy Produces Hostile Attribution Bias," (Opening Brief at 25; Dkt. Entry# 27.1 at 15-20), that study itself concludes with an express caveat demonstrating its inapplicability to this case:

> *It is beyond the scope of this research to evaluate DEI training writ large and our work therefore, should not be taken as evaluating the efficacy of an entire industry.* There are numerous diversity trainings that do not subscribe to anti-oppressive frames, some of which may be successful or, at the least, harmless.

*"Instructing Animosity: How DEI Pedagogy Produces the Hostile Attribution Bias,"* Ankita Jagdeep et al., Network Contagion Research Laboratory 1 (Rutgers Univ. Social Perception Lab Nov. 13, 2024) at 15 (emphasis added).  Predictably, neither Diemert nor *amici* acknowledge this limitation, which vitiates their argument.

Further, another recent survey of published studies indicated that a significant percentage of other studies (over 80%) showed a demonstrated *improvement* in DEI program participants' in knowledge, awareness, and  perceived importance of recognizing biases and improving diversity, with a somewhat lesser percentage of

- 21 -

improved positive feelings toward gender outgroups.[10]   Other articles also document

economic and workforce benefits from DEI programs.[11]   The District Court correctly

took note of the benefits of DEI programs, but even if the "jury is still out" as to the

precise degree of the their effectiveness, such questions hardly convert DEI programs

into *per se* discrimination.

The District Court also correctly noted that training and education continue to be

needed because racial and other discrimination still exists. 1 ER 0024-25.  Diemert and

amici do not appear to controvert the District Court's citation to Justices Kavaugh's and

Jackson's opinions stating exactly that, and it seems impossible that they could.

Nevertheless, to the extent any question exists whether circumstances have improved

since the District Court's issuance of its decision, consider that in the last few *weeks*, it

was publicly reported that the person nominated to lead the U.S. Office of Special

Counsel stated on digital messaging texts that "MLK Jr. was the 1960s George Floyd

and his 'holiday' should be ended and tossed into the seventh circle of hell where it

belongs," used an Italian slur (moulignon) for Black people to the effect that there should

---

[10] *See e.g.*, "*A systematic review of diversity, equity, and inclusion and antiracism training studies: Findings and future directions,*" Wang et. al, Transl Behav Med. 2023 Oct 19;14(3):156–171. doi: 10.1093/tbm/ibad061, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC10890819/

[11] *See, e.g.*, "*Three Reasons The Case For Corporate DEI Programs Is Stronger Than Ever,*" Clark, Forbes Magazine (November 28, 2023), available at https://knowledgeanywhere.com/articles/statistical-proof-that-diversity-and-inclusion-dei-works-for-innovation-and-profitability/;  "Statistical Proof That Diversity and Inclusion (DEI) Works For Innovation and Profitability," McKinstry (2025), available at: https://www.forbes.com/councils/forbeshumanresourcescouncil/2023/11/28/three-reasons-the-case-for-corporate-dei-programs-is-stronger-than-ever/.

FG: 104447171.3

be "[n]o moulignon holidays … From kwanza [sic] to mlk jr day to black history month to Juneteenth" . . ."Every single one needs to be eviscerated"; cautioned his colleagues to "[n]ever trust a chinaman or Indian," "NEVER"; and postulated that "Blacks behave that way [as victims] because that's their natural state … You can't change them"; and "Proof: all of Africa is a shithole, and will always be that way."[12]  While the particular nominee eventually withdrew in the face of public scrutiny of his remarks, the fact that such statements were casually made by a nominee for one of the highest federal legal positions charged with oversight of the agency responsible for investigating federal employee whistleblower complaints and discrimination claims, and repeated after recipients of his comments objected, speaks volumes about the breadth and persistence of racism in America.  Of course, if made in the workplace, such comments would be subject to review for whether they were "jokes," and were objectively pervasive and abusive enough, if made by the head of the Office of Special Counsel would result in automatic liability for the United States, because liability for a HWE created by a supervisor is automatically attributed to the employer and is not subject to the *Faragher-Ellerth* defense.  More important here, the statements underscore the need for continued training and education in the workplace if prohibited discrimination – or liability for it -- is to be avoided or remedied.

---

[12] "*Trump nominee says MLK Jr. holiday belongs in 'hell' and that he has 'Nazi streak,' according to texts*" Politico (October 20, 2025), available at https://www.politico.com/news/2025/10/20/paul-ingrassia-racist-text-messages-nazi-00613608.

FG: 104447171.3

In that respect, DEI programs can and do play a valuable role in teaching employees' awareness about racism, including institutional racism, and ways to avoid it. They are often used by Washington municipalities for exactly this purpose. To the extent this Court takes on amici's invitation to address the role and legality of DEI programs broadly, it should affirm that DEI programs are not per se discriminatory; that they may be permissibly used to combat institutionalized racism, bias in employment decisions, and other problematic and potentially illegal practices that could fester if all DEI programs had to be abandoned; and that they remain a permissible use for employers in meeting their obligations under Title VII, including establishing the *Fargher-Ellerth* affirmative defense.

## VI.  CONCLUSION

For all the foregoing reasons, this Court should affirm the decision of the District Court.

RESPECTFULLY SUBMITTED this 24th day of October, 2025.

FOSTER GARVEY PC

By: _s/ Bob C. Sterbank_
Timothy J. Filer, WSBA #16285
Bob C. Sterbank, WSBA #19514
1111 Third Avenue, Suite 3000
Seattle, Washington 98101
(206) 447-4400
tim.filer@foster.com
bob.sterbank@foster.com

SMITH GOODFRIEND, P.S.

By: _s/ Jonathan Collins_
Jonathan Collins, WSBA # 48807
1619 8th Avenue North
Seattle, WA 98109
(206) 624-0974
jon@washingtonappeals.com

- 24 -

FG: 104447171.3

## <u>CERTIFICATE OF SERVICE</u>

On October 24, 2025, I caused a true and correct copy of the foregoing document to be served by filing it through ECF, and thus a copy will be delivered electronically to all parties.

Executed at Seattle, Washington, on October 24, 2025.

*/s/  Keri Newman*_____
Keri Newman, Legal Practice Assistant

- 25 -

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

    I am the attorney or self-represented party.

    **This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

    I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
    29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated         .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                               **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**            *Rev. 12/01/22*