**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSHUA A. DIEMERT, an individual,<br><br>*Plaintiff - Appellant*,<br><br>v.<br><br>CITY OF SEATTLE, a municipal Corporation,<br><br>*Defendant - Appellee*. | No. 25-1188<br><br>D.C. No. 2:22-cv-01640-JNW<br><br>OPINION |

Appeal from the United States District Court
for the Western District of Washington
Jamal N. Whitehead, District Judge, Presiding

Argued and Submitted April 23, 2026
Seattle, Washington

Filed September 28, 2026

Before: Mary H. Murguia, Chief Judge, and William A. Fletcher and Lucy H. Koh, Circuit Judges.

Opinion by Chief Judge Murguia

## SUMMARY*

### Employment Discrimination

The panel affirmed in part and reversed in part the district court's summary judgment in favor of the City of Seattle in Joshua Diemert's action alleging a violation of the Equal Protection Clause of the Fourteenth Amendment as well as hostile work environment, constructive discharge, disparate treatment, and retaliation in violation of Title VII and the Washington Law Against Discrimination ("WLAD").

Diemert, a white man who worked for the City's Human Services Department, alleged that the City's Race and Social Justice Initiative classified employees on account of race and, in combination with various workplace incidents, created a racially hostile work environment.

Reversing the district court's grant of summary judgment to the City on Diemert's hostile work environment claims, the panel held that, viewing the evidence in the light most favorable to Diemert and drawing all reasonable inferences in his favor, he established a genuine issue of material fact as to whether he was subjected to a racially hostile work environment in violation of Title VII and WLAD. To succeed on a hostile work environment claim, a plaintiff must show: (1) that he was subjected to verbal or physical conduct because of his race, (2) that the conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of his employment

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and create an abusive work environment. The panel concluded that the workplace incidents at issue were sufficiently numerous, frequent, and severe to create a triable issue as to the existence of a racially hostile work environment.

The panel affirmed the district court's grant of summary judgment as to constructive discharge, which Diemert alleged as part of his hostile work environment and retaliation claims.

The panel affirmed the district court's grant of summary judgment to the City on Diemert's claims that he was subjected to disparate treatment and retaliation as a result of: (1) the City's failure to investigate his discrimination claims; (2) the City's initial denial of a leave extension under the Family and Medical Leave Act; and (3) his supervisor's unfair treatment towards him.

The panel affirmed the district court's summary judgment on Diemert's equal protection claim based on Article III standing. Diemert was required to establish a triable issue that (1) the City expressly classified employees based on race and (2) he was personally injured by that classification. Assuming without deciding that Diemert established a triable issue that racially aligned affinity groups in the Race and Social Justice Initiative involved an express racial classification, the panel concluded that he did not establish a triable issue that he was personally injured by any such classification. And even assuming that the City expressly classified employees based on race with respect to some trainings, Diemert did not show that he was personally injured by the classification. The panel therefore concluded that Diemert failed to establish standing for his equal protection claim.

## COUNSEL

Laura M. D'Agostino (argued), Pacific Legal Foundation, Arlington, Virginia; Andrew R. Quinio and Erin E. Wilcox, Pacific Legal Foundation, Sacramento, California; for Plaintiff-Appellant.

Sarah Tilstra (argued), Assistant City Attorney; Erika J. Evans and Ann Davison, Seattle City Attorneys; Seattle City Attorney's Office, Seattle, Washington; Victoria M. Slade, Davis Wright Tremaine LLP, Seattle, Washington; for Defendant-Appellee.

Rachel Jankowski (argued), Deputy Chief; Andrew G. Braniff, Attorney, Appellate Section, Civil Rights Division; Jesus A. Osete, Principal Deputy Assistant Attorney General; Harmeet K. Dhillon, Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Amicus Curiae United States of America.

Alexia M. Diorio and May Che, Assistant Attorneys General; Nicholas W. Brown, Washington Attorney General; Office of the Washington Attorney General, Seattle, Washington; for Amicus Curiae State of Washington.

Ilya Shapiro and Tim Rosenberger, Manhattan Institute, New York, New York, for Amicus Curiae Manhattan Institute.

J. Michael Connolly, Thomas R. McCarthy, Cameron T. Norris, and R. Gabriel Anderson, Consovoy McCarthy Park PLLC, Arlington, Virginia, for Amicus Curiae American Alliance for Equal Rights.

David C. Tryon and Jay R. Carson, The Buckeye Institute, Columbus, Ohio, for Amicus Curiae The Buckeye Institute.

William E. Trachman and Grady J. Block, Mountain States Legal Foundation, Lakewood, Colorado, for Amicus Curiae Mountain States Legal Foundation.

Kevin P. Garvey and Anthony A. Pericolo, Steptoe LLP, Washington, D.C.; Michael A. Petrino, Center for Individual Rights, Washington, D.C.; for Amicus Curiae Center for Individual Rights.

Maureen Riordan, Equal Protection Project, Barrington, Rhode Island; Timothy R. Snowball, James R. Nault, and William A. Jacobson, Legal Insurrection Foundation, Barrington, Rhode Island; for Amicus Curiae Equal Protection Project.

Amanda Karras, International Municipal Lawyers Association, Rockville, Maryland, for Amicus Curiae International Municipal Lawyers Association.

Heidi J. Jacobsen-Watts, Senior Deputy Prosecuting Attorney; Leesa Manion, King County Prosecuting Attorney; King County Office of the Prosecuting Attorney, Seattle, Washington; for Amicus Curiae County of King.

Alexsis M. Johnson and Alaizah Koorji, NAACP Legal Defense and Educational Fund Inc., New York, New York; Jason P. Bailey and Avatara Smith-Carrington, NAACP Legal Defense and Educational Fund Inc., Washington, D.C.; for Amicus Curiae NAACP Legal Defense and Educational Fund Inc..

Jonathan B. Collins, Smith Goodfriend PS, Seattle, Washington; Bob C. Sterbank, Foster Garvey PC, Seattle, Washington; for Amicus Curiae Washington State Association of Municipal Attorneys.

## OPINION

MURGUIA, Chief Circuit Judge:

Joshua Diemert is a white man who worked for the Human Services Department ("HSD") of the City of Seattle (the "City"). During his employment, Diemert participated in the City's Race and Social Justice Initiative (the "RSJI"). The RSJI aims to undo institutionalized racism in the workplace by, among other things, requiring employees to attend trainings on racial justice and facilitating racially aligned affinity groups.[1] Diemert asserts that the RSJI classified employees on account of race and, in combination with various workplace incidents, created a racially hostile work environment.

Diemert resigned from his employment with the City in September 2021, and he commenced this action against the City and its then-mayor, Bruce Harrell (collectively, "Defendants"), in November 2022. Diemert alleges a violation of the Equal Protection Clause of the Fourteenth Amendment, as well as hostile work environment, constructive discharge, disparate treatment, and retaliation in violation of state and federal civil rights laws. The district court granted Defendants' motion for summary judgment, and Diemert timely appealed. We affirm in part, reverse in part, and remand.

[1] Affinity groups, also called caucuses, are City-sponsored workgroups associated with the RSJI. The City's SharePoint page described the role of these groups as follows: "During off-work hours or during work hours with special permission, City of Seattle employees meet regularly to organize affinity groups focused on forwarding the City of Seattle's Race and Social Justice Initiative's efforts to eliminate racial disparities and achieve racial equity in Seattle."

# I

When reviewing a grant of summary judgment, we construe the evidence in the light most favorable to the nonmoving party. *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 646–47 (9th Cir. 2021). We therefore recite the facts in the summary judgment record in the light most favorable to Diemert. We emphasize that Defendants vigorously dispute some of these facts and that Diemert's version of disputed facts has not been proven.

## A

Diemert began working for HSD in 2013. In his role as a program intake representative, Diemert assessed applicants' eligibility for assistance with utility bills under the City's Utility Discount Program. Diemert received satisfactory performance evaluations and was never disciplined or placed on a performance improvement plan.

Like all HSD employees, Diemert participated in the City's Race and Social Justice Initiative. The RSJI, which began in 2004, aims to undo institutionalized racism and achieve racial equity in City government and the Seattle community. The RSJI does not involve racial quotas. Rather, the RSJI assesses City programs and procedures for barriers to entry and seeks to undo these barriers in order "to create a level playing field for all."

The RSJI offers workplace activities. These activities include trainings or events regarding racial and other social justice issues, such as gender, poverty, Indian affairs, and LGBTQ issues. While HSD employees are required to participate in two RSJI activities per year, employees who do not meet this requirement can still receive satisfactory performance evaluations.

In addition to trainings, the City offers employees the opportunity to participate in racially and ethnically aligned affinity groups, or caucuses, such as the "White Caucus," the "African Descent Caucus," and the "European Descent Community Group." The City advised employees that:

> Caucuses are completely voluntary and no one will be turned away. Caucuses are intended to deepen our understanding of our racialized experiences. City employees may choose to attend the caucus that aligns with how they identify racially.

Although the City presented evidence that RSJI trainings are open to all, regardless of race, some record evidence suggests otherwise. The details for the "Internalized Racial Oppression (White Allies)" training, for example, stated, "Who can attend: City employees that identify as white allies." The details for the "Internalized Racial Superiority" training stated, "Who should take it? City employees who identify as white." The details for the "Internalized Racial Oppression (For POC [Person of Color])" training stated, "Who can attend: City employees that identify as Person of Color." The details for the "Internalized Racial Inferiority" training stated, "Who should take it? City employees who identify as a person of color." In 2020, the City invited "City employees who identify as white," including "White Caucus members," to attend the "Training on Internalized Racial Superiority for White People." According to a 2021 email, several employees who "identified as white/Caucasian" were "asked . . . to remove themselves" from a training for "POC employees."

In March 2015, Diemert participated in an RSJI training entitled "Race: The Power of an Illusion." As part of this training, Diemert was required to play "Privilege Bingo," in which all employees, regardless of race, identified their perceived "privileges," such as privileges based on height, weight, gender, and race. This training also included a discussion of "[w]hite [s]upremacy [c]ulture."

Diemert contends that the RSJI was hostile to white employees and that this racial hostility spilled over into the workplace generally. According to Diemert, his "supervisors and coworkers applied the Racial Initiative's teachings to justify discriminatory behavior, deny him advancement, and retaliate when he objected." In 2015, for instance, Diemert's manager, Gloria Hatcher-Mays, advised Diemert not to apply for an open supervisor position "because she was looking for someone who was bilingual and who had contacts within one of the marginalized communities." Hatcher-Mays filled the position with a person of color, who was inexperienced and unqualified. Because of the chosen coworker's inexperience, Diemert was forced to perform many of the position's duties without receiving the commensurate title or pay. In the same month, another HSD manager asked Diemert, "[W]hat could you possibly offer our department . . . , being a straight white male?"

In 2016, Diemert discovered that one of his coworkers had denied utility assistance to an eligible white applicant because, in the coworker's words, the applicant had "white privilege." When Diemert told his coworker that she was not permitted to discriminate against applicants based on race, his manager, Hatcher-Mays, berated him and told him that "it was 'impossible' to be racist toward 'white people.'"

In April 2017, Diemert's supervisor, Tina Inay, told him that he should step down from his lead role at HSD because his Family and Medical Leave Act ("FMLA") needs conflicted with the department's business needs. Inay told Diemert that he was preventing a person of color from being promoted by remaining in his lead role. Diemert ultimately stepped down from the role.

In April 2017, Diemert attended an RSJI training entitled "Equity Lens[:] Why we lead with race." This training concerned racial biases. Diemert again participated in "Privilege Bingo." In the same year, Diemert engaged in a lunchroom conversation with a coworker who said that "white people" were to blame for "all atrocities" and that the United States was built upon a system of "white supremacy." The coworker also deemed Diemert a "racist" because he "favored capitalism." At a department retreat, Diemert participated in a "racist/anti-racist continuum" exercise in which employees were required to line up based on how "racist" or "anti-racist" they perceived themselves to be in comparison to their coworkers.

In 2018, Diemert approached a union representative about signing up for an RSJI training that the City had designed for persons of color. Diemert was interested in attending the training to protest what he perceived as the training's racially discriminatory nature, and he compared himself to the "four black students [who had] refused to leave the segregated lunch counter at Woolworth's" in 1960. Diemert abandoned his interest in attending the training after the representative advised him that the trainers "probably would not allow [him] to participate."

In December 2018, an HSD coworker invited Diemert to attend a monthly meeting of the White Caucus affinity

group. Diemert declined the invitation, asked to be removed from such invitations in the future, and threatened to file harassment charges.

In November 2019, Diemert attended an RSJI training entitled "Undoing Institutional Racism Workshop." One of the trainers went "off into a rant," stating that "there was a lie that Christopher Columbus went to the Caribbean and that [the indigenous people living there] were cannibals" when "the real truth is . . . that all white people are cannibals." Other trainers said that "'racism is in white people's DNA,' and that 'white people are like the devil.'" Diemert's coworkers called him a "white supremacist" as a result of comments he had made during the training. That year, Diemert did not meet the requirement that he participate in two RSJI activities per year but received a "fully performing" rating in his annual performance evaluation.

Around February 2020, Diemert reported his supervisor, Shamsu Said, for enrolling Said's family members in the utility assistance program. Said later "physically accosted" Diemert and called Diemert a "colonist" who had "white privilege" and "was to blame for all injustices in the United States." Said made similar statements towards Diemert in 2019 and 2020. After the incident, Diemert filed a Human Resources ("HR") complaint against Said. HR responded to the complaint by moving Diemert's and Said's desks further apart and removing Said as Diemert's lead supervisor. Diemert, however, maintains that the City still required him to report to Said, pointing to an email in which his manager, Chaney Kilpatrick-Goodwill, instructed him to include Said on leave requests.

Also in 2020, Diemert overheard a group of coworkers, including Kilpatrick-Goodwill, discussing white privilege in the lunchroom. When Diemert interjected, his coworkers said that he "did not have a right to speak about black oppression" and accused him of using his "white privilege" to discredit their lived experiences. Diemert also heard coworkers openly discuss the need to lay off white employees during the COVID-19 pandemic.

On December 23, 2020, Diemert filed a discrimination charge with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that he was harassed and discriminated against due to his race and that the RSJI trainings were racially hostile. The City opened an investigation into Diemert's claims, but Diemert chose "not [to] give the City much" help in the investigation because he perceived the investigators as biased. With limited information, the investigators rejected Diemert's charges of unlawful discrimination and harassment.

In February 2021, Diemert was offended by an email in which a new employee noted that he provided self-care to himself by "being around Black and brown folks." In the same year, Diemert informed his HR manager, Ryan Groce, that he found RSJI trainings offensive and would no longer participate in them. HSD took no corrective action against Diemert for refusing to participate.

In June 2021, an HSD executive, Edward Odom, posted about the Tulsa Race Massacre on the City's internal website. The Tulsa Race Massacre involved a violent attack by a mob of 10,000 white men against the thriving Black community of Tulsa, Oklahoma's Greenwood District in 1921. *See Review and Evaluation*, *Tulsa Race Massacre*, DOJ Report, Civil Rights Division (Jan. 17, 2025) (available

at https://perma.cc/87ST-5AN4). Odom wrote that events such as the Tulsa Race Massacre were being erased from history because of critical race theory bans. Diemert interpreted the post as an attack against all white people and posted a defense of critical race theory bans in which he decried racial stereotyping and asserted that saying "white people . . . enslaved black people" was bigoted. One of Diemert's coworkers responded by posting a passage about ignorance from Octavia Butler's novel *The Parable of the Talents*. Additionally, Odom emailed Diemert directly to address perceived historical inaccuracies in Diemert's post. Odom stated, "I get it—it can seem as [*sic*] it was a personal attack directed against all white people, but it is not. It is about accurately telling the stories that have been buried for years."

In July 2021, Diemert emailed his HR manager, Groce, about his interest in "creat[ing] a non-race-based [affinity] group that [would] advocate[] for western liberal values and reject[] stereotyping people by race." Diemert wrote that the existing affinity groups were all "based on race" and said that his new group would "oppose[] the political and ideological stance that the current affinity groups are based on." Groce advised Diemert that he would have to submit his proposal to the HSD Change Team—the group of employees responsible for administering the RSJI program and approving new affinity groups—to ensure that his group "would support and advance the efforts of the City's RSJ Initiative and aid in eliminating racial disparities." Believing that the Change Team would reject his proposed group, Diemert did not submit his proposal.

### B

Diemert contends that he was subjected to retaliatory and discriminatory acts after he filed his December 2020 EEOC charge. First, Diemert contends that his manager, Kilpatrick-Goodwill, retaliated against him by: (1) sending him and an administrative assistant an email asking about his delays in processing applications; (2) declining to help him with a technological issue; and (3) cancelling meetings. These events occurred in or around January 2021.

Second, Diemert contends that Defendants retaliated against him by denying his request to renew his reduced-work schedule under the FMLA. In early 2021, Diemert's FMLA reduced-work schedule was set to expire. Diemert submitted paperwork to renew his leave certification, but HR denied the request. Despite that denial, Diemert continued to work reduced hours, and he filed a complaint with the U.S. Department of Labor, which found that the request had been denied in error. The City corrected the error and granted the certification retroactively.

Finally, Diemert contends that Defendants retaliated against him by failing to promptly grant his request to continue working remotely following the COVID-19 pandemic. Diemert began teleworking in April 2020. In early 2021, unbeknownst to HSD, Diemert moved to Texas. In June 2021, HSD directed employees to return to in-person work. In response, Diemert requested full-time telework as a disability accommodation. Diemert resigned his employment in September 2021, before HSD resolved his request.

### C

Diemert filed this action on November 16, 2022, alleging a claim of racial discrimination under the Equal Protection Clause of the Fourteenth Amendment, as well as claims of hostile work environment, disparate treatment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Washington Law Against Discrimination ("WLAD"), Wash. Rev. Code ch. 49.60. Diemert also alleged that the hostile work environment and retaliation he faced amounted to constructive discharge. The district court dismissed as time-barred the Title VII disparate treatment and retaliation claims based on discrete acts that occurred before February 27, 2020, which was 300 days before Diemert filed his EEOC charge. It also dismissed as time-barred Diemert's WLAD disparate treatment and retaliation claims based on discrete acts that occurred before November 16, 2019, which was three years before Diemert commenced this action. *See* 42 U.S.C. § 2000e-5(e)(1); *Antonius v. King County*, 103 P.3d 729, 732 (Wash. 2004). The district court subsequently granted Defendants' motion for summary judgment as to the remaining claims. In addressing summary judgment, the district court partially sustained Defendants' objections to two of Diemert's exhibits, Exhibits 6 and 36. Diemert timely appealed.

## II

We review a district court's order granting summary judgment de novo. *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021). We view the evidence in the light most favorable to Diemert and determine whether there are any genuine issues of material fact and whether the district court correctly applied the law. *Fried*, 18 F.4th at 646–47.

We review the district court's evidentiary rulings at summary judgment for an abuse of discretion. *Sandoval v. County of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021). "[W]e must affirm the district court unless its evidentiary ruling was manifestly erroneous *and* prejudicial." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). Federal Rule of Civil Procedure 56 requires a movant to establish that the evidence "would be admissible in evidence" at trial. Fed. R. Civ. P. 56(c)(4).[2]

[2] On appeal, Diemert challenges for the first time the district court's ruling on two exhibits (Exhibit 6 and 36) that he proffered in opposition to Defendants' motion for summary judgment. Exhibit 6 consists of undated and unsigned bulleted lists, photos of whiteboards, and purported excerpts from other documents. In summary judgment proceedings before the district court, Diemert did not state that he ever received these materials in the workplace or that they were used in trainings he attended. Nor did he state who created the materials or when they were created. And Diemert did not cite Exhibit 6 in his opposition to summary judgment. The district court granted Defendants' motion to strike Exhibit 6 on the grounds that Diemert failed to properly authenticate the materials. Exhibit 36 consists of discrimination complaints and interview summaries from various HSD employees in 2018 and 2019. The district court denied Defendants' motion to strike Exhibit 36 but declined to consider the statements contained in the exhibit to the extent they contained hearsay and did not fall within a hearsay exception. The court therefore considered Exhibit 36 only "insofar as it shows that discrimination complaints were filed." Although Diemert did not respond to Defendants' motion to strike these exhibits in the district court, he argues on appeal that the district court abused its discretion. We disagree. Diemert does not establish that he would have been able to proffer the exhibits in an admissible form at trial. *Orr*, 285 F.3d at 773. The district court, therefore, did not abuse its discretion. In any event, Diemert has not shown that he was prejudiced by the district court's rulings.

## III

We first address Diemert's hostile work environment claims. Viewing the evidence in the light most favorable to Diemert, and drawing all reasonable inferences in his favor, we conclude that Diemert has established a genuine issue of material fact as to whether he was subjected to a racially hostile work environment in violation of Title VII and the WLAD. We therefore reverse the grant of summary judgment to Defendants on these claims. We, however, affirm the grant of summary judgment as to constructive discharge.

### A

Title VII and the WLAD prohibit discrimination on the basis of race, including racially hostile work environments. To succeed on a hostile work environment claim under Title VII, Diemert must show: (1) that he was subjected to verbal or physical conduct because of his race, (2) that the conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). Washington courts interpret WLAD to require similar showings. *Glasgow v. Ga.-Pac. Corp.*, 693 P.2d 708, 712 (Wash. 1985) (outlining the elements required for a sex-based hostile work environment claim under WLAD); *Fisher v. Tacoma Sch. Dist. No. 10*, 769 P.2d 318, 320 (Wash. Ct. App. 1989) (extending *Glasgow*'s hostile work environment standard to race-based hostile work environment claims).

"The working environment must both subjectively and objectively be perceived as abusive." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 799 n.6 (9th Cir. 2003) (quoting *Brooks*

*v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000)). To determine whether a work environment is abusive, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 687 (9th Cir. 2017) (citation and internal quotations marks omitted) (Title VII); *accord Blackburn v. State*, 375 P.3d 1076, 1081 n.4 (Wash. 2016) (WLAD). "No single factor in this non-exhaustive list is required." *Okonowsky v. Garland*, 109 F.4th 1166, 1179 (9th Cir. 2024) (citation and internal quotations marks omitted). "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005) (quoting *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001)).

"Not every insult or harassing comment will constitute a hostile work environment." *Fried*, 18 F.4th at 648 (quoting *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000)). "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)' will not trigger Title VII's protections." *Okonowsky*, 109 F.4th at 1179 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)). "The standard for judging hostility is meant to 'ensure that Title VII does not become a "general civility code."'" *Fried*, 18 F.4th at 648 (quoting *Faragher*, 524 U.S. at 788). And "properly applied, this standard 'will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (quoting *Faragher*, 524 U.S. at 788).

Workplace training programs designed to address racial barriers are not inherently discriminatory, and nothing in Title VII prohibits employers from either discussing historical and ongoing discrimination against persons of color or seeking to address such discrimination. *See, e.g.*, *Chislett v. N.Y.C. Dep't of Educ.*, 157 F.4th 172, 191 (2d Cir. 2025) (rejecting the proposition that "the conduct of implicit bias trainings is per se racist"). But "Title VII's disparate-treatment provision draws no distinctions between majority-group plaintiffs and minority-group plaintiffs." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 309 (2025). Accordingly, race-conscious training programs may violate Title VII when they create a racially hostile work environment. *See Chislett*, 157 F.4th at 191 ("When employment trainings discuss any race 'with a constant drumbeat of essentialist, deterministic, and negative language [about a particular race], they risk liability under federal law.' And when a municipal agency consistently ignores the racial harassment of employees in both trainings and workplace interactions, it can be held liable." (alteration in original) (quoting *De Piero v. Pa. State Univ.*, 711 F. Supp. 3d 410, 424 (E.D. Pa. 2024))).

Time-barred "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" on their own are not "actionable," but they may be considered as evidence of a hostile work environment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002); *see also Lui v. DeJoy*, 129 F.4th 770, 781 (9th Cir. 2025). This is so because the "very nature" of hostile work environment claims "involves repeated conduct." *Morgan*, 536 U.S. at 115.

Here, the parties dispute only whether the workplace incidents at issue were sufficiently severe or pervasive to

create an objectively hostile work environment. We therefore focus on this element.

Diemert points to the following as evidence of an objectively hostile work environment: (1) in 2015, Diemert was discouraged from applying for a supervisory role, a person of color was hired for the position, and Diemert was required to perform the responsibilities of the position without receiving the commensurate title or pay; (2) in 2015, an HSD manager asked Diemert, "[W]hat could you possibly offer our department . . . , being a straight white male?"; (3) in 2016, manager Gloria Hatcher-Mays told Diemert "that it was 'impossible' to be racist toward 'white people'"; (4) in 2017, supervisor Tina Inay encouraged Diemert to step down from his lead role in the department in part to allow a person of color to take his position; (5) in 2017, a coworker called Diemert a "racist" and told him "that 'white people' are to be blamed for 'all atrocities' and that the United States was built upon a system of 'white supremacy'"; (6) in 2019, Diemert overheard RSJI trainers say that "white people are cannibals," that "racism is in white people's DNA," and that "white people are like the devil"; (7) between 2019 and 2020, supervisor Shamsu Said called Diemert a "colonist," "physically accosted" Diemert, accused Diemert of having "white privilege," and informed Diemert that he was "to blame for all injustices in the United States"; (8) in 2020, coworkers told Diemert that he "did not have a right to speak about black oppression" and accused him of using his "white privilege" to discredit their lived experiences; (9) in 2021, a new coworker stated that his "[s]elf and personal care" included "being around Black and brown folks"; and (10) also in 2021, Diemert was criticized by coworkers after Diemert defended critical race theory

bans in connection with a discussion of the Tulsa Race Massacre.

We conclude that these incidents were sufficiently numerous, frequent, and severe to create a triable issue as to the existence of a racially hostile work environment. Viewed in isolation, the incidents at issue here might not be sufficient. We have held, for example, that referring to a Chinese coworker as "China Man" while mocking her appearance, *Manatt*, 339 F.3d at 795, 799; telling a Hispanic coworker that "Hispanics do good in the field," *Vasquez*, 349 F.3d at 643; and referring to a female coworker as a "madonna," a "regina," and a "castrating bitch," *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1107 (9th Cir. 2000), were not severe enough to create a hostile work environment. But unlike cases involving only one or two racially offensive incidents, *see Manatt*, 339 F.3d at 798–99 (two incidents "over a span of two-and-a-half years"); *Vasquez*, 349 F.3d at 644 (two incidents "over the course of more than one year"); *Kortan*, 217 F.3d at 1110–11 (incidents were concentrated in "one occasion"), Diemert has presented evidence of numerous incidents over a five-year span.

This case, therefore, is comparable in frequency and severity to cases in which the evidence supported a finding of a hostile work environment. *Reynaga*, for instance, is instructive. There, the plaintiff, Reynaga, was one of two Hispanic employees who worked as a millwright. 847 F.3d at 683. Reynaga alleged that his coworker made racially derogatory comments and engaged in other harassing conduct repeatedly over his six years of employment, including: (1) using racial slurs to refer to Blacks and Arabs; (2) stating "I'm a true believe[r] that we should close the borders to keep motherf---ers like you from coming up here"; (3) stating "Minorities are taking over the country";

(4) asking Reynaga whether "all Mexican women [were] fat"; (5) referring to Native American women, one of whom Reynaga was married to, as "nasty fat squaws"; (6) belittling Reynaga in front of a coworker as "a big boy" with a "little, tiny dick" who "needs all the help he can get"; and (7) while Reynaga was working, commenting "Boy, you're slow," and remarking to the other millwrights, "Man, he just dinks around." *Id.* We held that a reasonable trier of fact could find that the coworker's conduct was sufficiently severe or pervasive to create a hostile work environment because: (1) the comments were directed at Reynaga and often referenced race or national origin; (2) Reynaga felt physically threatened due to the proximity to dangerous machinery and his coworker's large stature; (3) the harassment interfered with Reynaga's work performance because it led to verbal and written complaints to management; and (4) management had to ensure the coworker and Reynaga were not scheduled to work on the same shift to limit their interactions. *Id.* at 688.

This case is comparable. As in *Reynaga*, the incidents at issue here referenced Diemert's race, targeted Diemert, caused Diemert to file complaints, required the City to separate Diemert from an allegedly harassing coworker, occurred over a substantial period of time, and were comparable in number and frequency.

This case is also comparable to *Chislett*. There, the plaintiff, Chislett, was a white woman who directed an initiative under the Office of Equity & Access in New York City's education department and supervised fifteen employees. 157 F.4th at 178–79. Chislett attended bias trainings where an instructor stated that the "values of white culture are supremacist," *id.* at 180 (alteration omitted), and an executive director declared that "[t]here is white toxicity

in the air, and we all breathe it in," *id.* At an overnight retreat, speakers "stated that 'white culture's values' are 'homogenous and supremacist.'" *Id.* In another training, participants were asked to write "white values" on a poster and form a line based on their proximity to white privilege. *Id.* The trainings conveyed a persistent message that "white culture is generally defensive; entitled; paternalistic; power hoarders; and privileged." *Id.* at 188 (alterations omitted). At another staff retreat, Chislett was singled out by coworkers in a fifteen-minute confrontation that referenced her race. *Id.* at 182–83. She was assigned a leadership coach who "offered [her] insight into what it means to be a white leader leading staff members of color." *Id.* at 181 (internal quotation marks omitted).

Racialized comments from trainings spilled over into the broader workplace. *Id.* at 189. When Chislett "asked her Black subordinate . . . why she was late to a meeting," for example, the employee accused Chislett of making a "race-based judgment" and told Chislett that she "could 'not be trusted.'" *Id.* The employee later referenced the incident and scolded Chislett, "How dare you approach me out of your white privilege!" *Id.* Another Black subordinate called Chislett a "racist," *id.*, both subordinates told Chislett that "'race [wa]s at the center of every conversation' they had with her," *id.* at 181, and other subordinates told Chislett "that she was 'socialized as a white person to be defensive,'" *id.* Chislett also heard employees "ma[k]e racist statements about a colleague of partially white parentage." *Id.* At one point, Chislett was removed from her supervisory responsibilities—although her title and pay remained the same. *Id.* at 182. Many of her supervisory duties were transferred to a Black subordinate. *Id.* Viewing the facts in the light most favorable to Chislett, the Second Circuit

concluded that a rational juror could find that Chislett experienced a racially hostile work environment. *Id.* at 190.

Here, too, the evidence presented by Diemert, accepted as true, would show that Diemert was subjected to a series of racially offensive statements and generalizations bearing little or no connection to legitimate training efforts, that he was denied or discouraged from pursuing opportunities for advancement on account of his race, and that he received scant support from his superiors when he challenged what he perceived as discriminatory behavior. Construing this evidence in the light most favorable to Diemert, and drawing all reasonable inferences in his favor, we cannot say, as a matter of law, that a reasonable jury could not find that Diemert was subjected to a racially hostile work environment. Where "severity is questionable, 'it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment.'" *Fried*, 18 F.4th at 648 (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir. 2008)). We therefore reverse the district court's grant of summary judgment on Diemert's Title VII and WLAD hostile work environment claims.[3]

**B**

As part of his hostile work environment and retaliation claims, Diemert asserts that he was constructively discharged. To establish constructive discharge in violation of Title VII, Diemert must demonstrate not only the severe or pervasive harassment necessary to support a hostile work environment claim but also "that the abusive working

[3] To the extent the district court concluded that Diemert could not rely on events occurring before November 16, 2019, to establish a hostile work environment, we disagree. We hold that these incidents are relevant evidence under *Morgan*. 536 U.S. at 115.

environment became so intolerable that [his] resignation qualified as a fitting response." *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004); *see also Brooks*, 229 F.3d at 930 ("Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job."); *Jordan v. Clark*, 847 F.2d 1368, 1377 n.10 (9th Cir. 1988) ("If shown, constructive discharge is an adverse employment action [for purposes of a Title VII retaliation claim]."); *Washington v. Boeing Co.*, 19 P.3d 1041, 1049 (Wash. Ct. App. 2000) (holding that constructive discharge requires working conditions so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign), *abrogated on other grounds by Robel v. Roundup Corp.*, 59 P.3d 611 (Wash. 2002), *as recognized in Washington v. Horning Bros., LLC*, 339 F. Supp. 3d 1106 (E.D. Wash. 2018).

We conclude that the district court properly granted summary judgment to Defendants on this claim. Although we consider the totality of the circumstances, the events occurring close in time to Diemert's September 2021 resignation are, of course, the most relevant. *See Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1184–85 (9th Cir. 2005) (holding that an employee was not constructively discharged under Title VII and WLAD where there was a five-month gap between last alleged incident of sexual harassment and the employee's resignation). Here, the events occurring close in time to the resignation were not sufficiently severe to support a claim of constructive discharge. *Cf. Chislett*, 157 F.4th at 193 ("Chislett's evidence can support a rational jury finding that her working conditions had been abusive

and unpleasant, but it did not show that the employer had intentionally created a workplace that would be so intolerable that she 'would have felt compelled to resign' such that it would constitute a constructive discharge to her." (quoting *Suders*, 542 U.S. at 141)).

Diemert cites three events occurring close in time to his resignation: (1) in June 2021, Diemert asked Groce about creating his own affinity group before abandoning the request; (2) in July 2021, Groce told Diemert that he was correcting the misclassification of Diemert's FMLA leave; and (3) less than a month before he resigned, the City was waiting for additional information from Diemert's doctor before resolving his request for full-time telework as an accommodation. These events plainly do not rise to conditions so "extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Brooks*, 229 F.3d at 930 (citation omitted). We therefore affirm summary judgment on Diemert's constructive discharge claim.

## IV

Diemert asserts that he was subjected to disparate treatment and retaliation as a result of: (1) the City's failure to investigate his discrimination claims; (2) the City's initial denial of his FMLA leave extension; and (3) his supervisor's unfair treatment towards him. The district court properly granted summary judgment to Defendants on these claims.

For disparate treatment and retaliation claims, a Title VII plaintiff may either produce direct or circumstantial evidence of discriminatory animus or proceed through the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Vasquez*, 349 F.3d at 640.

"Direct evidence is 'evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption.'" *Id.* (alteration in original) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)). Diemert points to the City's implementation of the RSJI as direct evidence of discriminatory animus. Diemert, however, has not presented evidence of discriminatory animus with respect to the three allegedly retaliatory actions at issue. Accordingly, he must proceed under *McDonnell Douglas*'s three-step framework for evaluating claims under Title VII. *See* 411 U.S. at 802–04.

At the first step, the plaintiff bears the "initial burden" of "establishing a prima facie case" by producing enough evidence to support an inference of discriminatory motive. *Id.* at 802. If the plaintiff clears that hurdle, the burden of production then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* Finally, if the employer articulates such a justification, the plaintiff must have a "fair opportunity" to show that the stated justification "was in fact pretext" for discrimination. *Id.* at 804. The standard is the same "whether or not the plaintiff is a member of a majority group," *Ames*, 605 U.S. at 310, and it applies to both disparate treatment and retaliation claims, *see Reynaga*, 847 F.3d at 690–91, 693; *see also Mackey v. Home Depot USA, Inc.*, 459 P.3d 371, 381 (Wash. Ct. App. 2020) (holding that when employee lacks direct evidence of discriminatory intent, courts analyzing WLAD discrimination and retaliation claims apply the *McDonnell Douglas* framework).

To establish a prima facie case of disparate treatment, Diemert must show that: (1) he is a member of a protected class; (2) he was performing according to his employer's

legitimate expectations; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse action give rise to an inference of discrimination. *Reynaga*, 847 F.3d at 691; *Marin v. King County*, 378 P.3d 203, 211–12 (Wash. Ct. App. 2016) (applying similar test for disparate treatment under WLAD). For disparate treatment claims, "an adverse employment action is one that 'materially affects the compensation, terms, conditions, or privileges of employment.'" *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018) (quoting *Davis*, 520 F.3d at 1089).

To make out a prima facie Title VII or WLAD retaliation claim, Diemert must show that: (1) he participated in a protected activity, (2) he suffered an adverse employment action, and (3) there is a causal link between the protected activity and the adverse action. *Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007) (Title VII); *Tyner v. State*, 154 P.3d 920, 928 (Wash. Ct. App. 2007) (WLAD). A plaintiff establishes an adverse employment action by showing that "a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Campbell*, 892 F.3d at 1021 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

First, Diemert contends that the City retaliated against him by failing to investigate his complaints but acting quickly to address complaints made by non-white employees. In the first place, Diemert's contention that the City retaliated against him by failing to investigate his December 2020 EEOC charge is belied by the evidence.

Diemert concedes that he did not cooperate with the investigators. He therefore cannot fault the City's investigation. *See Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001) (noting that "an employer cannot be held liable for misconduct of which it is unaware"); *cf. Heller v. EBB Auto Co.*, 8 F.3d 1433, 1440 (9th Cir. 1993) (noting that an employee's failure to cooperate with the employer's attempt to reach reasonable religious accommodation may preclude the employer's liability). Diemert contends that the investigators were biased, but no evidence supports this contention. In any event, when Diemert asserted that one of the investigators, Brandon Kuykendall, was biased because Kuykendall was involved in the RSJI trainings, the City assigned another employee, Christy Kuna, to investigate Diemert's charge that the RSJI trainings were discriminatory. The City tasked Kuykendall with investigating only Diemert's harassment claim.

Diemert's contention that the City retaliated against him by failing to investigate his 2020 complaint against Said fails as well. HR responded to that complaint by moving Said's and Diemert's desks apart and removing Said as Diemert's lead supervisor. In short, there is no evidence from which a reasonable jury could find that the City retaliated against Diemert in response to his EEOC or Said complaints. No reasonable jury could find that the City's actions "materially affect[ed] the . . . privileges of [Diemert's] employment," *Campbell*, 892 F.3d at 1012 (citation omitted), or would have "dissuaded a reasonable worker from making or supporting a charge of discrimination," *id.* at 1021 (citation omitted). Therefore, Diemert cannot establish a prima facie case at step one of the *McDonell Douglas* framework. *Reynaga*, 847 F.3d at 693–94 (holding that both disparate

treatment and retaliation claims require a showing of an adverse employment action).

Next, Diemert contends that after he filed his EEOC complaint in December 2020, the City retaliated against him by initially mischaracterizing his FMLA leave in late April 2021. In 2021, Diemert's FMLA-authorized reduced-work schedule was set to expire, and he needed to renew his leave certification. Diemert submitted new paperwork, but an HR representative denied his request. Despite the denial, Diemert continued working reduced hours. Diemert filed a complaint with the U.S. Department of Labor, which found that Diemert's request had been denied due to various paperwork errors, such as incomplete instructions provided to Diemert, and that the City had failed to designate Diemert's reduced work schedule as FMLA. The City retroactively reclassified the leave and issued a written notice to Diemert approving his intermittent leave. Although Diemert asserts that this was an adverse employment action, he provides no evidence that his FMLA leave was initially mischaracterized due to his race. Diemert attempts to tie the mischaracterization to the filing of his EEOC complaint four months earlier, but he has presented no evidence that the HR representative knew of Diemert's EEOC complaint when she denied leave.

When asked why Diemert believes the HR representative denied FMLA leave based on his race, he testified that "[i]t was just her demeanor" and "[s]he didn't treat [him] very nicely." Diemert does not establish circumstances that give rise to an inference of discrimination and so has not established a causal relationship between his race and the FMLA mischaracterization. *Vasquez*, 349 F.3d at 646 (holding that plaintiff's retaliation claim failed because he could not show a "causal link" between the protected activity

and the alleged adverse action). Even assuming that Diemert could establish a prima facie case based on the inference that his FMLA leave was denied due to his EEOC complaint, Diemert cannot show the City's proffered nondiscriminatory reason—a paperwork error—is pretextual. *Id.* (holding that even if plaintiff could show a causal link, his retaliation claim failed because he could not show the employer's "proffered reason . . . was pretextual").

Finally, Diemert contends that his manager, Chaney Kilpatrick-Goodwill, discriminated and retaliated against him by: (1) asking him about delays in processing applications; (2) canceling meetings with him; and (3) failing to support him with a technology issue he was experiencing. We address each of these actions in turn below and conclude that none of these actions constitutes an adverse employment action. No reasonable jury would find that Kilpatrick-Goodwill's actions "materially affect[ed] the . . . privileges of [Diemert's] employment," *Campbell*, 892 F.3d at 1012 (citation omitted), or would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 1021 (citation omitted). Furthermore, even assuming Diemert could establish a prima facie case of discrimination or retaliation, he has not presented evidence from which a reasonable jury could find that Kilpatrick-Goodwill's proffered nondiscriminatory reasons for her actions were pretextual. *Vasquez*, 349 F.3d at 646.

First, Kilpatrick-Goodwill emailed Diemert and an administrative assistant to investigate the cause of delays after Diemert himself raised the issue to Kilpatrick-Goodwill and others. Kilpatrick-Goodwill testified that she canceled meetings because of vacation or scheduling conflicts, but she stated that she was no more likely to cancel a meeting with Diemert than with other employees. Diemert testified that

he did not know how many meetings Kilpatrick-Goodwill canceled with other employees. Thus, Diemert has not shown that there is a genuine dispute as to whether Kilpatrick-Goodwill cancelled meetings with a discriminatory and retaliatory motive. Finally, Diemert has not shown that Kilpatrick-Goodwill's failure to personally assist him with a technology issue constitutes an adverse action. Diemert does not dispute that Kilpatrick-Goodwill elevated the technology issue to another colleague to assist Diemert. Kilpatrick-Goodwill additionally offered to arrange for accommodations until the technology issue was resolved. Based on these undisputed facts, no reasonable jury could find that Kilpatrick-Goodwill's actions constituted an adverse employment action or that Kilpatrick-Goodwill acted with a discriminatory or retaliatory motive.

In sum, Diemert has not raised a genuine dispute of material fact as to his disparate treatment and retaliation claims under Title VII and the WLAD. We affirm the grant of summary judgment on these claims.

**V**

Diemert asserts that the City's implementation of the RSJI violated the Equal Protection Clause of the Fourteenth Amendment. Specifically, Diemert contends that the district court erred by treating the RSJI as a race-neutral program. He contends that the RSJI "is a facially race-based policy that classifies employees by race, assigns them race-specific expectations, and encourages race-segregated groups and trainings," and, consequently, that the district court should have applied strict scrutiny in evaluating the lawfulness of the program.

**A**

As a threshold matter, we note that our ability to evaluate Diemert's equal protection claim is hampered by his noncompliance with Rule 28 of the Federal Rules of Appellate Procedure. Rule 28(a)(6) requires "a concise statement of the case setting out the facts relevant to the issues submitted for review, . . . with appropriate references to the record," and Rule 28(a)(8)(A) requires an argument section "with citations to the . . . parts of the record on which the appellant relies." Fed. R. App. P. 28(a). To comply with Rule 28, a brief must set forth *specific* facts supported by *specific* citations to the record. *See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) ("[I]t is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify *with reasonable particularity* the evidence that precludes summary judgment." (emphasis added) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995))).

Diemert's briefing does not satisfy these requirements. On pages 6–7, for example, Diemert's opening brief makes a broad factual contention—that "[t]he Racial Initiative includes employee trainings targeted to specific racial groups, trainings that use racially charged language or normalize discriminatory language about 'white' employees, racially segregated workplace meetings, single-race employee caucuses and affinity groups, and it applauds reducing the number of white employees across the City"—followed by a string citation to 332 pages of the excerpts of record. On page 5, the opening brief makes a similarly broad factual contention—that the RSJI's "implementation includes racially segregated trainings, race-focused 'change teams,' race-specific work plans and caucuses, and the use

of race-based evaluation tools, like the Racial Equity Toolkit"—followed by a string citation to 148 pages of the excerpts of record. On page 42, the opening brief likewise makes a broad factual assertion—that "[t]he City's Race and Social Justice Initiative is a facially race-based policy that classifies employees by race, assigns them race-specific expectations, and encourages race-segregated groups and trainings"—followed by a string citation to 85 pages of the excerpts of record. These examples are representative of Diemert's briefing as whole.

Under Rule 28, it is the job of the parties, not the court, to identify the specific facts supporting a legal claim and the specific portions of the record that support those facts. *See, e.g.*, *Taylor v. Harbour Pointe Homeowners Ass'n*, 690 F.3d 44, 48 (2d Cir. 2012) (explaining that a brief is deficient under Rule 28 when it amounts to "an invitation to the court to scour the record . . . and serve generally as an advocate for appellant" (quoting *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999))); *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 435–36 (7th Cir. 2002) ("The norm supposes that the parties have presented th[e] evidence to the court of appeals in a digestible fashion, so that we may evaluate the record's contents. . . . Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material. 'Judges are not like pigs, hunting for truffles buried in' the record." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))); *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) ("Perhaps counsel for Appellant intends that we form an argument for him, by looking into the record to document

the 'facts' posited in his 'statement of the case,' and then examining various combinations of these facts in the light of the legal doctrines he later mentions. But that is simply not our job, at least in a counseled case."); *Smith v. Town of Eaton*, 910 F.2d 1469, 1471 (7th Cir. 1990) ("[T]his court cannot be called upon to supply the legal research and organization to flesh out a party's arguments.").

Diemert's briefs violate Rule 28 because they neither identify the specific facts supporting his contentions nor cite the specific portions of the record supporting those facts. Although we decline to dismiss the appeal on this basis, *cf. Han v. Stanford Univ.*, 210 F.3d 1038, 1040 (9th Cir. 2000) (dismissing an appeal where the appellant "'exhibited complete disregard for the requirements' of the appellate rules respecting citations to the record" (quoting *Mitchel v. Gen. Elec. Co.*, 689 F.2d 877, 879 (9th Cir. 1982))), we emphasize that the violation has made our task much more difficult than it should have been. Diemert's noncompliance with Rule 28 also required us to ask the parties for supplemental briefing addressing the facts that should have been, but that were not, specifically identified in Diemert's opening brief.

**B**

Turning to the merits of Diemert's claim, the "core purpose" of the Equal Protection Clause is to eliminate "all governmentally imposed discrimination based on race." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) (citation omitted). "[L]aws that classify citizens on the basis of race . . . are constitutionally suspect and must be strictly scrutinized." *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999). "When racial classifications are explicit, no inquiry into legislative

purpose is necessary." *Id.* "A facially neutral law, on the other hand, warrants strict scrutiny only if it can be proved that the law was motivated by a racial purpose or object or if it is unexplainable on grounds other than race." *Id.* (citations and internal quotation marks omitted). Here, Diemert relies exclusively on an explicit classification theory.[4]

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish Article III standing, Diemert must demonstrate that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan*, 504 U.S. at 560–61). At the summary judgment stage, Diemert need not establish that he in fact has standing, but only that there is a genuine question of material fact as to the standing elements. *Healy v. Milliman, Inc.*, 164 F.4th 701, 709 (9th Cir. 2026).

To establish an injury in fact sufficient to support a claim for retrospective relief under the Equal Protection Clause, Diemert must demonstrate a triable issue that he was personally denied equal treatment.[5] *Carroll v. Nakatani*, 342 F.3d 934, 940 (9th Cir. 2003) ("[E]ven if a government actor discriminates on the basis of race, the resulting injury 'accords a basis for standing only to those persons who are

---

[4] Diemert does not ask us to *apply* strict scrutiny. He asks us to determine only whether he has established a genuine dispute of fact as to whether the RSJI facially classifies based on race, triggering such scrutiny.

[5] Diemert does not seek prospective relief on his equal protection claim. He seeks "damages and other retrospective relief."

personally denied equal treatment.'" (quoting *Allen v. Wright*, 468 U.S. 737, 755 (1984))). Therefore, to survive summary judgment Diemert must establish a triable issue that (1) the City expressly classified employees based on race and (2) he was personally injured by that classification.

Diemert points to two features of the RSJI that he says constitute facially racial classifications: (1) racially aligned affinity groups; and (2) racially segregated trainings. In supplemental briefing, Diemert more broadly argues that the RSJI classified employees by race and that the concrete injuries he allegedly suffered during his employment were attributable to these classifications.

**1**

We assume without deciding that Diemert has established a triable issue that the affinity groups involved an express racial classification. It is undisputed that the City permitted employees to form racially and ethnically aligned affinity groups, such as the "White Caucus," the "African Descent Caucus," and the "European Descent Community Group." There is also some evidence that the City encouraged employees to join affinity groups based on their race, although there is no credible evidence that the City either required employees to join affinity groups associated with their race or prohibited employees from joining affinity groups aligned with a different race. One document in the record, for instance, states both that "City employees may choose to attend the caucus that aligns with how they identify racially" and that "[c]aucuses are completely voluntary and no one will be turned away." We need not decide whether an employer expressly classifies employees based on their race by encouraging employees to join affinity groups aligned with their race. For purposes of our standing

analysis, we assume, without deciding, that these actions amount to an express racial classification. We do so because, even assuming the City's actions amounted to an explicit racial classification, Diemert has not established a triable issue that he was personally injured by any such classification.

First, Diemert was never required to join an affinity group aligned with his race. He was invited to attend a meeting of the White Caucus, but he declined the invitation. Second, Diemert was never prohibited from joining an affinity group aligned with a race other than his own. Third, Diemert was not prohibited from establishing a racially diverse or non-racially aligned affinity group. When Diemert emailed an HR representative about his interest in creating a racially diverse affinity group, HR advised him to submit his proposal to the HSD Change Team. But Diemert never submitted his proposal, and the City never rejected any such proposal. Finally, Diemert does not contend that he suffered any adverse consequences due to his refusal to participate in a racially aligned affinity group. Diemert says that employees were denied promotions if they refused to participate in an affinity group or a change team, and he says that he never received a promotion. But Diemert offers no specific, nonspeculative evidence that he was denied a promotion, or was otherwise discriminated against, because he failed to participate in an affinity group. Therefore, Diemert has not established a triable issue that he was injured. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.").

**2**

We also assume without deciding that Diemert has established a triable issue that some of the City's RSJI trainings involved facial racial classifications. At minimum, there is evidence that the City designed different trainings for employees of different races and encouraged employees to attend trainings based on their race. With respect to an "Internalized Racial Superiority" training, for example, the City wrote, "Who should take it? City employees who identify as white." The "Internalized Racial Superiority" training was "specifically targeted for White employees." With respect to an "Internalized Racial Oppression" training, the City wrote, "Who can attend: City employees that identify as a Person of Color." In addition, there is conflicting evidence as to whether white employees were prohibited from attending trainings designed for employees who identified as persons of color. On the one hand, several white employees, who were recent immigrants to the United States, were asked to remove themselves from a training designed for persons of color. On the other hand, a City employee wrote that "[a] white person could attend [an "Internalized Racial Inferiority"] training—we wouldn't turn them away," though "it would be an uncomfortable and unsafe experience for all the participants." Ultimately, we need not address for current purposes whether the City prohibited employees from attending trainings based on race or merely encouraged employees to attend trainings on account of their race. For purposes of our standing analysis, we assume without deciding that merely encouraging employees to attend certain trainings based on their race is sufficient to establish that the City expressly classified employees on account of their race. The question is irrelevant for current purposes because, even assuming the

City expressly classified employees based on race with respect to some of the RSJI trainings, Diemert has not shown that he was personally injured by the classification.

First, Diemert does not argue that he was required to attend any trainings designed for white employees or was prohibited from attending any trainings designed for persons of color. Other employees complained that their coworkers excluded them from trainings due to their race. But "a party bringing a discrimination action must, as a prudential matter, assert his own rights and interests, not those of third parties." *Estate of Amos ex rel. Amos v. City of Page*, 257 F.3d 1086, 1093 (9th Cir. 2001). Diemert contemplated attending a training designed for persons of color as a form of protest, and he was discouraged from doing so by his union representative, who suggested that he might not be permitted to attend for that purpose. But Diemert ultimately declined to pursue the matter. Accordingly, even if there were evidence that the City precluded white employees from attending trainings designed for persons of color, Diemert was not personally denied equal treatment. *See Carroll*, 342 F.3d at 942. Furthermore, even if Diemert could point to this evidence to suggest that he was denied equal treatment, the union representative was not a City employee at the time, and Diemert does not point to evidence that the representative was authorized to speak on the City's behalf. *See Carroll*, 342 F.3d at 940 (noting that an equal protection violation occurs when "a government actor discriminates on the basis of race"); *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006) ("Generally, for an equal protection claim to trigger strict scrutiny, the plaintiff must allege that a *government actor* intentionally discriminated against him or her on the basis of race or national origin." (emphasis added)).

Second, Diemert does not contend that he suffered any adverse consequences due to his failure to attend trainings designed for employees of any race. Diemert says that employees' performance evaluations were based in part on their participation in RSJI activities. But he does not argue that his evaluations suffered because he declined to attend trainings designed for white employees. On the contrary, when Diemert refused to participate in any RSJI trainings in 2021, the City undisputedly took no corrective action against him.

**3**

In his final supplemental brief, Diemert argues that the alleged facial classifications, and therefore the standing inquiry, are broader than the trainings and affinity groups. Diemert argues that the RSJI involved a pattern of racial classifications that caused him injury—i.e., that the City and the RSJI broadly classified employees based on race, that these classifications permeated the workplace, and that the injuries he allegedly suffered were attributable to these broader classifications.

An explicit racial classification exists when "a state actor explicitly treats an individual differently on the basis of race." *Mitchell v. Washington*, 818 F.3d 436, 444 (9th Cir. 2016). In *Students for Fair Admissions*, for example, the Supreme Court held that university admission policies that explicitly considered an applicant's race were express racial classifications. 600 U.S. at 229–30; *see, e.g.*, *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 306, 310 (2013) (holding that an express racial classification existed where the university considered race as one of various factors in its undergraduate admissions process); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 709–

10, 720 (2007) (holding that an express racial classification existed where Seattle school districts "adopted student assignment plans that rel[ied] upon race to determine which public schools certain children may attend"); *Johnson v. California*, 543 U.S. 499, 502, 509 (2005) (holding that the express racial classification existed where the California Department of Corrections had a "policy of racially segregating prisoners in double cells in reception centers for up to 60 days each time they enter[ed] a new correctional facility").

First, putting aside the trainings and affinity groups, Diemert has not identified anything in the RSJI that explicitly treats an individual differently on the basis of race. He points out that the RSJI was a race-conscious program, but evidence that the City maintained a race-conscious training program is not tantamount to evidence that the City treated employees differently or expressly classified employees based on race. Requiring all employees, regardless of race, to participate in a race-conscious training program does not classify, or discriminate against, employees based on race. *See Spengler v. Coop. Educ. Serv. Agency 7*, 180 F.4th 1015, 1017, 1019–20 (7th Cir. 2026) (rejecting equal protection and Title VII claims where the employer required all employees, regardless of race, to adopt an "equity mindset" and to confront their implicit racial biases and privileges); *Chislett*, 157 F.4th at 191 ("We do not suggest that the conduct of implicit bias trainings is per se racist."); *cf. Shaw v. Reno*, 509 U.S. 630, 642 (1993) ("This Court never has held that race-conscious state decisionmaking is impermissible in *all* circumstances.").

Diemert has also failed to present evidence attributing his asserted injuries to any express racial classification. Specifically, Diemert recounts that he was discouraged from

applying for a promotion, was pressured to give up a leadership position, and was subjected to racially offensive comments. He argues that these actions were attributable, indirectly, to the RSJI. Diemert, however, has not tied these alleged injuries to any express racial classification maintained by the City.

In sum, Diemert has not established standing for his equal protection claim. Even assuming arguendo that the RSJI contained express racial classifications with respect to affinity groups and some trainings, Diemert has not established a triable issue that he was personally injured by those classifications. Furthermore, although he alleges certain injuries, he has not shown that those injuries were attributable to any express racial classification. He points out that the RSJI was a race-conscious program, but the mere fact that a program is race-conscious does not establish that it expressly classified employees on account of race. We therefore affirm the grant of summary judgment to Defendants as to this claim. *See Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 926 (9th Cir. 2003) ("We may affirm a district court's judgment on any ground supported by the record.").

## VI

We **AFFIRM** the grant of summary judgment to Defendants on Diemert's constructive discharge, disparate treatment, and retaliation claims under Title VII and the WLAD, as well as Diemert's Equal Protection Clause claim under the Fourteenth Amendment. But questions of material fact exist as to whether the workplace incidents subjected Diemert to a hostile work environment. We therefore **REVERSE** the district court's order granting summary judgment in favor of Defendants for the hostile work

environment claim. We **REMAND** for further proceedings consistent with this opinion.

The parties will bear their own costs on appeal.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**